EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Ángel M. Rodríguez Otero<br><br>*Recurrido*<br><br>*v.*<br><br>Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros<br><br>*Recurridos* | | 2017 TSPR 2<br><br>197 DPR ____ |
| Comisionado Electoral del Partido Popular Democrático<br><br>*Recurrido*<br><br>*v.*<br><br>Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros<br><br>*Recurridos* | | |
| Juan Pablo Hernández<br><br>*Peticionario*<br><br>*v.*<br><br>Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros<br><br>*Recurridos* | | |
| Ramón Ruiz Nieves<br><br>*Recurrido*<br><br>*v.*<br><br>Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros<br><br>*Recurridos* | | |

| | | |
|---|---|---|
| Hon. Thomas Rivera Schatz, Presidente entrante del Senado de Puerto Rico Y Comisionada Electoral del Partido Nuevo Progresista, Norma Burgos Andújar<br><br>*Peticionarios en Certificación*<br><br>*v.*<br><br>Comisión Estatal de Elecciones por conducto de su Presidenta, Liza García Vélez y otros<br><br>*Recurridos* | | |

Número del Caso: CT-2016-19
                 CC-2016-20


Fecha: 4 de enero de 2016

Abogado de la parte Peticionaria:

     Lcda. José A. Hernández Mayoral

Abogados de la parte Peticionaria en Certificación:

     Lcdo. Eliezer Aldarondo Ortiz
     Lcda. Rosa Campos Silva
     Lcda. Sheila Torres Delgado
     Lcdo. Carlos Santiago Tavárez
     Lcdo. Hamed G. Santaella Carlo
     Lcdo. Eliezer A. Aldarondo López

Abogados de la parte Recurrida:

     Lcdo. Pedro E. Ortiz Álvarez
     Lcdo. José A. Velázquez Grau
     Lcdo. Luis R. Santini Gaudier
     Lcdo. William Vázquez Irizarry
     Lcdo. Luis Enrique Romero Nieves

Materia: Sentencia con Opiniones de Conformidad, Opiniones Concurrentes y Opiniones Disidentes en parte y Concurrentes en parte.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ángel M. Rodríguez Otero

*Recurrido*

*v.*

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

*Recurridos*

_____

Comisionado Electoral del Partido Popular Democrático

*Recurrido*

*v.*

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

*Recurridos*

_____

Juan Pablo Hernández

*Peticionario*

*v.*

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

*Recurridos*

**Núm.** **CT-2016-19**
**CT-2016-20**

*Certificación*

Ramón Ruiz Nieves

*Recurrido*

*v.*

Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

*Recurridos*

_____

Hon. Thomas Rivera Schatz, Presidente entrante del Senado de Puerto Rico Y Comisionada Electoral del Partido Nuevo Progresista, Norma Burgos Andújar

*Peticionarios en Certificación*

*v.*

Comisión Estatal de Elecciones por conducto de su Presidenta, Liza García Vélez y otros

*Recurridos*

**Sentencia**

En San Juan, Puerto Rico, a 4 de enero de 2017.

Los recursos ante nuestra consideración plantean la controversia de si un candidato independiente al Senado –Dr. José A. Vargas Vidot– y un candidato de un partido que no pudo retener su franquicia electoral –Lcdo. Juan Dalmau Ramírez–, deben ser considerados para calcular el límite de nueve (9) senadores de partidos de minoría a la

luz de la Sección 7 del Artículo III de nuestra Constitución, *infra*. Tres (3) candidatos no electos del Partido Popular Democrático sostienen que la cláusula constitucional comúnmente denominada como "Ley de Minoría" fue creada para favorecer a los partidos políticos y que por tal razón, el candidato independiente así como el candidato electo por un partido no inscrito, deben ser excluidos del cómputo de nueve (9) senadores por adición.

Procede confirmar la Resolución emitida por la Comisión Estatal de Elecciones.

I.

En los comicios celebrados el 8 de noviembre de 2016 el Partido Nuevo Progresista ("PNP") obtuvo veintiún (21) de los veintisiete (27) escaños que componen el Senado de Puerto Rico. En términos porcentuales esto representa un 77.78% de los escaños senatoriales. Los seis (6) escaños restantes de minorías fueron obtenidos por candidatos del Partido Popular Democrático ("PPD"), el Partido Independentista Puertorriqueño ("PIP") y por un candidato independiente quien no representa ninguna insignia o franquicia electoral. En específico, el PPD logró elegir a cuatro (4) de sus candidatos,[1] mientras que el Lcdo. Juan Dalmau Ramírez ("Dalmau Ramírez") resultó electo bajo la

---

[1] Los candidatos del PPD que resultaron electos por el voto directo fueron los senadores por acumulación Eduardo Bathia Gautier, Rossana López León y Aníbal José Torres. Asimismo, el senador José Luis Dalmau Santiago resultó electo por el Distrito de Humacao.

insignia del PIP. Asimismo, Dr. José A. Vargas Vidot ("Vargas Vidot") fue electo como candidato independiente.

En cuanto al puesto de gobernador, los resultados electorales luego del escrutinio general fueron los siguientes:[2]

| Candidato y Partido | Votos | Porciento |
|---|---|---|
| Ricardo Rosselló, PNP | 660,510 | 41.80% |
| David Bernier, PPD | 614,190 | 38.87% |
| Alexandra Lúgaro, Independiente | 175,831 | 11.13% |
| Manuel Cidre, Independiente | 90,494 | 5.73% |
| María de Lourdes Santiago, PIP | 33,729 | 2.13% |
| Rafael Bernabe, PPT[3] | 5,430 | 0.34% |

En vista de que el PNP logró obtener más de dos terceras partes de los escaños senatoriales pero obtuvo *menos* de dos terceras partes para el cargo de gobernador, no existe controversia de que se activó el inciso (a) de la cláusula constitucional conocida comúnmente como "Ley de Minorías" que provee para la adición de escaños "en número suficiente hasta que la totalidad de los miembros del *partido o partidos de minoría* alcance el número de nueve en el Senado…". (Énfasis suplido). Const. PR, Art. III, Sec. 7, 1 LPRA Tomo 1. La Comisión Estatal de Elecciones ("CEE") aplicó la referida disposición constitucional y certificó la elección de tres (3)

---

[2] Resultados del escrutinio general obtenidos en: http://elecciones2016.ceepur.org/Escrutinio_General_77/index.html#es/default/GOBERNADOR_Resumen.xml (accedido el 19 de diciembre de 2016).

[3] Partido del Pueblo Trabajador.

candidatos adicionales del PPD, a saber: José Nadal Power, Miguel Pereira Castillo y Cirilo Tirado Rivera, todos senadores por acumulación. En cuanto a la adición de estos escaños no existe controversia. A raíz de estas certificaciones adicionales, el Senado estaría compuesto por un total de treinta (30) escaños divididos de la manera siguiente: veintiún (21) senadores del PNP, siete (7) del PPD, uno (1) del PIP y el doctor Vargas Vidot.

No obstante la adición de tres (3) escaños a favor del PPD, otros tres (3) candidatos de ese partido solicitaron a la CEE ser electos en virtud de la Sección 7 del Artículo III de la Constitución de Puerto Rico, *supra*. Nos referimos al candidato del distrito senatorial de Guayama, Juan Pablo Hernández ("Hernández"); Ángel M. Rodríguez Otero ("Rodríguez Otero"), también candidato del distrito senatorial de Guayama; y al candidato por el distrito senatorial de Ponce, senador Ramón Ruiz Nieves ("Ruiz Nieves").

Ante la CEE, el señor Hernández planteó que el mecanismo de adición de escaños opera a favor de los "partidos de minoría", ello en virtud de una interpretación literal del lenguaje de la Sección 7 del Art. III de la Constitución de Puerto Rico, *supra*. En consecuencia, sostuvo que no era posible admitir a un candidato independiente -como lo es el doctor Vargas Vidot- dentro de los nueve (9) escaños por añadidura que dispone la referida cláusula constitucional. A base de esta teoría, adujo que fueron cinco (5) los senadores electos por

"partidos de minoría" a considerar para efectos de añadir escaños, a saber: cuatro (4) senadores del PPD elegidos por el voto directo y el licenciado Dalmau Ramírez del PIP. El señor Hernández sostuvo que bajo este escenario el PPD debe obtener un total cuatro (4) escaños adicionales en el Senado. Esto es, los tres (3) senadores del PPD electos bajo la cláusula constitucional de adición de minoría sobre los cuales no existe controversia y el cuarto escaño que le correspondería a él por estar en segundo lugar entre los candidatos de distrito no electos del PPD.[4]

Por su parte, el señor Rodríguez Otero realizó un planteamiento similar al del señor Hernández respecto al candidato independiente doctor Vargas Vidot. No obstante, adujo que también procede excluir del cálculo de nueve (9) senadores por adición al candidato electo por el PIP, por lo que sostuvo que se deben añadir un total de cinco (5) escaños senatoriales a favor del PPD. Argumentó que los nueve (9) escaños de minoría deben responder a "partidos de minoría" debidamente inscritos y que el PIP no obtuvo los resultados electorales necesarios para quedar inscrito.

El senador Ramón Ruiz Nieves, candidato a senador por el distrito de Ponce, hizo los mismos planteamientos esbozados por

---

[4] Nótese que luego de la aplicación de la Sección 7 del Artículo III de la Constitución de Puerto Rico, *supra*, todos los candidatos a senadores por acumulación del PPD fueron electos; tres (3) mediante el voto directo y otros tres (3) mediante la el mecanismo constitucional.

los señores Hernández y Rodríguez Otero respecto al candidato independiente y al candidato del PIP. Además, solicitó que se excluyeran las papeletas en blanco, nulas y las de nominación directa de personajes ficticios para efectos del cómputo de la proporción de votos obtenidos. En síntesis, reclamó que procedía añadir cinco (5) senadores cuyos escaños serían ocupados por aquellos tres (3) candidatos por acumulación del PPD sobre los cuales no existe controversia y aquellos dos (2) candidatos por distrito no electos con la más alta proporción de votos, luego de excluir las papeletas en blanco y las nominaciones directas de personajes ficticias.

La CEE solicitó memorandos de Derecho a los comisionados electorales y con el beneficio de estos, celebró una vista en la que las partes tuvieron la oportunidad de exponer y argumentar sus planteamientos. Sin embargo, los comisionados electorales no lograron concertar un criterio unánime, por lo que la controversia quedó sometida ante la Presidenta de la CEE, Lcda. Liza M. García Vélez ("Presidenta de la CEE").

El 30 de noviembre de 2016, la Presidenta de la CEE emitió la Resolución Núm. CEE-RS-16-90, *In re: Cláusula Constitucional sobre Escaños por Adición*, mediante la cual denegó la solicitud que hicieran los tres (3) candidatos Hernández, Rodríguez Otero y Ruiz Nieves. Luego de examinar detenidamente el historial y los debates de la Asamblea Constituyente respecto a la Sec. 7 del Artículo III de nuestra

Constitución, *supra*, determinó que la intención original de la referida cláusula requiere concluir que la minoría de nueve (9) senadores requerida constitucionalmente puede incluir un candidato que represente un núcleo de opinión distinto al de la mayoría, a pesar de que no esté afiliado a partido político alguno.

Asimismo, reconoció que de adoptar la interpretación propuesta por los peticionarios ante la CEE a los efectos de excluir al doctor Vargas Vidot y el licenciado Dalmau Ramírez, se añadirían cinco (5) escaños de minoría y el partido de mayoría – en este caso el PNP– perdería el control de las dos terceras partes del Senado que obtuvo mediante voto directo. Sin embargo, la Presidenta de la CEE concluyó que la intención de la referida cláusula constitucional no fue la de impedir que un partido ganara el favor electoral con un amplio margen, sino que consistió en preservar el control legislativo del partido de mayoría según elegido por el voto directo y a la misma vez otorgar un límite de una tercera parte de los escaños del Senado para que las minorías tuviera representación legislativa y, a su vez, pudieran ejercer su función fiscalizadora de forma efectiva.

Inconformes, el 12 de diciembre de 2016 los candidatos Hernández, Rodríguez Otero, Ruiz Nieves y el Comisionado Electoral del PPD recurrieron en revisión al Tribunal de Primera Instancia ("TPI") en casos separados.[5] No obstante, el

---

[5] Los casos presentados ante el TPI son: *Juan Pablo Hernández v. Liza García Vélez, et al.*, SJ2016CV00338; *Ángel Rodríguez Otero v. CEE*, SJ2016CV00334;

15 de diciembre de 2016 el señor Hernández, el Presidente Electo del Senado Hon. Thomas Rivera Schatz[6] y la Sra. Norma Burgos Andújar como Comisionada Electoral del PNP, recurrieron ante este Tribunal y solicitaron la certificación de todos los casos pendientes ante el TPI. Por entender que las controversias planteadas son de alto interés público, noveles y eminentemente de Derecho, una mayoría de ocho (8) jueces de este Tribunal entendió prudente expedir los recursos de certificación ese mismo día. Además, paralizamos los procedimientos ante el TPI, ordenamos a las partes certificar el diligenciamiento de los emplazamientos y a presentar sus respectivos alegatos el lunes, 19 de diciembre de 2016 a las 9:00 a.m.

En esencia, los recursos ante nuestra consideración plantean la controversia central de si el candidato independiente doctor Vargas Vidot y el candidato de un partido que no pudo retener su franquicia electoral en los comicios generales –Dalmau Ramírez–, deben ser considerados para calcular el límite de nueve (9)

senadores de partidos de minoría a la luz de la Sección 7 del Artículo III de nuestra Constitución, *supra*.

---

*Comisionado Electoral del PPD v. CEE*, SJ2016CV00337; y *Ramón Ruiz Nieves v. CEE*, SJ2016CV00340.

[6] El senador Thomas Rivera Schatz presentó ante el TPI una solicitud para que se autorizara su intervención como Presidente Electo del Senado, la cual fue declarada *con lugar*.

Luego de examinar detenidamente los alegatos de las partes, procede confirmar la Resolución emitida por la Comisión Estatal de Elecciones.

Notifíquese inmediatamente por correo electrónico y posteriormente por la vía ordinaria.

Así lo pronunció y manda el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Kolthoff Caraballo emitió una Opinión de Conformidad. El Juez Asociado señor Rivera García emitió una Opinión de Conformidad. El Juez Asociado señor Estrella Martínez emitió una Opinión de Conformidad. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión Concurrente. El Juez Asociado señor Martínez Torres emitió una Opinión Concurrente a la cual se unió el Juez Asociado señor Feliberti Cintrón. La Jueza Presidenta Oronoz Rodríguez emitió una Opinión Disidente en parte y Concurrente en parte. El Juez Asociado señor Colón Pérez emitió una Opinión Disidente en parte y Concurrente en parte. El Juez Asociado señor Feliberti Cintrón hace constar la siguiente expresión:

> "El Juez Asociado señor Feliberti Cintrón concurre con la Sentencia emitida por este Tribunal, pero no está de acuerdo con que este asunto haya sido resuelto por medio de una Sentencia y no mediante una Opinión".

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Ángel M. Rodríguez Otero<br><br>    Recurrido<br><br>        v.<br><br>Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros<br><br>    Recurridos<br>_____<br>Comisionado Electoral del Partido Popular Democrático<br><br>    Recurrido<br><br>        v.<br><br>Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros<br><br>    Recurridos<br>_____<br>Juan Pablo Hernández<br><br>    Peticionario<br><br>        v.<br><br>Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros<br><br>    Recurridos | CT-2016-19<br><br><br>Cons.<br><br>CC-2016-20 | Certificación |

Ramón Ruiz Nieves

　　Recurrido

　　　　v.

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

　　Recurridos

_____

Comisionada Electoral del Partido Nuevo Progresista, Norma Burgos Andújar y Hon. Thomas Rivera Schatz, Presidente entrante del Senado de Puerto Rico

　　Peticionarios en Certificación

　　　　v.

Comisión Estatal de Elecciones por conducto de su Presidenta, Liza García Vélez y otros

　　Recurridos

Opinión de Conformidad emitida por el Juez Asociado señor Kolthoff Caraballo

> "The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."[7]

San Juan, Puerto Rico, a 4 de enero de 2017.

De los derechos fundamentales que reconoce nuestra Constitución, el que más trascendencia tiene en nuestra

---

[7] A. Scalia y B. A. Garner, Reading Law: The interpretation of Legal Texts, St. Paul, MN: Thomson/West, 2012, pág. 180.

vida como colectivo social es el derecho al voto. Nuestra razón de ser como sociedad depende, en primer lugar, de que el Pueblo soberano pueda elegir el rumbo a seguir como colectivo, y ese rumbo se legitima a través de la expresión democrática del sufragio. Es decir, en este contexto, lo primordial es que el Pueblo haya tenido la oportunidad de participar en la elección de aquellos que establecerán la política pública que finalmente regirá nuestro destino como colectivo, independientemente del resultado. Así, podrá el criterio de un ciudadano palidecer y ser derrotado ante la brillantez de otro o ahogarse ante la realidad del populismo demagógico, pero lo importante es que éste siempre tenga derecho a decir y expresar cuál es su voluntad. Y una vez esa sagrada voluntad haya sido expresada democráticamente, corresponde finalmente a este Tribunal cuidar que la misma sea acatada. Precisamente, este caso se trata de eso: de cómo los delegados de la Asamblea Constituyente intentaron asegurar que la voluntad del Pueblo, según expresada en las urnas, fuera preservada. La controversia se reduce específicamente a lo siguiente: ¿Incluye la expresión "partidos de minoría" contenida en el Art. III, Sec. 7 de la Constitución del Estado Libre Asociado de Puerto Rico, *infra*, un Senador electo de manera independiente y un Senador cuyo partido no quedó inscrito?

Ahora bien, de entrada y adelantando conclusiones es menester señalar que este caso no se trata de reconocer la representación de otros núcleos de opinión que no sean

partidos políticos o de evitar un rechazo a los candidatos independientes o de garantizar una representación justa de los grupos minoritarios, entendiéndose por estos últimos candidatos sin partidos políticos o independientes. De eso no es que se trata este caso. No existe duda que tanto el senador electo José Vargas Vidot, como el senador electo Juan Dalmau Ramírez tienen sus escaños asegurados, y con ello la representación de los cientos de miles de ciudadanos -de partidos políticos y fuera de ellos- que le dieron su voto. Tampoco se trata de si un partido de minoría, en este caso el Partido Popular Democrático (PPD), obtiene o no un escaño más en el Senado, sin pensar en las consecuencias futuras de la interpretación dada al texto aludido. En otras palabras, lo que constituye la médula de este caso es no si las minorías -tanto las pertenecientes a partidos minoritarios o a candidaturas independientes- obtienen más o menos escaños representativos mediante esta fórmula innovadora que es la "Ley de Minorías", sino si al hacerlo, diluyen de tal forma la representación mayoritaria que la exponen a perder el control absoluto obtenido en la elección general. Los hechos son los siguientes.

I

El 8 de noviembre de 2016 se celebraron en la Isla las elecciones generales, en las cuales prevaleció el Partido Nuevo Progresista (PNP), tanto a nivel de la gobernación y comisaría residente, como en ambas cámaras legislativas. Esto tuvo como consecuencia que se activara

la garantía constitucional incluida en el Art. III, Sec. 7 de la Const. ELA, LPRA, Tomo 1, también conocida como la "Ley de Minorías". Específicamente, en el Senado de Puerto Rico el PNP obtuvo 21 de los 27 escaños que conforman dicho cuerpo. Por su parte, el PPD obtuvo 4 escaños, mientras que el Partido Independentista Puertorriqueño (PIP) solo obtuvo uno. Además, también resultó electo para dicha cámara el candidato independiente, el Sr. José Vargas Vidot. De acuerdo al escrutinio general realizado por la Comisión Estatal de Elecciones (CEE), la distribución porcentual de estos resultados fue la siguiente:

| | | |
|---|---|---|
| PNP | 21 | 77.78% |
| PPD | 4 | 14.81% |
| PIP | 1 | 3.70% |
| José Vargas Vidot | 1 | 3.70% |

En cuanto a los resultados para el cargo de Gobernador, el escrutinio reveló lo siguiente:

| | | | |
|---|---|---|---|
| Ricardo Rosselló | PNP | 659,750 | 41.79% |
| David Bernier | PPD | 613,701 | 38.87% |
| Alexandra Lúgaro | Independiente | 175,802 | 11.13% |
| Manuel Cidre | Independiente | 90,472 | 5.73% |
| María de Lourdes Santiago | PIP | 33,706 | 2.13% |
| Rafael Bernabe | PPT | 5,427 | 0.34% |

Ante tal escenario, el PNP alcanzó una mayoría de más de dos terceras partes o un 77.78% en el Senado, por lo

cual resultó necesario aplicar la "Ley de Minorías". Específicamente, se configuró el supuesto contemplado en el inciso (a) de la Sec. 7 del Art. III de la Constitución, *supra*. Ello pues, para el cargo de Gobernador, el Dr. Ricardo Rosselló, candidato por el PNP, recibió el 41.73% de los votos. Es decir, recibió menos de dos terceras partes de los votos.

Consecuentemente, el mandato constitucional requirió aumentar el número de senadores declarando electos a aquellos candidatos del "partido o partidos de minoría" hasta alcanzar 9 escaños. Para ello, se escogerían en primer lugar a los candidatos por acumulación en el orden de votos obtenidos y, de no ser suficientes, entonces se seleccionarían a los candidatos de distrito con la más alta proporción en el número de votos depositados en relación a candidatos del mismo partido en otros distritos.

Conforme a los resultados de la elección antes señalados, hubo consenso en que correspondía certificar a los 3 candidatos no electos a senadores por acumulación del PPD en el orden de votos obtenidos: José Nadal Power, Miguel Pereira Castillo y Cirilo Tirado Rivera. No obstante, la controversia surgió sobre si es correcto o no incluir a los senadores electos que no forman parte del PPD, ello para efectos del cómputo de los 9 senadores que representarán a los "partidos de minoría". Estos son: el candidato del PIP, Juan Dalmau Ramírez, y el candidato independiente, José Vargas Vidot.

A esos efectos, la CEE recibió 3 peticiones de candidatos a senadores por distrito. La primera petición la presentó el Sr. Juan Pablo Hernández, candidato a Senador por el distrito senatorial de Guayama y quien no resultó electo. Específicamente, el señor Hernández planteó que tanto la Constitución como el historial del proceso constituyente son claros en que la Sec. 7 opera en función de los "partidos de minoría". Por lo tanto, ante un lenguaje tan claro, no es posible considerar a un candidato independiente dentro de la totalidad de 9 que dispone el inciso (a) de dicha sección. A su entender, el número de senadores de "partidos de minoría" a considerar para realizar el cómputo correspondiente es la suma de los 4 senadores del PPD y el senador del PIP. Así, al haber sido electos solo 5 senadores de "partidos de minoría", procede añadir 4 escaños adicionales dentro de los candidatos no electos del PPD. Además de los 3 senadores por acumulación mencionados anteriormente que no resultaron electos, el señor Hernández sostuvo que resulta necesario acudir a la lista de senadores por distrito del PPD, en la cual éste es quien aparece con la más alta proporción de votos con un 23.28%. Por ende, solicitó su certificación como Senador.

Por otro lado, el Sr. Ángel M. Rodríguez Otero fue candidato a Senador por el distrito senatorial de Guayama y tampoco resultó electo en los pasados comicios. Su proporción de votos correspondió a un 22.89%. En su petición ante la CEE, el señor Rodríguez Otero hizo un

planteamiento similar al del señor Hernández sobre el candidato independiente señor Vargas Vidot. Sin embargo, éste también indicó que procede excluir del cómputo de los 9 senadores de los partidos de minoría al senador Dalmau Ramírez. Ello pues, los 9 escaños deben responder a "partidos de minoría", lo cual debe interpretarse como partidos debidamente inscritos. Dado a que el PIP no alcanzó los resultados necesarios para quedar inscrito como partido, el señor Rodríguez Otero entiende que sólo pueden ser considerados para el cómputo de 9 los 4 senadores electos por el PPD. Por consiguiente, habría que añadir 5 senadores de los que no fueron electos, correspondiéndole el quinto escaño al señor Rodríguez Otero por lograr el segundo lugar con la más alta proporción de votos obtenidos entre los candidatos de distrito del PPD que no resultaron electos.

Finalmente, el Sr. Ramón Ruiz Nieves también solicitó a la CEE su certificación como Senador. El señor Ruiz Nieves fue candidato a Senador por el distrito senatorial de Ponce sin resultar electo. Éste obtuvo una proporción de votos de 22.60%. El señor Ruiz Nieves presentó planteamientos similares a los esbozados por el señor Rodríguez Otero en cuanto al candidato independiente señor Vargas Vidot y el candidato del PIP, señor Dalmau Ramírez. No obstante, éste solicitó a la CEE que, para efectos del cómputo de la proporción más alta de votos obtenidos, se excluyan las papeletas en blanco, las nulas y las de nominación directa de personajes ficticios, conforme a la

decisión del Tribunal Supremo de Puerto Rico en Suárez Cáceres v. Com. Estatal Elecciones, *infra*. A tales fines, el señor Ruiz Nieves sostuvo que la proporción de votos recibida por él en comparación a la recibida por los candidatos del PPD en el Distrito de Guayama, el señor Hernández y el señor Rodríguez Otero, es tan cerrada que no debe producirse una certificación sin haber concluido el escrutinio, según las exclusiones de votos antes expresadas. Consecuentemente, a su entender, corresponde añadir 5 senadores de "partidos de minoría": los 3 senadores por acumulación mencionados y los 2 senadores por distrito con las más altas proporciones de votos entre los señores Hernández, Rodríguez Otero y él.

Así las cosas, el 22 de noviembre de 2016 la CEE celebró una vista en la cual los 3 peticionarios presentaron sus argumentos. Posteriormente, el pleno de la CEE se constituyó para deliberar sobre los planteamientos ante su consideración. El Comisionado del PPD, el Lcdo. Guillermo San Antonio Acha, se suscribió a los señalamientos esbozados por los 3 candidatos del PPD que no fueron electos y que presentaron las referidas peticiones ante la CEE.

Por su parte, el entonces Comisionado del PNP, el Lcdo. Aníbal Vega Borges, sostuvo que al PPD sólo le correspondían 3 escaños adicionales para los candidatos Nadal Power, Pereira Castillo y Tirado Rivera. En cuanto al concepto de "partidos de minoría", indicó que el mismo no puede interpretarse literalmente sino liberalmente.

Así, sostuvo que los senadores electos Vargas Vidot y Dalmau Ramírez entraron por voto directo al Senado, lo cual cumple con lo dispuesto en el Art. III, Sec. 7 de la Constitución, *supra*. Por lo tanto, los peticionarios no tendrían derecho a ocupar escaños por la "Ley de Minorías".

Por otro lado, el Comisionado del PIP, el Sr. Roberto Aponte Berríos, se suscribió al memorando presentado por su partido. Por último, el Comisionado del Partido del Pueblo Trabajador (PPT), el Dr. José Córdova Iturregui, expresó que se debía considerar únicamente a la representación de los "partidos de minoría" y no a las minorías en general. A su vez, diferenció la representación del senador electo Vargas Vidot, quien no aspiró bajo ninguna insignia de partido, y la representación del señor Dalmau Ramírez, quien fue electo bajo la insignia del PIP. Sobre éste último explicó que, a pesar de que el PIP perdió su franquicia electoral, éste es un partido de minoría representado en la Legislatura y, por ende, debe ser contado al realizar el cómputo de los 9 senadores de la minoría. Por lo tanto, considera que al PPD le corresponden 3 senadores por acumulación y un senador de distrito adicional.

Debido a que la determinación de los comisionados electorales no fue unánime, la controversia quedó sometida para la consideración de la Presidenta de la CEE, la Lcda. Liza García Vélez. Luego de evaluar los planteamientos esbozados, el 30 de noviembre de 2016 la

Presidenta de la CEE emitió su determinación. En síntesis, resolvió que la solución más razonable para preservar la mayoría de más de dos terceras partes, respetar el mandato de los electores y garantizar una representación de opiniones de minorías que fiscalicen a la mayoría del PNP es reconociendo a los candidatos independientes como parte de la representación de minorías para efectos del cómputo de los 9 senadores. Además, en cuanto al planteamiento sobre el Senador electo por el PIP, señor Dalmau Ramírez, indicó que, aun considerándolo como un Senador que no representa a un partido de minoría, de todos modos éste representaría a los núcleos de opinión como ocurre en el caso de los candidatos independientes. No obstante, entendió que para efectos de aplicar la disposición constitucional de la "Ley de Minorías", dicho candidato debía considerarse como uno electo por un partido de minoría. Ello pues, como candidato se sometió a la voluntad del electorado bajo la insignia del PIP, cobijado por la oferta política de esa colectividad. Consecuentemente, la Presidenta de la CEE denegó las solicitudes de los 3 peticionarios.

Inconformes, el Comisionado Electoral del PPD, el señor Hernández, el señor Rodríguez Otero y el señor Ruiz Nieves presentaron sus respectivos recursos de revisión ante el Tribunal de Primera Instancia. A petición del Comisionado Electoral del PPD, el foro de instancia consolidó los 4 casos y señaló una vista para el 16 de diciembre de 2016.

Así las cosas, el 15 de diciembre de 2016 el señor Hernández presentó ante este Tribunal una *Solicitud de certificación bajo la Regla 52.2 de Procedimiento Civil*. Además de reiterar sus argumentos anteriores, sostuvo que al tratarse la controversia en este caso de un aspecto constitucional revestido de un alto interés público y que no ha estado sujeto a interpretación por esta Curia, era meritoria la expedición del recurso de certificación.

Por su parte, el Hon. Thomas Rivera Schatz, Presidente entrante del Senado y la Sra. Norma Burgos Andújar, actual Comisionada Electoral del PNP, presentaron una *Moción urgente para que se paralicen los procedimientos en el tribunal [de] instancia al amparo de la Regla 28(A) del Reglamento del Tribunal Supremo de Puerto Rico* y una *Certificación*. En síntesis, estos reafirmaron los planteamientos esbozados ante la CEE e insistieron en la importancia de expedir el recurso de certificación presentado por tratarse de una controversia revestida del más alto interés público al plantear un asunto de naturaleza constitucional novel sobre el alcance e interpretación de la "Ley de Minorías".

Ese mismo día, este Tribunal emitió una Resolución, en la cual declaramos "con lugar" las solicitudes de certificación y ordenamos la consolidación de ambos casos por tratarse de la misma controversia.

II

## A. El texto y propósito de la llamada "Ley de Minorías"

Como señalé, la controversia a dilucidar en este caso es la siguiente: ¿Incluye la expresión "partidos de minoría" contenida en el Art. III, Sec. 7 de la Const. ELA, *supra*, un Senador electo de manera independiente y un Senador cuyo partido no quedó inscrito? Nos encontramos con un texto que de su faz parece expresar claramente la intención de sus redactores: asignar como únicos beneficiarios de la referida Sec. 7 del Art. III de nuestra Constitución a aquel o aquellos candidatos pertenecientes a un partido o partidos de minoría. Sin embargo, para poder resolver correctamente la controversia que nos ocupa es imprescindible discernir el significado de la expresión "partidos de minoría" a la luz de su contexto. Esto, pues, el significado de un texto que de su faz es claro puede ser cuestionado si el mismo parece chocar con lo que surge del contexto fue un elemento cardinal en la redacción del mismo.

El propósito del Art. III, Sec. 7, de la Const. ELA, *supra*, es garantizar a las minorías "cierto mínimum de representación en proporción a lo que las minorías obtengan"; esto, sin que se entendiera que los delegados constituyentes avalaran en toda su amplitud el principio de representación proporcional.[8] La referida Sec. 7 del Art. III nace como consecuencia del gran desbalance en la

---

[8] 4 Diario de Sesiones de la Convención Constituyente 2596 (1961).

representación de los partidos políticos en las cámaras legislativas que produjeron los comicios de 1948. Esto debido a la escasa representación de los partidos minoritarios en la Asamblea Legislativa de Puerto Rico. Ante dicho escenario, el liderato del País consideró necesario garantizar una representación sustancial a los grupos minoritarios en la Legislatura. Ello, aunque los candidatos de la minoría no hubiesen obtenido los votos para resultar electos.[9]

En síntesis, esa preocupación fue la que impulsó a los delegados de la Asamblea Constituyente a introducir un mecanismo en nuestra Constitución que garantizara una representación de los partidos de minoría que fuera proporcionalmente más equivalente a la realidad del voto popular. Como veremos, un análisis de esta Sec. 7 del Art. III confirma con claridad su propósito, según surge del Diario de Sesiones de la Asamblea Constituyente. El texto de la referida sección, en lo pertinente, señala lo siguiente:

> Cuando en una elección general resultaren electos más de dos terceras partes de los miembros de cualquiera de las cámaras por un solo partido o bajo una sola candidatura, según ambos términos se definan por ley, se aumentará el número de sus miembros en los siguientes casos:
>
> (a) **Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hubiese obtenido menos de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, se aumentará el número de miembros del Senado o de la Cámara de Representantes o de ambos cuerpos,**

---

[9] Fuster v. Busó, 102 DPR 327, 330 (1974).

**según fuere el caso, declarándose electos candidatos del partido o partidos de minoría en número suficiente hasta que la totalidad de los miembros del partido o partidos de minoría alcance el número de nueve en el Senado y de diecisiete en la Cámara de Representantes. Cuando hubiere más de un partido de minoría, la elección adicional de candidatos se hará en la proporción que guarde el número de votos emitidos para el cargo de Gobernador por cada uno de dichos partidos con el voto que para el cargo de Gobernador depositaron en total esos partidos de minoría.**

**Cuando uno o más partidos de minoría hubiese obtenido una representación en proporción igual o mayor a la proporción de votos alcanzada por su candidato a Gobernador, no participará en la elección adicional de candidatos hasta tanto se hubiese completado la representación que le correspondiese bajo estas disposiciones, a cada uno de los otros partidos de minoría.**

(b) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hubiese obtenido más de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, y uno o más partidos de minoría no eligieron el número de miembros que les correspondía en el Senado o en la Cámara de Representantes o en ambos cuerpos, según fuere el caso, en proporción a los votos depositados por cada uno de ellos para el cargo de Gobernador, se declararán electos adicionalmente sus candidatos hasta completar dicha proporción en lo que fuere posible, pero los Senadores de todos los partidos de minoría no serán nunca, bajo esta disposición, más de nueve ni los Representantes más de diecisiete. (Énfasis suplido).[10]

En primer lugar, surge del primer párrafo de esta sección que su aplicación depende de la ocurrencia de un evento: que "en una elección general resultaren electos **más de dos terceras partes** de los miembros de cualquiera de las cámaras por un solo partido o bajo una sola

---

[10] Art. III, Sec. 7, Const. ELA, LPRA, Tomo 1.

candidatura".[11] De manera que si un partido político no logra alcanzar **más** de las dos terceras partes de los escaños -por ejemplo, si obtuviera exactamente dos terceras partes- entonces esta sección no aplica. Esto necesariamente implica que de salida los delegados constituyentes no pretendieron de ninguna manera que esta sección tuviera el propósito de violentar la voluntad del Pueblo, expresada mediante el voto popular, de conceder a un partido las dos terceras partes de los cuerpos legislativos, con las implicaciones constitucionales que presupone tal poder.

En segundo lugar, la Sec. 7 del Art. III pasa a considerar dos circunstancias distintas. El inciso (a) considera la instancia en que un solo partido elige más de dos terceras partes de los miembros de cualquiera de las cámaras legislativas, **pero obtiene menos** de dos terceras partes del total de votos emitidos para el cargo de Gobernador. O sea, cuando la obtención de más de dos terceras partes de los escaños en cualquiera de las cámaras no es equivalente o representativo de lo que fue el voto popular por ese mismo partido. En esa instancia se añadirían -en el caso del Senado- lo suficiente para que la facción o facciones que hayan quedado en minoría obtengan hasta 9 escaños. Nótese que 9 escaños en el caso del Senado constituyen exactamente una tercera parte de los 27 escaños que la propia Constitución establece será

---

[11] Art. III, Sec. 7, Const. ELA, *supra*.

el número total de escaños en ese cuerpo legislativo, siendo 18 escaños las restantes dos terceras partes.[12] Sin embargo, ya hemos concluido que la activación de esta sección requiere al menos 19 escaños -más de dos terceras partes- en el caso del Senado por uno solo de los partidos. Si un solo partido -el que vendría a ser de mayoría- obtiene al menos 19 escaños, y esta sección no permite que el número obtenido por la otra u otras facciones sea mayor de 9, entonces es evidente que el propio texto de la sección de ninguna manera permite que el partido que obtuvo más de dos terceras partes pierda el control absoluto del Cuerpo.

Por otra parte, el inciso (b) de la Sec. 7, Art. III establece, en síntesis, que si el partido que obtuvo más de dos terceras partes de los escaños de cualquiera o ambas cámaras hubiese obtenido, a su vez, más de dos terceras partes del total de votos emitidos para el cargo de Gobernador, y el por ciento de escaños de la otra u otras facciones no correspondiera con el número de votos depositados para cada una de ellas para el cargo de Gobernador, "se declarará electos adicionalmente sus candidatos [el de estas facciones en minoría] hasta completar dicha proporción en lo que fuera posible", pero nunca podrá ser más de 9 escaños en el caso del Senado o 17 en el caso de la Cámara de Representantes. Nótese, entonces, que los delegados de la Asamblea Constituyente,

---

[12] Art. III, Sec. 2, Const. ELA, *supra*.

en un claro respeto por lo que es la expresión democrática del Pueblo, determinaron que en el caso en que un partido obtuviera más de dos terceras partes -tanto de escaños en alguna o ambas cámaras, así como del voto popular- la facción o facciones minoritarias solo tendrían aquella cantidad de escaños que reflejara la proporción real de votos obtenidos en el voto popular para la candidatura a la gobernación de dicho partido.

Como es claro del análisis de ambos incisos de esta Sec. 7, los delegados de la Asamblea Constituyente buscaron que la representación en las cámaras legislativas fuera proporcionalmente más equivalente a la realidad del voto popular, **pero sin que esto significara que de alguna manera el partido que obtuvo el poder absoluto del cuerpo mediante la adjudicación de más de dos terceras partes de los escaños pudiera perderlo.**

El análisis anterior se confirma por las expresiones del Presidente de la Comisión de la Rama Legislativa y autor de la sección en cuestión, el delegado Luis Negrón López, quien señaló lo siguiente:

> este plan lo que se propone meramente es dar un poco de protección mayor a situaciones anómalas que pueden surgir, cuando haya una distribución matemáticamente inequitativa de los votos, porque resulte así en las urnas, cosa que es inevitable. Bajo el segundo plan, bajo la segunda parte, lo que este plan se propone es que todavía, cuando la situación no sea la de 1948, sino cuando la situación sea más difícil todavía, cuando sea una situación verdaderamente precaria para las minorías electorales, [cuando] su fuerza electoral no llegue al treinta y tres por ciento de los votos, este plan le garantiza una representación igual a la que obtuvieron en las

urnas, a los partidos que no la hayan obtenido, dentro de la tercera parte del número original de miembros de una cámara.

Significa esto que si los partidos de minoría, en conjunto, obtienen menos del treinta y tres y un tercio [por ciento] de los votos que se depositan en una elección, y obtienen menos del treinta y tres y un tercio [por ciento] de los miembros de una cámara, y ocurre la situación anómala de que alguno de esos partidos, habiendo obtenido determinada proporción en el electorado, no haya obtenido una proporción igual en los votos, hasta donde queda dentro de la tercera parte del número original de miembros, se aumenta la representación de esos partidos minoritarios.[13]

Así también surge de la expresión del delegado Antonio Reyes Delgado al señalar que "[n]osotros no queremos que un partido que ha obtenido las dos terceras partes del voto total, venga a formar la Asamblea Legislativa con menos votos de los que en realidad el voto electoral le produjo para venir al hemiciclo de la Cámara y del Senado en su día".[14]

Por último, en Suárez Cáceres v. Com. Estatal Elecciones, 176 DPR 31, 75-76 (2009), señalamos que 2 elementos importantes considerados por los constituyentes al adoptar la "Ley de Minorías" fueron:

en primer lugar, no restarle efectividad a los esfuerzos que tuviera a bien promover el partido seleccionado por el Pueblo como partido mayoritario y, en segundo lugar, proveer a los partidos de minoría la coyuntura de encarnar con efectividad los intereses de los grupos de opinión que representan, de manera que realicen la importante labor de fiscalizar la gestión del Gobierno.[15]

---

[13] 2 Diario de Sesiones de la Convención Constituyente 1304 (1961).

[14] Íd., pág. 1282.

[15] Véase, además, 4 Diario de Sesiones de la Convención Constituyente 2595-2596 (1961).

En conclusión y como hemos visto, del análisis del Art. III, Sec. 7 de nuestra Constitución, *supra*, así como de las expresiones de los delegados de la Asamblea Constituyente, se deduce claramente que la misma no está dirigida a que el partido que haya obtenido más de dos terceras partes de los escaños legislativos, los pierda. Es por eso que se limitó el número de legisladores pertenecientes a los partidos de minoría que podrían ser incluidos a una tercera parte del número original del cual estaba compuesta cada cámara. Por consiguiente, el número de miembros en el Senado pertenecientes a un partido de minoría sería de 9, lo cual constituye el número mínimo que se le garantizó a los partidos de minoría.[16]

B. <u>Un vacío constitucional</u>

De la Resolución de la CEE así como de su Alegato surge que ésta fundamenta su determinación, en parte, en la alegación de que del debate constitucional sobre la Sec. 7 emana un "énfasis en garantizar un espacio para minorías representativas de núcleos de opinión, más que a la defensa de los partidos políticos".[17] Así, señala la recurrida CEE que "**hay expresiones** del proceso constitucional que claramente apuntan a que el foco primordial que informó el diseño de la disposición constitucional en controversia fue el deseo de ampliar el panorama de diversidad de opiniones en la estructura de

---

[16] <u>Suárez Cáceres v. Com. Estatal Elecciones</u>, 176 DPR 31, 76 (2009); Opinión Concurrente de la Jueza Asociada señora Naveira de Rodón en <u>P.P.D. v. Peña Clos I</u>, 140 DPR 779, 794 (1996).

[17] Alegato de la Comisión Estatal de Elecciones (CEE), pág. 9.

representación política del poder legislativo". (Énfasis suplido).[18] Añade que "[a]l momento de traducir eso en un diseño concreto, se utilizaron las figuras que representaban el juego real e histórico de los procesos electorales de entonces: los partidos políticos".[19] Con esto, la recurrida concluye que "[e]l debate de la Constituyente demuestra que aun cuando el texto constitucional se redactó sobre la premisa de un escenario de partidos políticos como protagonistas, la preocupación esencial no se circunscribía a los partidos como figuras institucionales, sino a la necesidad de garantizar espacios para las voces minoritarias".[20]

El problema con este enfoque es que, contrario a lo alegado por la recurrida CEE, el mismo no encuentra en realidad una base firme en el Diario de Sesiones ante un **texto tan claro y taxativo** como el que nos ocupa, y parece más bien moverse en arenas movedizas. Me explico. Ante un texto tan claro en la letra de nuestra Constitución se precisa de una fuerza contraria que justifique con esa misma claridad el ir más allá de ese texto. Recordemos que, como ya hemos sostenido, "cuando el legislador [en este caso la Asamblea Constituyente] se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa".[21]

---

[18] Íd.

[19] Íd.

[20] Resolución de la CEE, pág. 14.

[21] Alejandro Rivera v. E.L.A., 140 DPR 538, 545 (1946).

Sin embargo, para fundamentar su racional, la Resolución de la CEE cita varias instancias de expresiones de los delegados constituyentes que no parecen tener la claridad o la fuerza para ampliar el claro texto constitucional de la manera que se pretende. Las expresiones son las siguientes:

> Hasta ahora lo que hemos oído, con la excepción de un poquito de luz en las palabras del delegado señor Padrón Rivera, han sido los ataques más violentos de parte del delegado señor Gelpí, del delegado doctor Figueroa y del delegado señor Reyes Delgado contra este plan de **representación minoritaria.**

> Se contrasta este plan con el que propone el señor Gelpí que por la defensa cálida que le hicieron los señores Reyes Delgado y Figueroa, ya es el plan "Gelpí, Reyes Delgado, Figueroa" con una proposición que le llaman "de Uruguay" a que le llaman "de Illinois" que consiste en otorgar una representación fija **a las minorías** por distritos representativos y senatoriales.

> En pocas palabras ese plan consiste en crear ocho distritos electorales, cada uno para elegir tres senadores en los cuales, de los cuales, no más de dos podrán ser **de la mayoría** y por consiguiente uno ha de ser de **la minoría;** con derecho a elegir siete representantes de los cuales cinco serán **de la mayoría** y dos serán **de la minoría.**

> Cuando nosotros redactamos este plan y cuando comparecemos ante la Convención Constituyente a defenderlo, no estamos pensando en que estamos afiliados a un partido político ni estamos pensando remotamente en la fuerza electoral que ese partido político puede tener. Pero parece que una parte de los delegados no puede sustraerse a un gran impulso para hablar a nombre de las representaciones que ostentan y a veces cometen errores grandes en contra de sí mismos.

> La defensa de este plan que establece una garantía fija para una sola **minoría,** necesariamente deja fuera de representación **la minoría** a nombre de la cual habla el señor Gelpí o **la minoría** a nombre de la cual habla el señor

Reyes Delgado. Porque si **una mayoría, llámese popular** o llámese como se llame, ha de elegir en un distrito dos senadores solamente, queda un senador para ser electo y ese senador ha de ser electo por una sola **minoría**. Si se compara ese plan con el que nosotros hemos formulado, se ve sin duda alguna la gran diferencia que existe con el plan que hemos formulado para que cuando **las minorías** tengan votos, tengan representación parlamentaria.

El plan del señor Gelpí y de los señores Reyes Delgado y Figueroa, coloca a **la mayoría** en la situación de tener que ganar necesariamente ocho distritos senatoriales para tener 16 senadores contra ocho senadores de la minoría. Quiere decir, entre otras palabras, que si no hay **una mayoría** que gane ocho distritos senatoriales, por muchos votos que tenga, **esa mayoría** no podrá obtener nunca dos terceras partes de los miembros de una cámara.

Una situación parecida o similar ocurre con la Cámara de Representantes, donde para tener treinta y cinco representantes necesariamente un partido mayoritario ha de ganar siete distritos senatoriales. Las dificultades que este plan presenta en la práctica son obvias. La injusticia de este plan es demasiado clara para que tenga que señalarse donde deja los tenedores de este plan, **los grupos responsables de opinión que se agrupan bajo banderas distintas a las del segundo partido en cada distrito** y cuál es el reconocimiento que le dan de representación parlamentaria.

¿Dónde está la voz, no ya de esos partidos políticos que es lo único que preocupa a algunos delegados en esta Convención Constituyente, dónde está **la voz de esos electores que votaron por esos partidos políticos**, que **no resultaron ser en ningún distrito, el segundo partido**? ¿Cuál es la expresión de su voluntad democrática que se va a oír en los cuerpos parlamentarios? Sin duda alguna que este plan está predicado en la aspiración o **de ser mayoría** o de ser primer partido de la minoría, pero yo no creo que ese es el *role* que debe jugar ningún delegado en la Convención Constituyente. A mí me parece que es más elevada y me parece que es más respetable, la actitud de guardar el más alto reconocimiento al deseo de los electores cuando votan, cualquiera que sea el partido o la forma en que ellos expresen su

deseo y su voluntad. (Énfasis suplido).[22]

La Resolución de la CEE también cita la discusión en torno al inciso (b) de lo que vino a ser la Sec. 7, cuando el Presidente de la Comisión de la Rama Legislativa, el delegado Luis Negrón López, señaló lo siguiente:

> No hay ninguna situación en la historia con la cual nosotros podamos ilustrarnos cómo funciona esta regla. Y esperamos que una situación de esa índole no se produzca, porque me parece que es demasiado extrema y que no hace ni siquiera bien a la democracia. Pero si ocurriera, como dádiva tampoco, generosidad tampoco, pero tampoco coma acto de justicia a partido político, sino como reconocimiento a núcleos de opinión, aquí está la garantía de representación para que no haya grupos electorales, voluntad de masa y de pueblo, cuya voz no se oiga en las cámaras legislativas, para que se planteen y se discutan todos los problemas, y todos los puntos de vista, y para que **las mayorías legislativas** tengan el acicate y el estímulo **de una minoría** que vigila y colabora en el proceso democrático. (Énfasis suplido).[23]

Al leer cada una de estas expresiones en su contexto hay que preguntarse si cuando los constituyentes hablaban de "representación de minorías", "de las minorías", "de la minoría", "de una minoría", lo hacían utilizando estas expresiones **como abreviaciones**, refiriéndose en realidad a "partido o partidos minoritarios", o si lo hacían

---

[22] 2 Diario de Sesiones de la Convención Constituyente 1301-1302 (1961).

[23] Íd., pág 1304.

queriendo hacer una real distinción. Esto, porque si los constituyentes utilizaban estas expresiones sólo como una abreviación de la expresión "partidos minoritarios" **que aparece finalmente en el texto constitucional y en donde no se hace finalmente alusión alguna a las minorías independientes, entonces, es evidente que del debate no surge ninguna intención de reconocer estas minorías independientes.**

No existe duda, como bien señala la recurrida CEE, que varios comentaristas han concluido a base de las expresiones antes citadas que "la concepción de un escaño por adición se origina en la voluntad del Constituyente de preservar una política de sana gestión de gobierno en un sistema de verdadera democracia que garantice la representación de aquellos sectores que promulgan ideas contrarias a las del partido que obtuvo la mayoría legislativa".[24] Y que la fórmula establecida por la Asamblea Constituyente mediante la Sec. 7 del Art. III de nuestra Constitución busca "ofrecer participación a los diferentes sectores de opinión en la gestión gubernamental cuando un solo partido lleva a la cámara correspondiente más de dos terceras partes de sus miembros".[25]

Sin embargo, como hemos analizado, del debate constitucional de la sesión no surge con la fuerza o la claridad que se precisa el que los Constituyentes

---

[24] O. E. Resumil y R. Faría González, La garantía constitucional a la representación de las minorías en la Asamblea Legislativa: naturaleza, alcance y extensión, 65 (Núm. 2) Rev. Jur. U.P.R. 329, 337 (1996).

[25] Íd.

advirtieran que ese "reconocimiento a [los] núcleos de opinión… [de la] voluntad de masas" que mencionaba el delegado constituyente Negrón López, o que esa "participación a los diferentes sectores de opinión" que reseñan los tratadistas, se pudiera dar, en el contexto de la sección en controversia, fuera de los "partidos de minoría". En conclusión, el que acepte, como bien señala la recurrida CEE, que "la preocupación esencial [de los Constituyentes] no se circunscribía a los partidos como figuras institucionales, sino a la necesidad de garantizar espacios para las voces minoritarias", no quiere decir que las referencias en el Diario de Sesiones a estas "voces minoritarias" se referían necesariamente a estas minorías independientes. ¿Tendrían los Constituyentes el interés de que toda voz sin importar ideología o cualquier otro credo pudiera ser parte de la Asamblea Legislativa? Me parece que el debate de la Asamblea Constituyente en torno a esta sección sí sostiene esa premisa. Sin embargo, de igual forma, nada en el texto del documento constitucional ni en el historial de la Asamblea Constituyente nos permite concluir con clara certeza que tal interés de voz para cualquier otro tipo de representación minoritaria fuera parte del debate de los delegados constituyentes en la referida Sec. 7 del Art. III.

Lo anterior me lleva a rechazar este primer enfoque de la CEE. Como señalé, lo cierto es que, ante un texto claro en la letra de nuestra Constitución -como lo es en el caso que nos ocupa- se precisa de una fuerza contraria

que justifique con esa misma claridad ir más allá de ese texto.

Lo correcto es concluir que nos encontramos ante un claro vacío constitucional. Esto es, enfrentamos una circunstancia no prevista y, por lo tanto, no considerada por la Asamblea Constituyente. Y es que, como ya he señalado, aun partiendo de la premisa de que los Constituyentes tenían el interés de que toda voz sin importar ideología o cualquier otro credo pudiera ser parte de la Asamblea Legislativa, eso no implica que estos hubieran vislumbrado la circunstancia a la que nos confrontamos en este caso. Ciertamente, los Constituyentes conocían y tenían presente la figura del candidato independiente. Así lo demuestra en diversas instancias el Diario de Sesiones de la Asamblea Constituyente.[26] Sin embargo, lo que nunca consideraron los Constituyentes, como lo demuestra la ausencia de discusión o al menos mención del asunto en el debate de la Sec. 7 del Art. III de la Constitución, es que un candidato independiente -como lo es el senador electo Vargas Vidot- resultara electo a la misma vez que un partido obtuviera más de dos terceras partes de los escaños. **El que los Constituyentes fueran conscientes de la existencia de la figura del candidato independiente no implica que al redactar esta innovadora fórmula de garantía de representación minoritaria hubieran previsto que una circunstancia como**

---

[26] Véase 4 Diario de Sesiones de la Convención Constituyente 2521, 2720, 2968 y 3215 (1961).

**la del caso de autos pudiera suscitarse.** Como señalé, en el Diario de Sesiones, con relación a todo lo concerniente a lo ocurrido durante el debate de la Sec. 7 del Art. III de la Constitución, *supra*, nada nos indica que los delegados constituyentes pudieran siquiera imaginar la circunstancia que hoy este Tribunal tiene ante sí.

III

En Roig Commercial Bank v. Buscaglia, Tes., 74 DPR 986, 998 (1953), señalamos que:

> [a]unque las cortes no pueden eliminar o cambiar el lenguaje de un estatuto para darle efecto a una supuesta intención legislativa, las palabras y las frases pueden ser alteradas o sustituidas cuando ello sea necesario para evitar repugnancia o inconsistencia en la ley, y para darle efectividad a la intención manifiesta de la legislatura. La intención legislativa debe prevalecer sobre la letra estricta de la ley, cuando el seguir el tenor literal de la ley pueda producir disposiciones contradictorias. Es cuando no surge alguna contradicción o inconsistencia que es aplicable la regla general que prohíbe a un tribunal el desviarse del significado literal de un estatuto... Algunas disposiciones estatutarias pueden ser tan inconsistentes que ellas no pueden ser armonizadas o reconciliadas. Es obvio que no se le puede dar efecto a todas las disposiciones de un estatuto cuando algunas de ellas sean inconsistentes e irreconciliables. En tal caso, como en otros casos, debe buscarse una interpretación que le imprima efectividad al propósito del estatuto y a la intención legislativa.

Consistente con lo anterior, en Fuster v. Busó, 102 DPR 327, 339 (1974), señalamos que al interpretar nuestra Constitución no debemos presumir que una cláusula no tiene sentido o que destruye el propósito de alguna otra

cláusula, "excepto cuando el lenguaje lo haga inevitable".[27]

No existe duda, como bien concluye la recurrida CEE, que interpretar de manera restrictiva el texto constitucional que nos ocupa crearía una contradicción con lo que fue claramente la intención de los Delegados Constituyentes, pues podría producir que en un futuro el partido que obtuvo más de las dos terceras partes de los escaños, terminara perdiendo ese control absoluto. En ese sentido cito *ad verbatim* el racional de la CEE:

> El problema medular con lo planteado por los peticionarios es que su lógica implicaría excluir no solo a Vargas Vidot, sino a cualquier candidato independiente electo. De ese modo, tomemos como supuesto que hubieran resultado electos veinte (20) senadores por el PNP, tres (3) por el PPD y cuatro (4) candidatos independientes. El PNP tendría una mayoría de 74% que activa la disposición constitucional. Bajo la posición esbozada por los peticionarios solo debiéramos contar tres (3) senadores de minoría para efectos del cómputo y correspondería añadir seis (6) legisladores por formula constitucional. El resultado final sería un total treinta y tres (33) senadores, donde la mayoría del PNP se reduce ahora a un 60.60%, menos de las dos terceras partes. Este es el efecto de excluir a los candidatos independientes, abrir la puerta a alterar la mayoría de más de dos terceras

---

[27] En este contexto, es muy correcta la posición -de perspectiva "originalista"- esbozada por la distinguida compañera, Juez Asociada señora Rodríguez Rodríguez, al señalar que "[n]uestra interpretación no puede alejarse del texto integral del documento fundacional de manera tal que el resultado sea enmendarlo mediante *fiat judicial*. La [C]onstitución tiene ya diseñado un mecanismo de enmienda". Opinión Concurrente de la Juez Asociada señora Rodríguez Rodríguez, pág. 30. Sólo falta añadir a lo que la distinguida Juez Asociada señora Rodríguez Rodríguez señala con gran corrección, la expresión que cité al inicio de esta ponencia del fenecido Antonin Scalia y que fue la conclusión a la que llegó la compañera en este caso: *"The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."* A. Scalia y B. A. Garner, *op. cit.*

partes que los Constituyentes consideran intocable.[28]

Como bien concluye la CEE de lo anterior se desprende que la consecuencia directa de excluir a todos los candidatos independientes que resulten electos en la Legislatura podría conllevar que el partido de mayoría pierda las dos terceras partes alcanzadas por el voto del Pueblo. En ese sentido, no hay duda de que a este Tribunal no le queda otra opción que interpretar la expresión "partidos de minoría" como que incluye, para efectos de la Sec. 7 del Art. III de nuestra Constitución, *supra*, un candidato electo de manera independiente.

En el pasado tuvimos la oportunidad de expresarnos sobre una situación que guarda cierta analogía a la controversia que hoy nos enfrentamos. Particularmente, en Guadalupe v. C.E.E., 165 DPR 106 (2005), tuvimos ante nuestra consideración si un candidato a Legislador Municipal que acudió a las elecciones generales de noviembre de 2004 como candidato independiente tiene derecho a ocupar el último escaño de Legislador Municipal que la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991, 21 LPRA sec. 4001 *et seq.*, reserva mediante el mecanismo de representación de minorías, a aquel "partido político" que llegue en tercer lugar en unas elecciones generales, cuando obtiene un número de votos que lo colocan como la tercera opción electoral con más votos directos.

---

[28] Resolución de la CEE, págs. 21-22.

En aquella ocasión resolvimos que la interpretación literal del referido estatuto atentaba contra elementales principios democráticos que postulan que la elección de un candidato supone el apoyo mayoritario del Pueblo.[29] A su vez, expresamos que en la medida en que se subordinaba el mandato electoral a formalismos legales, se desvirtuaba el valor del voto directo.[30] Además, tal interpretación desmerecería un esquema electoral muy conocido por la ciudadanía que procura que frente a las alternativas partidistas tradicionales, la ciudadanía pueda optar por candidatos independientes e incluso votar por personas no incluidas en una papeleta mediante el mecanismo de nominación directa.[31] Finalmente, señalamos que una interpretación formalista como esa atentaría contra el principio básico de la igualdad electoral, ya que excluye a las candidaturas independientes de la posibilidad de obtener un puesto electivo mediante uno de los mecanismos de elección considerado por ley.[32] En ese sentido, en este caso tampoco podemos permitir que una interpretación literal de la expresión "partidos de minoría" atente contra lo que fue claramente la intención de los Delegados Constituyentes de proteger el control absoluto del partido en mayoría, obtenido válidamente en las urnas.

---

[29] Guadalupe v. C.E.E., 165 DPR 106, 115 (2005); Art. II, Sec. 2, Const. ELA, *supra*.

[30] Guadalupe v. C.E.E., supra, pág. 116.

[31] Íd.

[32] Íd.

Finalmente, en cuanto a la situación del senador electo Dalmau Ramírez, coincido con la apreciación de la CEE. Esto es, el señor Dalmau Ramírez fue electo por el Pueblo bajo la insignia y los ideales del PIP, el cual era un partido debidamente inscrito para los comicios celebrados el pasado noviembre. Éste, quien es el único Senador electo del PIP, representa a ese grupo de electores que votó por él conforme a los principios promulgados en la campaña de su partido. Por consiguiente, dado a que el señor Dalmau Ramírez forma parte de un partido de minoría en el Senado, su escaño tiene que considerarse como parte de la minoría de dicho Cuerpo.

IV

Resuelto el asunto sobre si un Senador electo de manera independiente y un Senador cuyo partido no quedó inscrito deben ser considerados dentro del cómputo de escaños de los "partidos de minoría", pasemos a evaluar cómo se deben adjudicar los escaños restantes.

A. La Ley Electoral del Estado Libre Asociado de Puerto Rico

La Ley 78-2011, Ley Electoral del Estado Libre Asociado de Puerto Rico (Ley Electoral), 16 LPRA sec. 4001 *et seq.*, regula las garantías establecidas en la Constitución sobre la forma de adjudicar las fracciones resultantes del mecanismo adoptado y consigna el número mínimo de votos que debe tener un partido de minoría para cualificar a la representación por adición. A tales fines,

el Art. 10.015 de la Ley 78-2011, 16 LPRA sec. 4205,

dispone lo siguiente:

> Después que la Comisión haya realizado el escrutinio general determinará los candidatos que resultaron electos para los once (11) cargos a senadores por acumulación, los once (11) a representantes por acumulación, los dos (2) senadores por cada distrito senatorial y el representante por cada distrito representativo. Además, la Comisión procederá a determinar la cantidad y los nombres de los candidatos adicionales de los partidos de minoría que deban declararse electos, si alguno, conforme a las disposiciones de la Sección 7 del Artículo III de la Constitución de Puerto Rico. La Comisión declarará electos y expedirá el correspondiente certificado de elección a cada uno de dichos candidatos de los partidos de minoría.

> (1) A los fines de implantar el inciso (a) de la Sección 7 del Artículo III de la Constitución de Puerto Rico, cuando un partido que no obtuvo dos terceras partes de los votos para el cargo de Gobernador haya elegido sobre dos terceras partes de los miembros de una o ambas cámaras, se hará la determinación de los senadores o representantes adicionales que corresponda a cada uno de dichos partidos de minoría en la siguiente forma:

> (a) Se divide la cantidad de votos emitidos para el cargo de Gobernador de cada partido de minoría entre la cantidad total de votos depositados para el cargo de Gobernador de todos los partidos de minoría;

> (b) se multiplica el resultado de la anterior división por nueve (9) en el caso de los senadores y por diecisiete (17) en el caso de los representantes, y

> (c) se resta del resultado de la multiplicación que antecede, la cantidad total de senadores o representantes que hubiera elegido cada partido de minoría por voto directo.

> El resultado de esta última operación matemática será la cantidad de senadores o representantes adicionales que se adjudicará a cada partido de minoría hasta completarse la cantidad que le corresponda, de manera que el total de miembros de partidos de minoría en los

casos que aplica el inciso (a) de la Sección 7 del Artículo III de la Constitución de Puerto Rico sea nueve (9) en el Senado o diecisiete (17) en la Cámara de Representantes de Puerto Rico.

(2) A los fines de las disposiciones establecidas en el inciso (b) de la Sección 7 del Artículo III de la Constitución de Puerto Rico, cuando un partido que en efecto obtuvo más de dos terceras partes de los votos para el cargo de Gobernador haya elegido más de dos terceras partes de los miembros de una o ambas cámaras, si hubiere dos o más partidos de minoría, la determinación de los senadores o representantes que correspondan a cada uno de dichos partidos de minoría se hará dividiendo la cantidad de votos emitidos para el cargo de Gobernador por cada partido político de minoría, por la cantidad total de votos depositados para el cargo de Gobernador para todos los partidos políticos y multiplicando el resultado por veintisiete (27) en el caso del Senado de Puerto Rico y por cincuenta y uno (51) en el de la Cámara de Representantes de Puerto Rico. En este caso se descartará y no se considerará ninguna fracción resultante de la operación aquí establecida que sea menos de la mitad de uno. El resultado de la operación consignada en este inciso constituirá la cantidad de senadores o representantes que le corresponderá a cada partido de minoría, y hasta esta cantidad se deberá completar, en lo que fuere posible, el total de senadores o de representantes de dicho partido de minoría. Los senadores de todos los partidos de minoría nunca serán más de nueve (9) ni los representantes más de diecisiete (17). De resultar fracciones en la operación antes referida, se considerará como uno la fracción mayor para completar dicha cantidad de nueve (9) senadores y de diecisiete (17) representantes a todos los partidos de minoría y si haciendo ello no se completare tal cantidad de nueve (9) o de diecisiete (17) se considerará entonces la fracción mayor de las restantes, y así sucesivamente, hasta completar para todos los partidos de minoría la cantidad de nueve (9) en el caso del Senado de Puerto Rico y de diecisiete (17) en el caso de la Cámara de Representantes de Puerto Rico.

Al aplicar el párrafo antepenúltimo de la Sección 7 del Artículo III de la Constitución de Puerto Rico se descartará y no se

considerará fracción alguna que sea menos de la mitad de uno. En el caso que resulten dos fracciones iguales, se procederá con la celebración de una elección especial de conformidad con lo establecido en este subtítulo. Ningún partido de minoría tendrá derecho a candidatos adicionales ni a los beneficios que provee la Sección 7 del Artículo III de la Constitución de Puerto Rico, a no ser que en la elección general obtenga a favor de su candidato a gobernador, una cantidad de votos equivalentes a un tres (3) por ciento o más del total de votos depositados en dicha elección general a favor de todos los candidatos a gobernador.

Del inciso (1) del artículo antes citado surge la fórmula que la CEE deberá utilizar para adjudicar el número de escaños que deben ser añadidos al activarse el inciso (a) del Art. III, Sec. 7 de nuestra Constitución, *supra*, aplicable al caso ante nuestra consideración.

Como mencioné anteriormente, de los 27 escaños que conforman el Senado de Puerto Rico, 21 fueron ganados por el PNP. De los restantes, el PPD obtuvo 4 escaños, el PIP alcanzó uno y para el otro escaño fue escogido un candidato independiente. Conforme a lo antes resuelto por este Tribunal, para computar los 9 escaños necesarios en aras de cumplir con la garantía constitucional que provee la "Ley de Minorías" se tienen que computar tanto los escaños obtenidos por los partidos políticos de minoría, entiéndase el PPD y el PIP, como el obtenido por el candidato independiente Vargas Vidot. Por consiguiente, al éstos sumar 6 escaños, para completar el total de 9 sólo le corresponde a los candidatos a senadores por acumulación del PPD que no resultaron electos, Nadal

Power, Pereira Castillo y Tirado Rivera, ocupar los 3 escaños restantes.

V

Por los fundamentos antes expuestos, estoy conforme con la determinación de la Comisión Estatal de Elecciones.


Erick V. Kolthoff Caraballo
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ángel M. Rodríguez Otero

*Recurrido*

*v.*

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

*Recurridos*

_____

Comisionado Electoral del Partido Popular Democrático

*Recurrido*

*v.*

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

*Recurridos*

_____

Juan Pablo Hernández

*Peticionario*

*v.*

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

*Recurridos*

**Núm. CT-2016-19**
**CT-2016-20**

*Certificación*

Ramón Ruiz Nieves

*Recurrido*

*v.*

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

*Recurridos*

---

Comisionada Electoral del Partido Nuevo Progresista, Norma Burgos Andújar y Hon. Thomas Rivera Schatz, Presidente entrante del Senado de Puerto Rico

*Peticionarios en Certificación*

*v.*

Comisión Estatal de Elecciones por conducto de su Presidenta, Liza García Vélez y otros

*Recurridos*

---

**Opinión de Conformidad emitida por el Juez Asociado señor RIVERA GARCÍA**

En San Juan, Puerto Rico, a 4 de enero de 2017.

Estoy conforme con la decisión que hoy toma este Tribunal de confirmar la Resolución Núm. CEE-RS-16-90 de la Presidenta de la Comisión Estatal de Elecciones ("CEE") y así incluir a los Senadores electos José A. Vargas Vidot y Juan Dalmau Ramírez como parte integral **del cálculo** de nueve escaños de minoría que garantiza la Constitución de Puerto Rico en circunstancias como las suscitadas en los

comicios del 8 de noviembre de 2016. Con ello, no tan sólo le reconocemos preeminencia al principio de la coherencia y de la razonabilidad por encima de interpretaciones textualistas irreflexivas, sino que avalamos una exégesis judicial que no trastoca los propósitos expresos de nuestra Constitución y mucho menos altera la voluntad de aquellos electores, quienes en el ejercicio de su libertad democrática, optaron por apoyar abrumadoramente a los candidatos al Senado de un partido político particular.

Si bien considero que el texto de la ley debe tener preeminencia en la evaluación de toda controversia judicial por encima de implicaciones prácticas que, en última instancia, deban ser atendidas por el Poder Legislativo, la realidad es que en este caso, **más allá de lo incorrecto del planteamiento**, las consecuencias que conllevaría acoger la posición de los demandantes ejemplifica, como mínimo, su improcedencia e irracionabilidad. Es por ello que intereso consignar unas expresiones dirigidas a explicar claramente el porqué he optado por votar a favor de la confirmación de la Resolución emitida por la Presidenta de la CEE. Esto no sin antes exponer concisamente los hechos principales que originaron la controversia que hoy atendemos.

## I

El pasado 8 de noviembre de 2016 se celebraron en Puerto Rico las elecciones generales. Como resultado de este proceso electoral, se produjeron dos hechos medulares que **no** están en controversia. En primer lugar, de los

veintisiete escaños disponibles en el Senado de Puerto Rico, el Partido Nuevo Progresista (PNP) logró que **más de dos terceras partes** de sus candidatos fueran electos para un total de veintiún senadores.[33] Mientras que la minoría quedó compuesta por cuatro candidatos miembros del Partido Popular Democrático (PPD), un candidato miembro del Partido Independista Puertorriqueño (PIP), y un candidato independiente.[34] En segundo lugar, el candidato a Gobernador del PNP resultó ganador con un total de 660,510 votos para una distribución porcentual de 41.80%, equivalente a **menos de dos terceras partes** de la totalidad de los votos emitidos entre todos los candidatos a la gobernación.

Cuando esas dos circunstancias concurren en una elección general, la Sección 7(a) del Artículo III de la Constitución de Puerto Rico establece un mecanismo **de adición de escaños** dirigido a garantizar una representación justa de grupos minoritarios.[35] Conforme a esta disposición constitucional, y dado al hecho de que **seis candidatos no pertenecientes al partido de mayoría** ya habían sido

---

[33] En específico, el PNP logró la elección de 15 candidatos al Senado por acumulación y 6 candidatos al Senado por distrito para un total de 21 senadores electos, equivalente a un 77.78% de los escaños disponibles.

[34] El PPD logró la elección de 4 senadores, a saber: el Lcdo. Eduardo Bhatia Gautier, la Sra. Rossana López León y el Lcdo. Aníbal José Torres como Senadores por acumulación y el Lcdo. José Luis Dalmau Santiago como Senador por el Distrito de Humacao. Mientras que el Partido Independista Puertorriqueño logró la elección del Sr. Juan Dalmau Ramírez como Senador por acumulación. Finalmente, el Sr. José A. Vargas Vidot resultó electo como candidato independiente.

[35] Art. III, Sec. 7, Const. ELA, LPRA, Tomo 1.

seleccionados mediante el voto directo de los electores, la CEE certificó únicamente a tres candidatos adicionales del PPD, de manera que la minoría en el Senado alcanzara los nueve senadores que dispone la Constitución para estos casos.[36] Como consecuencia, el Senado quedó constituido por treinta senadores en total: veintiuno senadores miembros del PNP, siete senadores miembros del PPD, un senador miembro del PIP y un senador independiente.

Inconformes con la determinación de añadir sólo tres candidatos adicionales del PPD, los aspirantes al Senado por Distrito Juan Pablo Hernández, Ángel M. Rodríguez Otero y Ramón Ruiz Nieves solicitaron a la CEE, cada uno por separado, ser añadidos como candidatos electos por virtud de la garantía constitucional de representación de minorías.[37] Sostienen, en esencia, que los Senadores electos Vargas Vidot y Dalmau Ramírez no se deben contabilizar como parte de los nueve escaños a los que hace referencia la Sección 7(a) del Artículo III de la Constitución, ya que éstos no pertenecen a un "partido de minoría".

Conforme a ello, entienden que esos nueve escaños deben ser ocupados **exclusivamente** por candidatos del PPD,

_____

[36] Como resultado de esta adición por virtud del inciso (a) de la Sección 7 del Artículo III de la Constitución de Puerto Rico, la CEE certificó como candidatos electos a los señores José Nadal Power, Miguel Pereira Castillo y Cirilio Tirado Rivera. Esto conforme al procedimiento de adición de escaños establecido en el Art. 10.015 de la Ley Electoral de Puerto Rico, 16 LPRA sec. 4205.
[37] Tanto el Sr. Juan Pablo Hernández como el Sr. Ángel Rodríguez Otero aspiraron al cargo de Senador por el Distrito de Guayama; y el Sr. Ramón Ruiz Nieves aspiró al cargo de Senador por el Distrito de Ponce.

como "único" partido de minoría inscrito posterior a los comicios. Por lo tanto, plantean que la Comisión erró al certificar como senadores electos por virtud de la garantía de minoría únicamente a tres candidatos del PPD. En su lugar, sostienen que la CEE debió certificar un total de cinco candidatos del PPD, quienes juntos a los cuatro candidatos del PPD electos mediante el voto directo completarían entonces los nuevos espacios presuntamente reservados a nivel constitucional para candidatos de "partidos de minoría".

Celebrada una vista para dilucidar los planteamientos de estos candidatos, y ante la falta de unanimidad por parte de los Comisionados Electorales, la Presidenta de la CEE emitió una Resolución en la que denegó la solicitud y sostuvo su determinación inicial de añadir únicamente tres escaños a favor de candidatos al Senado del PPD.[38] Posteriormente, los tres candidatos acudieron ante el Tribunal de Primera Instancia en revisión judicial y finalmente el caso llegó ante nuestra consideración mediante los dos recursos de certificación intrajurisdiccional que hoy atendemos conjuntamente.

Así las cosas, la única controversia que nos corresponde considerar es la siguiente: Para efectos del cómputo de los nueve senadores del "partido de minoría" que establece la Sección 7(a) del Artículo III de la

---

[38] Véase, Resolución Núm. CEE-RS-16-090 emitida por la Presidenta de la CEE el 30 de noviembre de 2016.

Constitución de Puerto Rico, ¿deben contabilizarse a los senadores electos Vargas Vidot y Dalmau Ramírez?

## II

La Sección 7 del Artículo III de la Constitución de Puerto Rico, en su parte pertinente al presente caso, establece lo siguiente:

> Cuando en una elección general resultaren electos más de dos terceras partes de los miembros de cualquiera de las cámaras por un solo partido o bajo una sola candidatura, según ambos términos se definan por ley, se aumentará el número de sus miembros en los siguientes casos:
>
> (a) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hubiese obtenido menos de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, se aumentará el número de miembros del Senado o de la Cámara de Representantes o de ambos cuerpos, según fuere el caso, **declarándose electos candidatos del partido o partidos de minoría en número suficiente hasta que <u>la totalidad de los miembros del partido o partidos de minoría</u> alcance el número de nueve en el Senado y de diecisiete en la Cámara de Representantes.** Cuando hubiere más de un partido de minoría, la elección adicional de candidatos se hará en la proporción que guarde el número de votos emitidos para el cargo de Gobernador por cada uno de dichos partidos con el voto que para el cargo de Gobernador depositaron en total esos partidos de minoría.
>
> Cuando uno o más partidos de minoría hubiese obtenido una representación en proporción igual o mayor a la proporción de votos alcanzada por su candidato a Gobernador, no participará en la elección adicional de candidatos hasta

tanto se hubiese completado la representación que le correspondiese bajo estas disposiciones, a cada uno de los otros partidos de minoría.

(b)… .

Los Senadores y Representantes adicionales cuya elección se declare bajo esta sección serán considerados para todos los fines como Senadores o Representantes por Acumulación.

La Asamblea Legislativa adoptará las medidas necesarias para reglamentar estas garantías, y dispondrá la forma de adjudicar las fracciones que resultaren en la aplicación de las reglas contenidas en esta sección, así como el número mínimo de votos que deberá depositar un partido de minoría a favor de su candidato a Gobernador para tener derecho a la representación que en la presente se provee.[39]

Del precitado texto de la Sección 7(a) del Artículo III de la Constitución de Puerto Rico, indudablemente surge una referencia directa y expresa a "partido o partidos de minorías". Sin embargo, resulta pertinente resaltar dos puntos al respecto. Primeramente, esa referencia expresa a "partido o partidos de minorías" se produce en el contexto único y exclusivo de la adición de escaños, es decir, en el contexto de quiénes pueden ser declarados como candidatos ganadores por virtud de esta cláusula, a pesar de no contar con el favor del electorado. En otros términos, la Sección 7(a) del Artículo III **no** hace referencia expresa a qué candidatos pueden ser considerados para calcular los nueve

---

[39] (Énfasis y subrayado suplido). Art. III, Sec. 7, supra.

escaños concernientes. Por lo tanto, la respuesta a la controversia que hoy atendemos no surge de una simple lectura del texto constitucional.

Por otro lado, debemos abandonar la idea generalizada de que en la disposición de una controversia basada en el texto de la ley no se pueden considerar aspectos circundantes a la formulación de la ley misma. Esto, **no** como una afrenta a la sabiduría del Poder Legislativo, ni como un cuestionamiento al texto expreso de la ley como excusa para acomodar visiones personales del juzgador, sino como un método de confirmación de que el texto de la ley es cónsono con lo que sus propulsores interesaban. De otra manera, fallaríamos en nuestro rol como máximos intérpretes de la Constitución y de la ley al validar posiciones textualistas que en nada reflejan lo que realmente se legisló. Ese ejercicio de confirmación, sin embargo, nunca debe resultar en el sinsentido de invalidar lo que sí expresamente consignó el legislador. El propósito debe ser siempre una vía confirmatoria del texto, más no una denegatoria de éste.

Con ello en mente, vale cuestionarnos, ¿qué pretendieron los delegados de la Convención Constituyente al incluir en la Sección 7(a) del Artículo III de la Constitución la frase "partido o partidos de minoría"? Ciertamente, el texto de la Constitución no incluye una definición o declaración ulterior que nos permita establecer diáfanamente qué exactamente ambicionaron los

delegados de la Convención Constituyente al redactar el artículo concerniente. Siendo así, es imprescindible que acudamos a los debates que se suscitaron durante su discusión en ánimo de responder adecuadamente esta interrogante.

   **(a)  Discusión sobre la Sección 7(a) del Artículo III de la Constitución durante la Convención Constituyente**

La elaboración de la propuesta de lo que constituirían las disposiciones relacionadas al Poder Legislativo estuvieron en mano, inicialmente, de la Comisión de la Rama Legislativa ("Comisión Legislativa"). Durante la presentación del *Informe Complementario de la Comisión de la Rama Legislativa* el 28 de diciembre de 1951, que incluyó todo lo pertinente "a la composición de las cámaras, [y] la forma de representación", el Delegado Presidente de la Comisión Legislativa, Luis A. Negrón López, expuso como punto introductorio lo siguiente:

> Vuestra Comisión ha estudiado detenidamente todos los puntos de vista contenidos en las proposiciones radicadas y expresadas individualmente por los delegados. En el examen de todos los tópicos que quedaron en este informe complementario hemos estado conscientes de la cuidadosa consideración que merece el tema de la composición y organización del poder legislativo. Nos ha guiado el principio de que las más sabias disposiciones constitucionales no habrían de tener eficacia alguna sino se garantizara la expresión de la voluntad del pueblo en el funcionamiento del poder legislativo. **Entendemos que este principio no puede sostenerse sin asegurarnos de que se provea para una**

> **representación adecuada y justa, tanto
> en cuanto a los factores de geografía y
> población como a los de la diversidad
> de criterios e ideologías que informan
> el pensamiento público. A tal fin, es
> básico para la salud democrática que
> <u>las minorías</u> tengan una representación
> que, aun bajo las circunstancias más
> desfavorables, les permita cumplir
> adecuadamente su función de fiscalizar y
> estimular a la mayoría en su obra de gobierno
> sin crear entorpecimientos que puedan
> resultar en detrimento de la democracia.** En
> todo caso, el pueblo debe tener los medios
> para asegurarse de que todos sus
> representantes respondan siempre a la
> verdadera voluntad de los representados.[40]

Con esa introducción de trasfondo, y al momento de discutir específicamente la propuesta de "garantías mínimas de representación", el Presidente de la Comisión Legislativa planteó lo siguiente:

> [E]s posible que una inadecuada
> distribución de los votos obtenidos por
> las minorías produzca el resultado
> indeseable de que su representación en
> las cámaras no guarde proporción con
> los votos que obtengan en las urnas.
> Previendo esta situación la Comisión ha
> elaborado **<u>un plan de representación que
> garantiza una justa representación a
> los grupos minoritarios</u>** que no la
> obtengan en razón de los factores
> señalados.[41]

En tal punto, éste añadió que la Comisión Legislativa entendía que "la misión fiscalizadora **<u>de las minorías</u>** no

---

[40] (Énfasis y subrayado suplido). Informe Complementario de la Rama Legislativa, 4 <u>Diario de Sesiones de la Convención Constituyente</u> 2590 (1961).

[41] (Énfasis y subrayado suplido). Íd., págs. 2595-2596.

[podía] cumplirse eficazmente si no hay la **garantía de cierto mínimum de representación** en proporción a los votos que **las minorías** obtengan, consideradas en conjunto".[42] Cónsono con ello, enfatizó que la propuesta constitucional establecía "suficiente garantía para que los **distintos criterios de opinión pública** estén representados en la Asamblea Legislativa".[43] Sin embargo, aclaró que en caso de que no se logre que, en efecto, los distintos criterios de opinión pública estén representados, la propia propuesta incluía un mecanismo "para **fortalecer la representación minoritaria**".[44] De hecho, el Presidente de la Comisión Legislativa que propuso el mecanismo que finalmente se incluyó en la redacción de la Sección 7 del Artículo III de la Constitución, consignó expresamente que "[e]sta fórmula de **garantía a las minorías** se [produjo] y [recomendó] por la Comisión como un medio para dar justa interpretación a la voluntad del pueblo y **no como una concesión a los partidos políticos**".[45]

Como bien surge del debate suscitado durante la Convención Constituyente sobre las propuestas presentadas por la Comisión Legislativa, no todos los delegados estuvieron conformes con la redacción incluida en la hoy Sección 7 del Artículo III, ya que "resulta[ba] muy

---

[42] (Énfasis y subrayado suplido). Íd., pág. 2596.

[43] (Énfasis y subrayado suplido). Íd.

[44] (Énfasis y subrayado suplido). Íd.

[45] (Énfasis y subrayado suplido). Íd.

complicado" el mecanismo propuesto.[46] En defensa de su propuesta, el Presidente de la Comisión Legislativa expresó lo siguiente:

> Alrededor de la enmienda que se presenta ahora a la sección 4 [hoy sección 7] viene la discusión sobre los méritos que puede tener este **plan de representación minoritaria** que contiene la proposición de la rama legislativa.
>
> Hasta ahora lo que hemos oído, con la excepción de un poquito de luz en las palabras del delegado señor Padrón Rivera, han sido los ataques más violentos de parte del delegado señor Gelpí, del delegado doctor Figueroa y del delegado señor Reyes Delgado contra este **plan de representación minoritaria**.
>
> […]
>
> Cuando nosotros redactamos este plan y cuando comparecemos ante la Convención Constituyente a defenderlo, **no estamos pensando en que estamos afiliados a un partido político** ni estamos pensando remotamente en la fuerza electoral que ese partido político puede tener.[47]

---

[46] Véase, 2 Diario de Sesiones de la Convención Constituyente 1280 (1961). Para una discusión completa sobre las diferencias entre los delegados, véase, íd., págs. 1280-1286 y 1295-1310. Es importante notar dos asuntos. *Primero*, al momento de la discusión en la Convención Constituyente, la hoy Sección 7 del Artículo III de la Constitución correspondía a la Sección 4. Véase, íd., pág. 1275. *Segundo*, la Sección 1 propuesta en ese momento que establecía el número total de miembros en el Senado y en la Cámara de Representantes hacía referencia directa a la entonces Sección 4 que discutía el método de representación de minorías, por lo que la discusión de las entonces secciones 1 y 4 estuvo interrelacionada. Véase, íd.

[47] (Énfasis y subrayado suplido). Íd., pág. 1301.

Más adelante, y en referencia a la situación que motivó el establecimiento del mecanismo contenido en la Sección 7, éste planteó lo siguiente:

> Ahora, yo admito y afirmo y esta proposición admite y afirma que este sistema [existente hasta el momento] tiene una falla. La falla más evidente fue la que se produjo en las elecciones de 1948 de la cual se ha hablado aquí para condenar un sistema que existió por treinta años antes de producirse esa falla de 1948, sin que se hiciera esfuerzo alguno por cambiarlo hasta este momento. La falla que se produjo en 1948 fue que un partido obteniendo el 62 por ciento de los votos, obtuviera la casi totalidad de la representación parlamentaria en la Cámara de Representantes donde los **grupos de minoría** solamente eligieron un representante y obtuviera la casi totalidad de la representación parlamentaria en el Senado, donde los **grupos de minoría** eligieron solamente dos senadores a pesar de tener todos en conjunto 38 por ciento de los votos depositados en las urnas.
>
> Para corregir **esa** deficiencia, para corregir esta falla grave de la cual no fueron responsables los electores cuando votaron en el año 1948 y de la cual no fueron responsables tampoco los candidatos triunfantes y derrotados en las elecciones de 1948, [por] esta proposición, tan cotejada con todos los epítetos que pudieron producirse en la argumentación por los oradores que la han combatido, se propone la siguiente solución.
>
> Si en el año 1948, tal como se produjeron los votos y se produjo la situación parlamentaria, el Senado de Puerto Rico hubiera estado compuesto de 27 senadores, ganando, como ganó, un partido siete distritos, sin duda alguna que [ese mismo partido] hubiera ganado con los mismos votos, y [hubieran sido] repartidos, como se

repartieron, los ocho distritos que se crean en este plan de distribución; y repartidos los votos en la misma forma en que se repartieron, y decididos los partidos a nominar los candidatos por acumulación, en la misma forma en que los nominaron, sin duda alguna que los votos de 1948 hubieran producido 27 representantes para la mayoría, 27 senadores para la mayoría, digo 25 senadores para la mayoría, y dos senadores para la minoría.

El plan que nosotros proponemos, y que ha sido tan cruelmente calificado esta noche, **aumentaría esa representación minoritaria** de dos senadores, a nueve senadores. La hubiera aumentado automáticamente de dos senadores a nueve senadores bajo la situación de 1948. […]

[…]

Bajo el plan que ha sido tan cruelmente calificado esta noche, ese error de unas matemáticas de los cual no fueron culpables ni los candidatos ni los electores de 1948 [se habría evitado], automáticamente hubiera sido [aumentada] **la representación minoritaria** en la Cámara de Representantes y, de un representante a 17 representantes.

Ese es el plan que yo quiero declarar aquí, para decir más que Padrón Rivera, que supera el de Uruguay, que supera el de Illinois, que supera todas las tentativas de **dar representación a la minoría** en el mundo entero; ese plan me llena a mí de profundo orgullo, a pesar de los epítetos y los calificativos que han merecido desde ese lado de la Convención.[48]

---

[48] (Énfasis y subrayado suplido). Íd., pág. 1303. Para una mayor exposición sobre los hechos suscitados en los comicios de mediados y finales de la década del cuarenta en los que un solo partido dominó el panorama electoral, véase, José Trías Monge, Historia Constitucional de Puerto Rico, San Juan, Ed. UPR, 1982, Vol. II, págs. 143-145.

Posteriormente, y como resultado del debate reseñado, la redacción de la propuesta según presentada por la Comisión Legislativa fue modificada con el único fin de añadir dos disposiciones adicionales.[49] Si bien ninguna de estas enmiendas alteró el lenguaje principal y pertinente a la controversia -entiéndase el primer párrafo del inciso (a) de la Sección 7 del Artículo III-, la realidad es que su discusión arroja mayor claridad sobre el particular. De hecho, de la discusión que las referidas enmiendas generaron, surge con meridiana claridad que la **preocupación principal** de los propulsores del mecanismo de representación minoritaria **no** era los partidos políticos, sino un reconocimiento a "núcleos de opinión" que se ubicaran en contraposición a ese partido de mayoría que obtuvo más de dos terceras partes en alguna de las cámaras legislativas. Sobre este particular, el delegado Presidente de la Comisión Legislativa expresó clara y contundentemente lo siguiente:

---

[49] Las enmiendas estuvieron dirigidas a incluir el lenguaje hoy contenido en el segundo párrafo del inciso (a) de la Sección 7 del Artículo III ("Cuando uno o más partidos de minoría hubiese obtenido una representación en proporción igual o mayor a la proporción de votos alcanzada por su candidato a Gobernador, no participará en la elección adicional de candidatos hasta tanto se hubiese completado la representación que le correspondiese bajo estas disposiciones, a cada uno de los otros partidos de minoría"); y en el último párrafo de la Sección 7 del Artículo III ("La Asamblea Legislativa adoptará las medidas necesarias para reglamentar estas garantías, y dispondrá la forma de adjudicar las fracciones que resultaren en la aplicación de las reglas contenidas en esta sección, así como el número mínimo a favor de su candidato a Gobernador para tener derecho a la representación que en al presente se provee"). Véase, 3 <u>Diario de Sesiones de la Convención Constituyente</u> 2024-2025 (1961).

Y si en determinado distrito el electorado decide – después de discutirse ampliamente ante todas las personas que van a formular su opinión y su criterio, y que tienen derecho a participar y participan en la elección – que determinado candidato… No importa si milita o no en un partido político, puede hasta ser un candidato independiente… o puede ser… ni siquiera ser… un candidato de coalición – puede ser un candidato nominado en más de un *ticket* sin ninguna relación entre los partidos políticos entre sí. Si los electores deciden que ese candidato debe tener preferencia sobre los demás candidatos, me parece que es injusto, cuando tratamos de dar corporeidad y realidad a una fórmula de representación minoritaria, decir que aquello que fue la voluntad de esos electores específicos en un distrito, debe computarse en relación con los cálculos generales que se hacen, para dar representación minoritaria, para dar lo que hemos llamado o lo que hemos dado en llamar representación minoritaria a los partidos políticos de minoría.

[…]

Pero yo quiero decir, señor Presidente, que cuando se escribieron las palabras de esta proposición originalmente, no se tuvo una idea tan preeminente, tan importante, tan absoluta, tan esclarecida sobre los partidos políticos. **<u>Lo que se tenía era un gran respeto a los grupos de opinión</u>**, a los núcleos de opinión importantes, no pensando en pequeños grupos que pudieran equivocarse y dividirse por cosas accidentales y adjetivas, votando en contra de lo que debía ser la norma de su pensamiento y de su criterio, de lo que es el ejercicio útil de la democracia, que manda a los hombres no dividirse por trivialidades y que les ordena ceder en las cosas que puedan ser pequeñas, a cambio de lo que sea definitivo y fundamental; y pensando en esos grupos

importantes de opinión… digo, si no importaba tampoco que fueran pequeños… pero que fueran respetables y sobre todo lo que tuvieran, que pudieran expresarse y que tuvieran corporeidad expresada en estas disposiciones constitucionales… y para esos grupos se proveía representación.[50]

A la luz de toda esta discusión, ¿qué interpretación de la Sección 7 del Artículo III de la Constitución de Puerto Rico es más cónsona con su texto y con la intención inicial de los delegados de la Convención Constituyente? ¿Una interpretación que tome la redacción de este artículo como una negativa a considerar a cualquier candidato **electo** que no pertenezca a un "partido de minoría", tan siquiera al momento de calcular a los nueve Senadores a los que la Constitución hace referencia? ¿O una interpretación que cobije dentro de ese concepto de "partido de minoría" a todo candidato **electo** por voto popular que no forme parte del partido de mayoría que obtuvo más de dos terceras partes? Veamos.

## III

En primer lugar, no hay duda de que únicamente los partidos políticos pueden beneficiarse del **mecanismo de adición** de escaños que establece la Sección 7(a) del Artículo III de la Constitución de Puerto Rico. No obstante, ese derecho de inclusión de candidatos no favorecidos en los comicios está **expresamente** atado a un porcentaje mínimo que debe obtener el candidato a

---

[50] Íd., pág. 2027.

Gobernador de ese partido de minoría, según disponga la Asamblea Legislativa en nuestra legislación electoral. Así lo reconocimos, de hecho, en *Fuster v. Busó*, 102 DPR 327 (1974).

En ese sentido, es importante notar que aquí estamos ante un escenario distinto al suscitado en *Fuster v. Busó*, supra. En el presente caso **no** evaluamos quiénes pueden solicitar ser incluidos por virtud de la garantía constitucional de minoría, sino **quiénes pueden ser contabilizados para efecto de los nueve escaños requeridos constitucionalmente** cuando un partido obtiene más de dos terceras partes en alguna de las cámaras. De esta manera, la conclusión que alcanzamos en *Fuster* **no** nos ofrece una respuesta definitiva mediante la cual podamos disponer del caso, ni mucho menos nos vincula como cuestión lógica, particularmente si tomamos en cuenta que para la controversia del cálculo no existe una disposición expresa que ate al asunto a partidos de minorías en un sentido estricto y práctico como sí ocurre con el punto de la adición de escaños.

Es por ello que cobra tanta relevancia la discusión suscitada entre los delegados de la Convención Constituyente, en especial las expresiones emitidas por el Presidente de la Comisión Legislativa y propulsor de la actual redacción de la Sección 7 del Artículo III de la Constitución. Nótese que, como diáfanamente expresa el delegado Presidente de esta Comisión, el texto que

finalmente se aprobó como Sección 7, se propuso como una medida dirigida a garantizar una justa representación de los "grupos minoritarios" y "distintos criterios de opinión pública".[51] Esto porque la preocupación que finalmente motivó la adopción del mecanismo de garantía de representación minoritaria fue la necesidad de asegurar la inclusión de un grupo distinto a los miembros del partido mayoritario que obtuvo más de dos terceras partes, de manera que se promoviera una adecuada función fiscalizadora.[52] Se estableció así un mecanismo que garantizaba un número de representación minoritaria que le hiciera frente a ese partido – llámese PPD, PNP, PIP o cualquier otro – que obtuviera una súper mayoría en alguna de las cámaras legislativas.

Si bien durante el debate de la Sección 7 en la Convención Constituyente se hicieron algunas referencias directas a "partidos políticos", la realidad es que éstas no son más que un reflejo del contexto histórico en que se produjo la discusión, mas no representan, bajo ninguna circunstancia, un deseo de los delegados de excluir de esa categoría de "minoría" a todo candidato **electo** a una cámara legislativa que no pertenezca a un partido político. Es por ello que coincido con la apreciación de la Presidenta de la CEE al expresar que "[e]l debate de la

---

[51] Véase texto citado en las notas 8, 9, 10, 11, 12, 14, 15 y 17 incluidas en la Sección II de esta Opinión de Conformidad.

[52] Véase texto citado en la nota 7 de esta Opinión de Conformidad.

Constituyente demuestra que aun cuando el texto constitucional se redactó sobre la premisa de un escenario de partidos políticos como protagonistas, **la preocupación esencial no se circunscribía a los partidos como figuras institucionales, sino a la necesidad de garantizar espacios para las voces minoritarias**".[53]

Así las cosas, entiendo que es correcta la conclusión a la que llegó la Presidenta de la CEE de contabilizar al Senador Vargas Vidot y al Senador Dalmau Ramírez como parte de la minoría que constituirá el Senado de Puerto Rico durante los próximos cuatro años y, como consecuencia, certificar únicamente tres candidatos adicionales miembros del PPD. Una interpretación contraria a ello equivaldría a una denegatoria del claro propósito de nuestros delegados en la Convención Constituyente de promover un mecanismo que garantizara la elección de al menos nueve candidatos que no pertenecieran al partido de mayoría. Como mencionara, el interés siempre fue contar con voces que representaran grupos de opinión distinta. Por lo tanto, cónsono con ese interés muy particular de nuestros delegados, no hay duda que procede incluir a un candidato independiente **electo** y a un senador **electo** cuyo partido no quedó inscrito en el proceso electoral como parte del **cálculo** de nueve miembros de minoría que establece nuestra Constitución. Ambos Senadores Vargas

___

[53] (Énfasis y subrayado suplido). Resolución Núm. CEE-RS-16-090, supra, pág. 18.

Vidot y Dalmau Ramírez representan, junto a los otros siete senadores de minoría certificados por la CEE, ese núcleo de opinión distinta que, precisamente, surge como interés primordial que motivó la redacción y eventual adopción de la Sección 7(a) del Artículo III de nuestra Constitución.

Soy consciente que esta conclusión podría generar la interrogante de que si la preocupación de los delegados en la Convención Constituyente al redactar la Sección 7 del Artículo III de la Constitución era proveer una garantía para la justa representación de los partidos de minoría, ¿por qué esa misma preocupación no aplica para efectos de la adición de escaños? Es decir, ¿por qué un candidato independiente que **no** resulte electo mediante el voto directo del electorado **no** podría ser añadido como miembro electo por virtud de la garantía de minorías que establece la Constitución? ¿Por qué interpretar que la frase "partido o partidos de minoría" nos dista que los candidatos independientes no pueden acceder al mecanismo de adición de escaños, pero sí pueden ser considerados para efectos del cálculo? Varios puntos sobre estas interrogantes.

Primero, debo enfatizar en la diferencia elemental que **no** es lo mismo evaluar si un candidato independiente que **no contó con el favor del electorado** deba ser declarado electo por virtud de la garantía establecida en la Sección 7 del Artículo III versus evaluar si un

candidato independiente **electo por voto popular** puede ser considerado como parte la minoría electa en un cuerpo legislativo. Segundo, el hecho de que un candidato independiente no electo no pueda acceder al mecanismo

constitucional de representación de minoría **no** se da como resultado exclusivo de que el texto de la Constitución incluya la frase "partido o partidos de minoría", sino como resultado de que la adición de escaños está directamente vinculada a los partidos políticos como institución, en la medida que su aplicabilidad está condicionada expresamente a un porcentaje mínimo en la candidatura a la gobernación.[54]

Por último, más allá de lo incorrecto del razonamiento de los demandantes, resulta sumamente significativo que su adopción presupone la erradicación del hecho base que *constitucionalmente* da paso a la inclusión de escaños adicionales en alguna de nuestras cámaras. Esto porque si, en efecto, validamos la exclusión de los Senadores electos Vargas Vidot y Dalmau Ramírez para el cálculo correspondiente y, como consecuencia, ordenamos la inclusión de dos Senadores adicionales miembros del PPD, significaría que el Senado estaría compuesto de treinta y dos senadores: veintiún senadores del PNP, nueve senadores del PPD, un senador del PIP y un senador independiente. **Esa distribución de escaños**

---

[54] Véase, *Fuster v. Busó*, <u>supra</u>.

**desvirtuaría sin más la voluntad de los electores quienes optaron por apoyar directamente a más de dos terceras partes de los miembros de un partido político**. Ciertamente, no podría validar tal ultraja a los principios democráticos sobre los cuales, precisamente, se sustenta nuestra Constitución.

**IV**

Por todo lo anterior, estoy conforme con la Sentencia que hoy dicta este Tribunal porque soy del criterio que la Resolución emitida por la Presidenta de la CEE es correcta en derecho.

Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ángel M. Rodríguez Otero

    Recurrido

       v.

Comisión     Estatal    de
Elecciones, por conducto de
su Presidenta, Lcda. Liza
García Vélez y otros

    Recurridos

---

Comisionado Electoral del
Partido Popular Democrático

    Recurrido

       v.

Comisión     Estatal    de
Elecciones, por conducto de
su Presidenta; Lcda. Liza
García Vélez; y otros

    Recurridos

CT-2016-19
CT-2016-20

---

Juan Pablo Hernández

    Peticionario

       v.

Comisión     Estatal    de
Elecciones, por conducto de
su Presidenta; Lcda. Liza
García Vélez y otros

    Recurridos

---

Ramón Ruiz Nieves

    Recurrido

       v.

Comisión Estatal de

Elecciones por conducto de su Presidenta, la Lcda. Liza García Vélez y otros

Recurridos

Comisionada Electoral del Partido Nuevo Progresista, Norma Burgos Andújar y Hon. Thomas Rivera Schatz, Presidente entrante del Senado de Puerto Rico

Peticionarios en Certificación

v.

Comisión Estatal de Elecciones por conducto de su Presidenta, Liza García Vélez y otros

Recurridos

> *"De nada sirve que a los ciudadanos se les garantice su derecho al voto si luego aquellos que fueron depositarios de la confianza de los electores son excluidos en momentos cruciales del proceso legislativo"*. <u>Silva v. Hernández Agosto</u>, 118 DPR 45, 69 (1986).

Opinión de conformidad emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ

En San Juan, Puerto Rico, a 4 de enero de 2017.

Estoy conforme con el dictamen emitido por la Comisión Estatal de Elecciones, pero por tratarse una controversia sin precedentes en nuestro ordenamiento jurídico, procedo a exponer y fundamentar mi criterio. El planteamiento central que permea es con relación a cuántos escaños adicionales deben añadirse al amparo de la disposición constitucional que contempla la posibilidad de incorporar

escaños por adición, para reconfigurar la composición legislativa seleccionada por los electores. En esencia, se cuestiona quiénes deben ser considerados como representantes de los diversos sectores opuestos al de la mayoría legislativa.

Como contestación a esa interrogante, se argumenta que las minorías sólo pueden estar representadas por candidatos adscritos a un partido político. De esta forma, se desecha la posibilidad de que grupos de opinión estén representados por candidatos independientes electos por voto directo. Además, también se pretende excluir como representante de la minoría a un candidato afiliado a un partido político que logró ser electo, pero su partido no logró mantenerse inscrito. Por tanto, se solicita que estos escaños electos, los cuales no responden a los ideales del grupo mayoritario, se excluyan del cómputo para fines de la aplicación de la cláusula constitucional de escaños por adición.

I

Los hechos que dan lugar a la presente controversia son sencillos. En las pasadas elecciones, el Partido Nuevo Progresista obtuvo 21 de los 27 escaños que componen el Senado de Puerto Rico (Senado). El Partido Popular Democrático obtuvo 4 escaños, el Partido Independentista Puertorriqueño uno y otro escaño correspondió a un candidato independiente electo, el Dr. José Vargas Vidot (doctor Vargas Vidot). En cuanto a los votos para el cargo

de Gobernador, el Partido Nuevo Progresista alcanzó el 41.79% de la totalidad de éstos.

Ante los resultados de las elecciones, y por haber ocupado el Partido Nuevo Progresista más de dos terceras partes de los miembros del Senado,[55] se activa el inciso (a) de la Sec. 7 del Art. III de la Constitución de Puerto Rico, LPRA Tomo 1, y la disposición habilitadora contenida en la *Ley Electoral del Estado Libre Asociado de Puerto Rico*, Ley Núm. 78-2011, 16 LPRA sec. 4001 *et seq.* En consecuencia, no existe controversia de que procede añadir tres senadores por acumulación adscritos al Partido Popular Democrático, a saber: José Nadal Power, Miguel A. Pereira Castillo y Cirilo Tirado Rivera. Sobre estos particulares no existe controversia alguna.

El debate que se suscita es en torno a si deben incorporarse escaños adicionales a esos tres. Es decir, si el candidato independiente, doctor Vargas Vidot, y el candidato del Partido Independentista Puertorriqueño, Lcdo. Juan Dalmau Ramírez (licenciado Dalmau Ramírez) deben excluirse del cómputo de hasta nueve senadores adicionales que requiere la Sec. 7 del Art. III de la Constitución de Puerto Rico para la representación minoritaria.[56] El argumento central consiste en que la

---

[55]Los votos obtenidos por el Partido Nuevo Progresista para los escaños al Senado de Puerto Rico representan el 77.78% de los miembros de ese cuerpo legislativo.

[56]En lo pertinente, ante la Comisión Estatal de Elecciones se argumentaron varias teorías en torno a cómo aplica la Sec. 7 del Art. III de la Constitución de Puerto

representación minoritaria opera y se limita en virtud de los "partidos políticos". En oposición a esa visión, el Partido Nuevo Progresista afirma que al Partido Popular Democrático le corresponden los tres escaños adicionales que no son objeto de controversia. Ello pues, sostiene que el doctor Vargas Vidot y el licenciado Dalmau Ramírez completarían los nueve legisladores de minoría.

Trabada así la polémica, la Comisión Estatal de Elecciones (CEE) dilucidó los argumentos planteados. A estos fines, dictaminó que "el debate de la Constituyente demuestra que aun cuando el texto constitucional se redactó sobre la premisa de un escenario de partidos

---

Rico. En primer lugar, se señaló que ésta opera en función de la figura de "partidos de minoría", por lo que no debe incluirse en el cómputo de los representantes de las minorías a los candidatos independientes. Bajo esta conceptualización, procedería añadir cuatro escaños adicionales al Senado. Así, entrarían los senadores por acumulación y el senador por distrito que aparece con la más alta proporción de votos. En segundo lugar, se arguyó que también procedía excluir del cómputo al candidato electo del Partido Independentista Puertorriqueño, porque los representantes de las minorías deben responder a partidos políticos debidamente inscritos. Por tanto, como el Partido Independentista Puertorriqueño no obtuvo el porcentaje necesario para quedar inscrito, no procede considerar a su candidato electo como un representante de la minoría. Bajo esta teoría, entrarían además de los tres senadores por acumulación antes mencionados, dos nuevos escaños correspondientes a los senadores por distrito con mayor proporción de votos. Por último, el Partido del Pueblo Trabajador razonó que el asunto debe tratar sobre la representación de partidos de minorías y no sobre minorías en general. Por ello, sostuvo que el candidato electo del Partido Independentista Puertorriqueño debe contarse como representante de minoría independientemente de si su partido obtuvo los votos necesarios para mantenerse inscrito. Por tanto, sostiene que procedería un total de cuatro escaños adicionales al Partido Popular Democrático.

políticos como protagonistas, la preocupación esencial no se circunscribía a los partidos como figuras institucionales, sino a la necesidad de garantizar espacios para las voces minoritarias". *Véase*, Resolución de la CEE de 30 de noviembre de 2016 en el CEE-RS-16-090 (Resolución). A su vez, resaltó que "al momento de reconocer si existe o no una minoría para efectos de evaluar si deben existir o no escaños adicionales, las expresiones del debate constituyente requieren concluir que la mejor interpretación, la más cónsona con el esquema adoptado, es la que reconoce que esa minoría de nueve (9) senadores **puede incluir un candidato electo por el pueblo que representa un núcleo de opinión distinto al de la mayoría, aunque no milite en un partido político de minoría**". Íd., pág. 18. Énfasis suplido. Con relación a los candidatos electos de partidos no inscritos, la CEE adjudicó que éstos se colocan dentro de la representación de núcleos de opinión que no pertenecen al partido de mayoría.

Inconformes, los peticionarios impugnaron la determinación de la CEE. Así las cosas, este Tribunal certificó el asunto y procede a pautar el Derecho aplicable.

II

Uno de los logros más importantes de nuestra Constitución es el reconocimiento de participación democrática de todos los sectores y las salvaguardas para

que los grupos minoritarios gozaran de representación en los cuerpos legislativos. 3 Diario de Sesiones de la Convención Constituyente 2029, Ed. Conmemorativa 2003 (1952). Ello es el resultado de la ardua tarea de la Convención Constituyente para incorporar unas disposiciones que permitieran la representación de la oposición política. Pues, **"el principio democrático de gobierno exige que el poder legislativo sea ejercido por un cuerpo de representantes de todo el pueblo"**. Véase, La Nueva Constitución de Puerto Rico, Escuela de Administración Pública, Río Piedras, Ed. U.P.R., 1954, pág. 253. Énfasis suplido.

La preocupación de que las minorías contaran con representación legislativa fue en respuesta a la búsqueda para atajar la realidad histórica del dominio electoral logrado por el Partido Popular Democrático en la época de 1944 y 1948. *Véase*, Fuster v. Buso, 102 DPR 327, 330 (1974)(*Per Curiam*). Tal hecho, planteó la necesidad de incorporar unas garantías constitucionales con el fin de velar que las minorías, representadas en aquel entonces por distintos partidos políticos, tuvieran su espacio en los cuerpos legislativos. De esta forma, durante el proceso de la Convención Constituyente permeó un espíritu que buscaba asegurar el que **"se garantizara la expresión de la voluntad del pueblo en el funcionamiento del poder legislativo"**, pues no había cuestionamiento en que "es básico para la salud democrática que **las minorías** tengan

una representación que, aun bajo las circunstancias más desfavorables, les permita cumplir adecuadamente **su función de fiscalizar y estimular a la mayoría en su obra de gobierno** sin crear entorpecimientos que puedan resultar en detrimento de la democracia". Informe Complementario de la Comisión de la Rama Legislativa, 4 Diario de Sesiones de la Convención Constituyente 2590 (1951). Énfasis suplido. Véase, además, Opinión concurrente emitida por la Juez Asociada señora Naveira de Rodón en P.P.D. v. Peña Clos I, 140 DPR 779, 799 (1996). En fin, las minorías tienen la obligación de fiscalizar, sin obstaculizar el funcionamiento legislativo. Silva v. Hernández Agosto, 118 DPR 45, 70 (1986).

En aras de lograr ese propósito, y entre las medidas aprobadas, se aumentó el número de distritos senatoriales y los escaños por acumulación como método para proveer una mayor participación minoritaria. J. Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, Ed. Universidad de Puerto Rico, T. III, pág. 143. Como si ello no fuera suficiente, se descartó el principio de representación proporcional, pero se vislumbró que la fuerza fiscalizadora estuviera a cargo de las minorías como grupos no vinculados con la mayoría parlamentaria.[57] En este proceder, la Escuela de Administración Pública

---

[57] Para la referencia a las distintas alternativas estudiadas antes de adoptar la fórmula incorporada por la Convención Constituyente, véase, J. Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, Ed. Universidad de Puerto Rico, T. III, págs. 144-145.

explicó que ese sistema proporcional no reflejaba la corriente moderna que vislumbraba al representante político como uno del pueblo, quien viene obligado a representar a la totalidad del pueblo, y sólo responde a su conciencia. *La Nueva Constitución de Puerto Rico*, op cit., pág. 260. Expuso que, por el contrario, el sistema de representación proporcional aumenta las facultades y autoridades de los partidos políticos, lo que en esencia era "sumamente peligroso para la vida misma de la democracia". Íd.

Los debates de la Convención Constituyente reflejan una preocupación de que el poder legislativo no se concentrara en una mayoría. A estos fines, se concebía que la rama legislativa debía reflejar la "**opinión pública de todos**" con una adecuada fiscalización del producto de una sociedad en conjunto. 2 Diario de Sesiones de la Convención Constituyente 1282 (1951). Por ello, la idea de salvaguardar la representación minoritaria pretendía el "**reconocimiento de núcleos de opinión**" con el fin de que las "**mayorías legislativas tengan el acicate y el estímulo de una minoría que vigila y colabora en el proceso democrático**". 2 Diario de Sesiones de la Convención Constituyente 1304 (1951). Énfasis suplido.

En el proceso de discusión de las alternativas para reconocer la representación minoritaria se descartaron varias propuestas hasta alcanzar un consenso formulado por el delegado Luis Negrón López. Éste propuso un novedoso

método basado en un número representativo a las minorías que nunca excede de una tercera parte de los miembros de las cámaras. En ese contexto, el delegado Negrón López expresó que la representación minoritaria promulgada era para "guardar el más alto reconocimiento al deseo de los electores cuando votan, **cualquiera que sea el partido o de la forma en que ellos expresen su deseo y voluntad**". 2 Diario de Sesiones de la Convención Constituyente 1302 (1951). Énfasis suplido. La idea de la representación minoritaria era restarles importancia a los partidos políticos y conferir preeminencia a "los grupos de opinión". 3 Diario de Sesiones de la Convención Constituyente 2028 (1952). Se pretendía fortalecer el carácter representativo para asegurar la participación política a las minorías en la Asamblea Legislativa. Silva v. Hernández Agosto, *supra*, pág. 70.

Igualmente, la Convención Constituyente concibió la creación de una Ley Suprema que superara la realidad de aquel momento histórico con el fin de que nuestra Constitución sea "buena, ahora y después; a lo largo de todas las elecciones que haya, y cualquiera que sea la distribución de votos". 2 Diario de Sesiones de la Convención Constituyente 1304 (1951). Incluso, los constituyentes vaticinaron la evolución del significado de la norma, en reconocimiento de que nuestro ordenamiento político estaría afecto a transformaciones políticas y al cambio de su electorado. Transformaciones y cambios que

nos llevan a la realidad de una elección general en la que un candidato independiente al Senado obtuvo más del triple de la cantidad de votos que acumularon conjuntamente los partidos políticos minoritarios, Partido Independentista Puertorriqueño y Partido del Pueblo Trabajador, para la gobernación.

Ante ello, no podemos obviar que al determinarse la fórmula incorporada en la Sec. 7 del Art. III de la Constitución de Puerto Rico, para salvaguardar a las minorías una garantía parlamentaria, las expresiones del delegado Negrón López resuenan como presagio de la controversia que hoy atiende este Tribunal, a saber:

> Partidos ha habido en el pasado que han tenido fuerza, que han hecho su obra, y que han desaparecido. Partidos habrán en el futuro también. Desaparecerán los partidos, su fuerza numérica, el prestigio con el que cuentan ante el electorado; pero esta fórmula … este plan subsistirá a través de los años, cualquiera que sea la evolución política de este pueblo". 2 Diario de Sesiones de la Convención Constituyente 1304 (1951).

Es decir, los propios constituyentes reconocieron que el concepto "partido político" no estaba escrito en piedra ni podía limitarse a las experiencias y análisis que ellos pudieran realizar en esa época, sino que la norma serviría de guía y subsistiría, pero interpretada a la luz de las transformaciones electorales que precisamente hoy experimentamos. Ante ese cuadro, el mecanismo propuesto por el delegado Negrón López consistía en atender aquellas circunstancias en las que un partido o una sola candidatura obtuviera más de dos terceras partes de los

miembros de una cámara; es decir, cuando el poder se concentraba en una mayoría unida por los mismos ideales. Para atender esa situación, se acordó un incremento automático de la composición de los miembros de la cámara, con el propósito de garantizar una representación adicional a quienes no compartían esos ideales. De esta forma, se fijó una fórmula que consideraba la representación proporcional para la adición de escaños en forma limitada. *La Nueva Constitución de Puerto Rico*, op. cit., págs. 264-265.

La fórmula fue ampliamente discutida y se consideró que los miembros adicionales serían representantes por acumulación y que la adición de escaños debía guardar relación y proporción con el número de votos emitidos para el cargo de Gobernador representado por esas minorías. De esta manera, se estableció una distribución de escaños adicionales en proporción a los votos que obtuviera esa minoría para el puesto de Gobernador. Además, se acordó que la Asamblea Legislativa establecería el porcentaje requerido para cualificar en la distribución de escaños adicionales.[58] De no obtener ese porcentaje, el partido político no tendría derecho al escaño adicional. 3 Diario de Sesiones de la Convención Constituyente 2025-2026 (1952).

El objetivo de limitar la distribución adicional de escaños representativos de la minoría bajo estas premisas

_____

[58] En este caso, el porcentaje fijado es de 3%. Véase, 16 LPRA sec. 4205.

consistía en erradicar la infinidad de pequeños partidos políticos, eliminándolos de no contar con suficientes votos para acreditarse el derecho a representación adicional. 3 Diario de Sesiones de la Convención Constituyente 2024-2029 (1952). Véase, además, Fuster v. Buso, *supra*, pág. 333. Tal ideal evitaba la posibilidad de que hubiese un reclamo individual para tener representación directa en los procesos políticos. Véase, Johanelle González Rodríguez, La participación de las minorías políticas en la Asamblea Legislativa, 85 Rev. Jur. U.P.R. 1195, 1196 (2016). A su vez, esta proporcionalidad limitada avalaba que aquellos sectores minoritarios que, aunque no alcanzaron elegir escaños representativos en los procesos legislativos, tenían el apoyo suficiente de un grupo de electores pudieran ostentar representación legislativa. Esa fuerza electoral se medía a través de los votos obtenidos para el cargo de Gobernador.

Así las cosas, el número de escaños adicionales a concederse fue limitado a nueve en el Senado y diecisiete en la Cámara de Representantes, lo que refleja que, en estos casos, la minoría nunca alcanzaría un exceso de una tercera parte de los miembros originales para cada cámara. Véase, Olga Elena Resumil de Sanfilippo y Rafael Faría González, La garantía constitucional a la representación de minorías en la Asamblea Legislativa: naturaleza, alcance y extensión, 65 Rev. Jur. U.P.R. 329, 338 (1996).

Como bien se reconoce en la Resolución recurrida, el delegado constituyente Reyes Delgado expresó que: "Nosotros no queremos que un partido que ha obtenido las dos terceras partes del voto total, venga a formar la Asamblea Legislativa con menos votos de los que en realidad el voto electoral le produjo para venir al hemiciclo de la Cámara y del Senado en su día". 2 Diario de Sesiones de la Convención Constituyente 1282 (1951).[59]

De esta forma, se respeta el sentir democrático del ideal político reconocido a una mayoría por el electorado, a la vez que se evita la concentración del poderío de un sector sobre otros sectores de opinión pública. Asimismo, se avaló que cuando hubiera más de una minoría con derecho a escaños adicionales, no participaría aquella que hubiera completado su representación hasta tanto cada minoría estuviere debidamente representada.

Con ese trasfondo, se incorporó la Sec. 7 del Art. III de la Constitución de Puerto Rico que establece el mecanismo para el cómputo de los escaños que deben añadirse a los cuerpos legislativos, en caso que sea necesario. En lo pertinente, la aludida sección establece que:

> Cuando en una elección general resultaren electos más de dos terceras partes de los miembros de cualquiera de las cámaras por un solo partido o bajo una sola candidatura, según ambos términos se definan por ley, se aumentará el número de sus miembros en los siguientes casos:

---

[59]*Véase,* Resolución de la Comisión Estatal de Elecciones, pág. 20.

(a) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hubiese obtenido menos de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, se aumentará el número de miembros del Senado o de la Cámara de Representantes o de ambos cuerpos, según fuere el caso, declarándose electos candidatos del partido o partidos de minoría en número suficiente hasta que la totalidad de los miembros del partido o partidos de minoría alcance el número de nueve en el Senado y de diecisiete en la Cámara de Representantes. Cuando hubiere más de un partido de minoría, la elección adicional de candidatos se hará en la proporción que guarde el número de votos emitidos para el cargo de Gobernador por cada uno de dichos partidos con el voto que para el cargo de Gobernador depositaron en total esos partidos de minoría.

Cuando uno o más partidos de minoría hubiese obtenido una representación en proporción igual o mayor a la proporción de votos alcanzada por su candidato a Gobernador, no participará en la elección adicional de candidatos hasta tanto se hubiese completado la representación que le correspondiese bajo estas disposiciones, a cada uno de los otros partidos de minoría.

El citado texto aplica a situaciones como la de autos, cuando un partido elige más de dos terceras partes de los miembros de cualquiera o ambas cámaras, pero obtuvo menos de dos terceras partes del total de votos para el cargo de Gobernador, se añaden escaños hasta que se alcance el número de nueve en el Senado y diecisiete en la Cámara de Representantes. Los miembros adicionales que procedan debido a la aplicación de esta sección serán considerados para todos fines como si hubieran sido Senadores o Representantes electos por acumulación. Al incorporar la referida sección, se expresó que ésta es un "medio de dar justa interpretación a la voluntad del pueblo y no como

una concesión a los partidos políticos". 4 Diario de Sesiones de la Convención Constituyente 2596 (1951).

Ante el claro mandato constitucional, la Ley Electoral habilita esa cláusula al incorporar el Art. 10.015, 16 LPRA sec. 4205. Éste establece que:

> Después que la Comisión haya realizado el escrutinio general determinará los candidatos que resultaron electos para los once (11) cargos a senadores por acumulación, los once (11) a representantes por acumulación, los dos (2) senadores por cada distrito senatorial y el representante por cada distrito representativo. Además, la Comisión procederá a determinar la cantidad y los nombres de los candidatos adicionales de los partidos de minoría que deban declararse electos, si alguno, conforme a las disposiciones de la Sec. 7 del Art. III de la Constitución de Puerto Rico. La Comisión declarará electos y expedirá el correspondiente certificado de elección a cada uno de dichos candidatos de los partidos de minoría.
>
> (1) A los fines de implantar el inciso (a) de la Sec. 7 del Art. III de la Constitución de Puerto Rico, cuando un partido que no obtuvo dos terceras partes de los votos para el cargo de Gobernador haya elegido sobre dos terceras partes de los miembros de una o ambas cámaras, se hará la determinación de los senadores o representantes adicionales que corresponda a cada uno de dichos partidos de minoría en la siguiente forma:
>
> (a) Se divide la cantidad de votos emitidos para el cargo de Gobernador de cada partido de minoría entre la cantidad total de votos depositados para el cargo de Gobernador de todos los partidos de minoría;
>
> (b) se multiplica el resultado de la anterior división por nueve (9) en el caso de los senadores y por diecisiete (17) en el caso de los representantes, y
>
> (c) se resta del resultado de la multiplicación que antecede, la cantidad total de senadores o representantes que hubiera elegido cada partido de minoría por voto directo.

El resultado de esta última operación matemática será la cantidad de senadores o representantes adicionales que se adjudicará a cada partido de minoría hasta completarse la cantidad que le corresponda, de manera que el total de miembros de partidos de minoría en los casos que aplica el inciso (a) de la Sec. 7 del Art. III de la Constitución de Puerto Rico sea nueve (9) en el Senado o diecisiete (17) en la Cámara de Representantes de Puerto Rico.

….

Los senadores de todos los partidos de minoría nunca serán más de nueve (9) ni los representantes más de diecisiete (17). …

Ningún partido de minoría tendrá derecho a candidatos adicionales ni a los beneficios que provee la Sec. 7 del Art.III de la Constitución de Puerto Rico, a no ser que en la elección general obtenga a favor de su candidato a gobernador, una cantidad de votos equivalentes a un tres (3) por ciento o más del total de votos depositados en dicha elección general a favor de todos los candidatos a gobernador.

De esta forma, la Ley Electoral implanta el mandato concebido en la Sec. 7 del Art. III de la Constitución de Puerto Rico.

III

La Sec. 7 del Art. III de la Constitución de Puerto Rico ha sido objeto de varias disputas. Entre ellas, en Fuster v. Buso, *supra*, se dilucidó si un partido político que no logró el porciento necesario para la adjudicación de escaños adicionales, tenía derecho a que su candidato para la legislatura fuera certificado como representante por acumulación por éste haber obtenido un número mayor de votos que los otros representantes de la minoría certificados.[60] En ese entonces, este Tribunal entendió que

---

[60]En el proceso electoral de 1972, hubo cuatro partidos políticos que tuvieron candidatos para el puesto de

sólo cualificaban los partidos políticos que obtuvieron el porciento determinado por la Asamblea Legislativa para el escaño adicional bajo la disposición de representación de minorías.

Posteriormente, en P.P.D. v. Peña Clos I, *supra*, surgió una situación interesante cuando un senador que ocupó el cargo como resultado de la aplicación de escaños adicionales por representación de minorías se desafilió del partido minoritario y luego se unió al partido de mayoría. Ello planteó la interrogante de si éste era acreedor del puesto y debía adicionarse un escaño para completar la representación minoritaria, en vista de que se creó un desbalance con la afiliación del incumbente al partido mayoritario. Este Tribunal emitió una Sentencia en

---

Gobernador; el Partido Popular Democrático, el Partido Nuevo Progresista, el Partido Independentista Puertorriqueño y el Partido del Pueblo. El Ing. Roberto Sánchez Vilella (ingeniero Sánchez Vilella) aspiró a Representante por Acumulación por el Partido del Pueblo. En ese periodo electoral, el Partido Popular Democrático eligió más de dos terceras partes de los representantes a la Cámara al elegir 37 candidatos, pero obtuvo menos de dos terceras partes de los votos emitidos para el cargo de Gobernador. El Partido Nuevo Progresista eligió 14 representantes. Siendo así, procedió a aplicarse la representación por minoría y se añadieron 3 escaños adicionales, correspondiendo éstos; dos al Partido Independentista Puertorriqueño y uno al Partido Nuevo Progresista. El problema se suscitó cuando se solicitó que se certificara al señor Sánchez Vilella al escaño como representante de minoría por haber obtenido más votos que algunos de los candidatos certificados para los escaños adicionales. Sin embargo, el partido que éste representaba no logró el porciento necesario para ser acreedor de la representación proporcional concebida en la Sec. 7 del Art. III de la Constitución de Puerto Rico. Nótese que en el caso ante nos, el licenciado Dalmau Ramírez fue electo directamente por el Pueblo.

la que permitió al senador Sergio Peña Clos permanecer en el Senado y ordenó la certificación de un candidato adicional del partido minoritario, bajo el cual fue electo, para completar la representación de la minoría.[61]

Además, resulta pertinente destacar que la solicitud del Partido Popular Democrático para que se le concediera un escaño adicional tuvo lugar cuando el senador Sergio Peña Clos se identificó con el Partido Nuevo Progresista. De los hechos del caso, resalta que el senador Peña Clos notificó su decisión de abandonar el *caucus* el 12 de octubre de 1993. Desde ese momento y hasta el 1995, fungió y se identificó como senador independiente, desafiliado de todo partido político. Durante ese periodo no se impugnó tal proceder, hasta que en el 1995 el Partido Popular Democrático procedió a hacerlo. Es decir, en aquel momento la parte peticionaria consideró a un senador independiente como parte de la fórmula de balance opositor que contempla la cláusula constitucional que nos ocupa.

Luego, consideramos el caso de <u>Suárez Cáceres v. Com. Estatal de Elecciones</u>, 176 DPR 31 (2009), para definir los contornos de la Sec. 7 del Art. III de la Constitución de Puerto Rico, a los efectos de si se consideraban como

---

[61]La controversia en <u>P.P.D. v. Peña Clos I</u>, *supra*, promovió un sinnúmero de expresiones de distintos miembros de este Tribunal. En todas ellas, existía el consenso de que el propósito de la Sec. 7 del Art. III de la Constitución del ELA era establecer un mecanismo para afianzar la representación minoritaria.

"votos depositados" los votos de aquellos electores que depositaron su papeleta en blanco para determinar si se aplicó correctamente la fórmula para establecer los escaños correspondientes a la representación minoritaria.

De cara a las trasformaciones electorales vigentes, nos toca pronunciarnos con relación a si, para fines del cómputo, deben considerarse como representantes de minorías los candidatos independientes electos y aquellos que fueron electos directamente por los electores bajo la insignia de un partido político que no quedó inscrito. No obstante, parecería que la postura que pretenden sustentar algunos es que la minoría está limitada a la afiliación y representación de partidos políticos, en virtud del texto aislado de la norma constitucional o mediante la preservación del cuadro histórico en que originalmente se aprobó la misma. Tal interpretación se aleja de la evolución necesaria de la norma, indispensable para reconocer las transformaciones sociales y electorales de nuestro ordenamiento político y mantener el balance de los intereses protegidos por la Constitución de Puerto Rico.

Ante una situación similar con relación a los miembros de la Legislatura Municipal, este Tribunal en Guadalupe v. C.E.E., 165 DPR 106 (2005), avaló el que un candidato independiente pueda ser considerado como parte del bloque opositor. En ese caso, se cuestionaba si procedía certificar a un candidato independiente para ser legislador municipal, mediante el mecanismo de

representación de minorías, a pesar de que éste no pertenecía a un "partido político".[62] En otras palabras, si un candidato independiente que no representa a un partido político puede ser considerado como un representante de una minoría parlamentaria. La determinación del foro apelativo intermedio revocó la designación del candidato independiente certificada por la Comisión Estatal de Elecciones amparado en que los escaños de minorías en las legislaturas municipales pertenecen a los "partidos políticos" que hayan comparecido a las elecciones, y no a los candidatos independientes. Íd., pág. 112.[63]

El razonamiento del foro intermedio no fue avalado por este Tribunal. Por el contrario, al apoyar la certificación del candidato independiente como uno de representación minoritaria, este Tribunal expresó que una interpretación a los fines de excluir la posibilidad de que un candidato independiente sea acreedor de considerarse como un representante de la minoría constituye una interpretación literal con "serios

---

[62]Al igual que en el caso ante nos, el candidato independiente había obtenido un número mayor de votos que los otros aspirantes.

[63]El estatuto que estaba siendo interpretado establece un mecanismo similar al de la Sec. 7 del Art. III de la Constitución de Puerto Rico a los efectos de reconocer un mecanismo de representación de minorías. Éste se determina a base de declarar como electos aquellos candidatos que no fueron electos por el voto directo, pero obtuvieron más votos de acuerdo a los "partidos" que representan; dos escaños al partido político que llegó en segunda posición en las elecciones para legisladores municipales y uno para el partido en la tercera posición. Véase, 21 LPRA sec. 4153 (a).

problemas jurídicos", pues "**subordina el mandato electoral a formalismos legales que desvirtúa el valor del voto directo**" e "**implicaría condicionar el valor de ese voto a que el candidato que lo recibe haya comparecido al proceso electoral como parte de un partido político**" Íd., págs. 116. Énfasis suplido. Tajantemente, este Tribunal denunció que proceder de otra forma "desmerece el esquema electoral" que propicia frente a las alternativas partidistas tradicionales optar por los candidatos independientes e incluso por personas no incluidas en una papeleta mediante nominación directa, lo cual constituye un atentado "contra el principio básico de igualdad electoral, pues excluye a las candidaturas independientes de la posibilidad de obtener un puesto electivo mediante uno de los mecanismos de elección considerados por ley". Íd.

Al resolver Guadalupe v. C.E.E., *supra*, este Tribunal concluyó, sin ambages, que "**el mecanismo electoral para garantizar la representatividad de las minorías no está limitado a los partidos políticos**". Íd., pág. 118. Énfasis suplido. Más aún, interpretó que la expresión "partido político" del estatuto "incluye a cualquier agrupación de individuos o **a candidatos independientes que hayan comparecido válidamente a una elección**". Íd. Énfasis suplido. En fin, "**privar a los candidatos independientes de la oportunidad de considerarse como minoría para fines de representación** … vulneraron los derechos y las

prerrogativas que, conforme, … la Ley Electoral de Puerto Rico, *supra*, le asisten al elector, máxime cuando esos candidatos independientes son certificados como candidatos". Íd., págs. 119-120.

Como vemos, se trata de que tanto nuestra Constitución como la Ley Electoral, *supra*, reconocen las garantías al proceso democrático al establecer que la expresión electoral se organiza a través de los distintos partidos políticos, pero siempre está sujeta a los derechos de los electores reconocidos en nuestro andamiaje electoral. Por ello, se reconoce la expresión con **independencia de afiliación partidista** para la protección de todos los ciudadanos que así lo desean. 16 LPRA sec. 4003 y 4061. No podemos olvidar que la razón para establecer ese mecanismo de representación minoritaria se fundó en la necesidad de voces disidentes, representantes de fuerzas opuestas a la de la mayoría, cuyo propósito es lograr el balance necesario para una fiscalización efectiva del poder. *Véase,* J. González, *supra*, pág. 1206.

IV

Con este marco, surge diáfanamente que la Sec. 7 del Art. III de la Constitución de Puerto Rico implementó un mecanismo para evitar que no se concentrara el poder legislativo en un grupo mayoritario. Así pues, se vislumbró una garantía representativa de sectores opuestos a la mayoría, denominados grupos minoritarios, cuyo fin era la fiscalización de la mayoría. Claro está, como la

intención de la Convención Constituyente era proteger la expresión de la voluntad del Pueblo, se aseguró que el partido seleccionado por el voto directo no perdiera su primacía. Por ello, al aplicar la fórmula en los cuerpos legislativos, los escaños añadidos para la representación minoritaria nunca excederían de la tercera parte del número original.[64] Véase, Trías Monge, op cit., pág. 145.

Ciertamente, el reclamo de los peticionarios conllevaría diluir el poder político de la mayoría legislativa, en contravención con la norma constitucional y al mandato de los electores. Además, tampoco debemos descartar las consecuencias que tendría aplicar aisladamente el texto de la Constitución o limitarlo a la visión tradicional que regía en esa época de gobernanza exclusiva, por parte de los partidos políticos, en lo referente al rol que tienen las minorías legislativas y las implicaciones que tendría la exclusión en el cómputo de los senadores entrantes licenciado Dalmau Ramírez y el doctor Vargas Vidot, en el ejercicio de su poder legislativo otorgado directamente por el electorado. A la luz de los fundamentos expuestos, también es necesario reconocer que la exclusión de los senadores entrantes licenciado Dalmau Ramírez y el doctor Vargas Vidot sí les afecta en el ejercicio de sus funciones. Si bien es cierto que ellos tienen sus escaños asegurados, una de las etapas

---

[64] En el caso del Senado hasta nueve escaños correspondientes a la minoría y diecisiete en la Cámara de Representantes.

cruciales del proceso legislativo estriba precisamente en la asignación de recursos y distribución de funciones. El cómputo de la cláusula de adición es un elemento clave en le reconfiguración de la nueva composición legislativa y tiene un efecto directo en los factores de recursos asignados y distribución de funciones. Es decir, la exclusión en el cómputo de los senadores entrantes licenciado Dalmau Ramírez y el doctor Vargas Vidot conllevaría ignorar las trasformaciones electorales presentes, con la consecuencia de aumentar inconstitucionalmente la composición legislativa del Partido Popular Democrático, en detrimento no solamente de la composición de más de dos terceras partes de la mayoría legislativa, ya que también tendría el efecto concreto y directo de diluir innecesariamente el poder político que el electorado le confirió directamente a los núcleos de opinión opositores.

La concepción de los escaños adicionales tiene su génesis en la intención de preservar una sana gestión de gobierno democrático proveyendo para la representación de sectores que promulgan ideas contrarias a las del partido que obtuvo la mayoría legislativa. Véase, Resumil, *supra*, pág. 337. El objetivo primordial es la representación de los distintos núcleos de opinión. No se trataba de si éstos son representados por partidos políticos o no, sino de que exista un grupo contrario al del poder mayoritario,

con la encomienda de fiscalizar y evitar la concentración de poder en una ideología política. Íd.

Atar la representación minoritaria, para fines de quiénes se consideran como representantes de las minorías, a que sólo se consideran aquellos candidatos afiliados a "partidos políticos" inscritos, constituye una afrenta al derecho a ejercer el voto a conciencia, igual, libre y directo. Socava el derecho de todo elector a un voto por candidatura o voto mixto e incluso de nominación directa. Más aún, no responde a los postulados democráticos de que el elector tiene derecho a que su voto cuente. Como vimos, la redacción de nuestra Constitución responde y está predicada en el **"reconocimiento al deseo de los electores cuando votan, cualquiera que sea el partido o la forma en que ellos expresen su deseo y su voluntad"**. 2 Diario de Sesiones de la Convención Constituyente 1302 (1951).

Esas manifestaciones calan al momento de interpretar la intención de la Convención Constituyente. Avalar una postura que secuestre la representación minoritaria a la afiliación a un partido político atenta contra el espíritu de la Sec. 7 del Art. III de la Constitución de Puerto Rico. Conllevaría un retroceso al sistema democrático y a la voluntad del electorado e ignoraría la evolución y transformación en el comportamiento del soberano en las urnas. Nuestra Constitución no pretendía circunscribirse a un momento histórico. Los partidos políticos no pueden ni deben atribuirse lo que no les corresponde. Los

constituyentes admitieron que no podrían recoger todas las opciones cualitativas que el Pueblo puede escoger en el ejercicio del derecho al voto, durante la evolución de los procesos políticos. En el 2016, el electorado eligió con su voto directo a dos personas que son parte de la fórmula que hoy avalamos. Es decir, nuestro electorado demostró en las urnas que existen grupos de opinión, cuya fuerza electoral es lo suficiente para alcanzar escaños legislativos que no están sujetos a un partido político. Es nuestro deber reconocer esa evolución y realizar una interpretación que promueva que la norma siga siendo buena durante todas las elecciones y cualquiera que sea la distribución de votos. *Véase* 2 Diario de Sesiones de la Convención Constituyente, op. cit., pág. 1304.

El voto de esos electores responde a un ejercicio democrático mediante el cual expresaron su sentir para elegir unos portavoces que no forman parte de los partidos tradicionales. Ante la realidad que hoy vivimos, una interpretación de la Constitución que no recoja esa transformación electoral, sencillamente provocaría estrangular la democracia. Asimismo, conduciría al quebrantamiento de la voluntad de nuestros electores e implicaría impartir desproporcionalmente una fuerza electoral artificial a quien no le corresponde.

V

Conforme a lo expresado, procede considerar tanto al candidato independiente, doctor Vargas Vidot, así como al

candidato por el Partido Independentista Puertorriqueño, licenciado Dalmau Ramírez, electos democráticamente, como representantes de las minorías. Estos candidatos representan un núcleo de opinión distinta al de la mayoría del Partido Nuevo Progresista.

Ante tal realidad, y al aplicar la fórmula de la Sec. 7 del Art. III de la Constitución de Puerto Rico, sólo corresponde añadir tres escaños adicionales a favor del Partido Popular Democrático que le corresponden a los Senadores por acumulación no electos: José Nadal Power, Miguel A. Pereira Castillo y Cirilo Tirado Rivera.

Por consiguiente, procede confirmar la Resolución emitida por la CEE.


                                    Luis F. Estrella Martínez
                                         Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ángel M. Rodríguez Otero

Recurrido

v.

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

Recurridos

---

Comisionado Electoral del Partido Popular Democrático

Recurrido

v.

Comisionado Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

Recurridos

---

Juan Pablo Hernández

v.

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

Recurridos

---

Ramón Ruiz Nieves

Recurrido

v.

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

Recurridos

CT-2016-0019
CT-2016-0020

Comisionada Electoral del Partido Nuevo Progresista, Norma burgos Andújar y Hon. Thomas Rivera Schatz, Presidente entrante del Senado de Puerto Rico

Peticionarios en Certificación

v.

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

Recurridos

Opinión Concurrente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 4 de enero de 2017

Tenemos ante nuestra consideración una controversia novedosa que nos obliga a plantearnos el alcance de la disposición constitucional que provee un mecanismo especial para modificar la composición de cualesquiera de las cámaras legislativas en caso de que en una elección general, resulten electos más de dos terceras (2/3) partes de los miembros de alguno de estos cuerpos legislativos por un solo partido o bajo una sola candidatura. Tenemos entonces que enfrentarnos al texto de la Sección 7 Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico, conocida comúnmente como la *Ley de minorías*.

I

Como cuestión de umbral, me veo obligada a consignar mi disconformidad con la forma en que se optó por disponer de la controversia de autos. Cabe recordar que la certificación intrajurisdiccional es un recurso extraordinario cuya expedición procede cuando "se planteen cuestiones noveles de derecho o de alto interés público que incluyan cualquier cuestión constitucional sustancial, la constitucionalidad de una ley, resolución conjunta, resolución concurrente, regla o reglamento". *Brau, Linares v. E.L.A.*, 189 DPR 1068, 1073 (2013) (Resolución). Resulta evidente que su propósito es atender con diligencia y prontitud asuntos de gran relevancia como de ordinario son controversias que nos requieren esclarecer los linderos del texto constitucional. En el pasado, he expresado que debemos ser por demás cautelosos en su expedición y, salvo circunstancias extraordinarias, no debemos preterir los procesos ante los foros de primera instancia. No me parece saludable que el Tribunal Supremo actúe, continuamente, como foro de primera instancia. El trámite de esta certificación pone de manifiesto de manera palmaria los malos usos de este recurso extraordinario.

El 15 de diciembre de 2016, el Tribunal expidió el recurso de certificación de epígrafe. Al así actuar, se detuvieron los trámites ante el Tribunal de Primera Instancia impidiendo que se celebrase una vista pautada para el 16 de diciembre de 2016. Al así obrar, era de suponer que el recurso fuera atendido con diligencia y prontitud y que en pocos días, a partir de su expedición, se circulara el borrador de Opinión del Tribunal. Después de todo, la disposición de este caso incide sobre la

constitución del Senado de Puerto Rico que se llevaría a cabo el 2 de enero de 2017. La urgencia parecía evidente.

Sorprendentemente, el 29 de diciembre de 2016, se circuló una enjuta sentencia en la cual no se abordan con ningún grado de rigor las cuestiones constitucionales novedosas que este caso plantea. Originalmente, con tal de subsanar esta deficiencia, se anejó a la misma la *Resolución* emitida por la Comisión Estatal de Elecciones. Además, destaco que se recomendó que la referida sentencia se certificara con posterioridad a los actos de juramentación a los cargos políticos en cuestión.

Este proceder apunta a una falta de interés o ausencia de intención de que esta controversia se resolviera, de manera definitiva, mediante una Opinión del Tribunal. En otras palabras, la sentencia tal cual fue circulada no dificultó, sino impidió que se consensuara una posición que permitiese a este Tribunal emitir una Opinión que diera por concluido, de cara a futuros eventos electorales, la controversia de autos.[65]

Resulta evidente que la función principalísima de un foro de última instancia es efectuar la revisión judicial. Esta piedra angular del quehacer jurídico de este Tribunal se cimenta tanto en los principios que orientan nuestro acervo jurídico civilista, como en los efectos de la transculturación del derecho con la llegada de la tradición jurídica anglosajona. En resumidas cuentas, la revisión judicial constituye la esencia misma del quehacer jurídico, a saber, disipar las penumbras y matizar los conflictos que surgen de la ley. A la luz de este

---

[65] Claro está, debo reconocer que, en la misma fecha en que se circuló el borrador de sentencia, varios miembros de esta Curia circularon extensas opiniones particulares en las cuales abordan con rigurosidad la controversia ante nuestra atención.

principio, francamente, me tengo que cuestionar para qué se expidió el auto cuando su disposición no demuestra un cumplimiento convincente con este deber. En consideración a ello, me veo obligada a consignar el análisis de los hechos y el derecho que estimo apropiado para disponer de la controversia.

**II**

El pasado 8 de noviembre de 2016 se celebraron las elecciones generales en Puerto Rico. En los comicios referentes a los veintisiete (27) escaños correspondientes al Senado de Puerto Rico, los resultados fueron los siguientes: veintiún (21) escaños para el Partido Nuevo Progresista (P.N.P.); cinco (5) escaños para el Partido Popular Democrático (P.P.D.); un (1) escaño para el Partido Independentista Puertorriqueño (P.I.P.), y un (1) escaño para el candidato independiente, Sr. José Vargas Vidot. Por tanto, el P.N.P. obtuvo una distribución porcentual de 77.78%, a saber, más de dos terceras (2/3) partes de los escaños correspondientes a ese cuerpo legislativo. Asimismo, es necesario señalar que el gobernador electo, Dr. Ricardo Rosselló Nevares, obtuvo una distribución porcentual de 41.79%, a saber, menos de dos terceras (2/3) partes de todos los votos emitidos para este cargo. Véase *In re: Cláusula Constitucional sobre escaños por adición*, CEE-RS-16-090, pág. 1.

En consecuencia de este desenlace electoral, entró en función la Sección 7(a) del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico, Const. P.R. Art. III, Sec. 7(a), la cual provee unas garantías particulares de representación a los partidos minoritarios en la Asamblea Legislativa. A saber, conforme al texto constitucional, se aumentará el número de senadores "declarándose electos

candidatos del partido o partidos de minorías en números suficiente" hasta llegar a nueve (9). Const. P.R. Art. III, Sec. 7(a). Consecuentemente, y en consideración al Artículo 10.015 de la *Ley Electoral del Estado Libre Asociado de Puerto Rico de 2011*, 16 LPRA sec. 4205, según enmendada, la Comisión Estatal de Elecciones (Comisión) emitió una determinación mediante la cual concluyó que el P.P.D. tenía derecho a tres (3) escaños por adición. Así, pues, se adicionó a los señores José Nadal Power, Miguel A. Pereira y Cirilo Tirado a la composición del Senado.

Consecuentemente, los candidatos por el P.P.D., Sr. Juan Pablo Hernández, Sr. Ángel M. Rodríguez Otero y Sr. Ramón Ruiz Nieves, presentaron -individualmente- peticiones ante la Comisión con tal de que fueran certificados como senadores por adición. El señor Pablo Hernández arguyó que el lenguaje de la Sección 7 del Artículo III de la Constitución es claro, por lo que el mecanismo que garantiza la representación mínima en la Asamblea Legislativa sólo le aplica a los partidos políticos de minoría. Así, pues, planteó que el doctor Vargas Vidot, en tanto un candidato independiente, no puede ser contabilizado como parte de los nueve (9) escaños que la Constitución le garantiza a los partidos de minoría en estas circunstancias.

Por otro lado, los señores Rodríguez Otero y Ruiz Nieves coinciden con el señor Pablo Hernández en cuanto a la exclusión del doctor Vargas Vidot del conteo. Ahora bien, además, arguyen que el Lcdo. Juan Dalmau Ramírez tampoco debe ser incluido en la contabilización debido a que éste no pertenecía a un partido político debidamente inscrito. Ello, pues, el P.I.P. no contó con el número mínimo de votos para quedar inscrito como partido político en virtud de la *Ley electoral de 2011*.

El 22 de noviembre de 2016, la Comisión celebró la vista correspondiente en la que se atendieron los planteamientos de los tres candidatos no electos. Posteriormente, el 30 de noviembre de 2016, la Comisión dispuso de los recursos presentados y determinó que, tanto el doctor Vargas Vidot como el licenciado Dalmau Ramírez debían ser contados para el total de nueve (9) senadores que representan a los partidos de minoría. Ello, tras concluir que sólo de esa forma se garantizaba el espacio a los núcleos de opinión de las minorías y se preservaba la proporción que le correspondía a la mayoría electa mediante voto directo.

Inconformes, tanto el Comisionado Electoral del P.P.D., Lcdo. Guillermo San Antonio Acha, como los señores Pablo Hernández, Rodríguez Otero y Ruiz Nieves presentaron recursos de revisión judicial ante el Tribunal de Primera Instancia. El Comisionado Electoral del P.P.D., en esencia, planteó que erró la Comisión en su interpretación de la referida disposición constitucional. Por ello, sostuvo que le correspondía al P.P.D. un total de cinco (5) escaños por adición, pues el doctor Vargas Vidot y el licenciado Dalmau Ramírez debían ser excluidos del conteo. Por otro lado, los demás peticionarios reiteraron los argumentos esbozados ante la Comisión.

El 12 de diciembre de 2016, el foro primario emitió una orden mediante la cual ordenó la consolidación de los recursos de revisión en cuestión y pautó una vista para el 16 de diciembre de 2016. Ahora bien, el 15 de diciembre de 2016, el señor Pabló Hernández presentó ante este Tribunal una *Solicitud de certificación bajo la Regla 52.2 de Procedimiento Civil*. En ésta, arguyó que este Tribunal debía expedir el auto de

certificación intrajurisdiccional por estar presente una controversia novedosa de alto interés público relacionada a una disposición constitucional y porque la controversia se debía resolver con carácter de urgencia debido a que en menos de tres (3) semanas se constituiría la nueva Legislatura.

Por otro lado, compareció ante nosotros el Lcdo. Thomas Rivera Schatz y la Sra. Norma Burgos Andújar, Comisionada Electoral del P.N.P., mediante una moción en auxilio de jurisdicción y una *Certificación*. En síntesis, le solicitaron a este Tribunal que asumiera jurisdicción en primera instancia sobre los recursos de revisión judicial consolidados que penden ante el Tribunal de Primera Instancia por involucrar un asunto de alto interés público que incide sobre la interpretación de una disposición constitucional. Cónsono con ello, solicitaron que paralizáramos los trámites ante el tribunal de instancia.

Ese mismo día, este Tribunal expidió el recurso en cuestión. A su vez, se le ordenó a las partes a que presentaran sus alegatos el lunes, 19 de diciembre de 2016. Oportunamente, la mayoría de las partes presentaron los alegatos correspondientes. Así, contando con el beneficio de sus comparecencias, procedemos a resolver.

## III

Hace ya más de seis décadas, los puertorriqueños aprobamos la Constitución del Estado Libre Asociado de Puerto Rico. Este documento fue producto de la deliberación ponderada y laboriosa de un puñado de puertorriqueños, de todas las ideologías políticas, que se dieron a la tarea de consagrar, con una visión de avanzada, tanto los derechos fundamentales de los ciudadanos

como la estructura que habría de regir el quehacer gubernamental de nuestro País.

El diseño de lo que sería nuestra Rama Legislativa fue objeto de un vigoroso debate. Uno de los temas que generó amplia discusión fue el asunto relativo a la representación de las minorías. La disposición que finalmente se aprobó para atender las inquietudes de los constituyentes sobre este particular constituyó "uno de los mayores logros de la Constitución". José Trías Monge, *Historia Constitucional de Puerto Rico*, Vol. III, pág. 143 (1982).

A fin de poder justipreciar en toda su dimensión el alcance de la disposición constitucional en controversia, conviene comenzar repasando -si bien someramente- los acontecimientos históricos que dieron paso a su adopción.

**A**

**i**

En nuestro País, la representación minoritaria en las Cámaras legislativas tiene un pasado de largo alcance que lo remonta a las postrimerías del Siglo XIX. Fue en la Carta Autonómica de 1897, cuando por primera vez se incluyó una disposición cuyo propósito era garantizar la representación de las minorías, no tan solo en la Diputación Provincial sino también a nivel municipal. Así, el Artículo 60 de la Carta Autonómica disponía que "[l]as elecciones de Concejales y Diputados provinciales se harán de manera que las minorías tengan en ellas su legítima representación". 1 LPRA T. IX, Art. 60. Lamentablemente y debido a los trágicos eventos del año 1898, el alcance de este artículo nunca pudo desarrollarse a plenitud.

Luego del cambio de soberanía y concluido el gobierno militar, el Congreso aprobó el 12 de abril de 1900, la *Ley Orgánica Foraker* para establecer un gobierno interno. Allí se estableció un sistema de representación territorial para la Asamblea Legislativa en el que se dividió a Puerto Rico en siete (7) distritos. En cada uno de estos distritos se seleccionarían cinco (5) miembros a la Cámara de Delegados.[66] El 8 de marzo de 1906, se aprobó la primera ley electoral bajo el dominio norteamericano que permitía implantar el diseño electoral creado. 1906 Leyes de Puerto Rico 33-63.[67]

Seis años más tarde, esta ley se enmendó mediante la Ley Núm. 83 de 14 de marzo de 1912, la cual supuso un tímido intento por salvaguardar la representación de los partidos minoritarios en la gestión gubernamental. A esos efectos, la Sección 1 de la Ley Núm. 83 limitó a cuatro (4) la cantidad de candidatos que un partido político podría designar para ocupar cargos en la Cámara de Delegados, por cada uno de los siete distritos electorales, a pesar de que a cada distrito correspondían cinco escaños. Véase 1912 Leyes de Puerto Rico 174-175. El profesor Fernando Bayrón Toro, en su trabajo sobre los partidos políticos y las elecciones en Puerto Rico ha indicado lo siguiente:

> La Legislatura insular enmienda la Ley Electoral a fin de garantizarle representación a las minorías en la Cámara de Delegados. Tal garantía se establece mediante una limitación para que cada partido postule sólo cuatro candidatos a delegados en cada uno de los siete distritos, que tienen cinco escaños. De esta manera el escaño libre es optado por los demás partidos. Fernando Bayrón

---

[66] Véase 1 LPRA secs. 27-28.
[67] Véase María L. Rojas Fabregat e Ildefonso Torres Rodríguez, *Representación de las minorías garantizadas en los escaños de adición y acumulación*, Revista de Derecho Puertorriqueño, 42 Rev. D.P. 162, 154 (2003).

Toro, *Elecciones y Partidos Políticos de Puerto Rico 1809-2000*, 139 (6ta Ed. 2003)

Posteriormente, al aprobarse la *Ley Orgánica Jones* de 2 de marzo de 1917, se modificó el sistema de representación territorial entonces vigente "al introducir la representación por acumulación". Carmen Ramos de Santiago, *El Gobierno de Puerto Rico* 520 (1984). Véase además, Arts. 26-28 de *Ley Orgánica Jones*, 1 LPRA secs. 26-28. De esta forma se le impartió a nuestro ordenamiento electoral matices de un sistema de representación proporcional. Curiosamente, ello se hizo a instancias del entones Comisionado Residente, don Luis Muñoz Rivera, quien interesaba con ello "contrarrestar las consecuencias de la Ley Foraker que había brindado a su Partido Unión de Puerto Rico tres copos consecutivos en la Cámara de Delegados…". Luis Muñoz Marín, *Memorias 1940-1952*, 333 (2003).

No obstante estos encomiables intentos, el esquema electoral vigente continuó facilitando victorias electorales abrumadores, como fue el caso de las victorias electorales del Partido Popular Democrático en las elecciones de los años 1944 y 1948, cuando obtuvo, respectivamente, el 64% y 61% de los votos emitidos. Estos eventos revivieron, en los círculos políticos del país, el debate sobre el tema de la representatividad electoral. "El alto liderato del Partido Popular, . . . llegó al convencimiento de que era necesario garantizar representación sustancial a los partidos minoritarios en la Asamblea Legislativa aunque sus candidatos no obtuviesen en las elecciones los votos necesarios para salir electos". *Fuster v. Busó*, 102 DPR 327, 330 (1974).

Como vemos, don Luis Muñoz Marín al igual que su padre, era consciente de la necesidad de proveerle a los partidos de minoría una "garantía adicional en contra de un partido abrumadoramente mayoritario." Muñoz Marín, *op. cit.*, pág. 334. Consecuentemente, y cara a un proceso constituyente, la Ley Núm. 1 de 3 de julio de 1951 impuso límites a la cantidad de delegados electos y delegados en representación de distritos que podrían ser postulados o elegidos por los partidos políticos para participar en la Convención Constituyente. 1951-1952 Leyes de Puerto Rico 3-71.

Convocada la Constituyente se acordó que era necesario elevar las garantías de representación de los partidos minoritarios a rango constitucional. *P.P.D. v. Peña Clos I*, 140 DPR 779, 799 (Naveira de Rodón, Op. Concurrente). Es así como la Sección 7 del Artículo III encuentra hogar en el documento constitucional.

**ii**

La aprobación de esta disposición no estuvo exenta de controversia. Particularmente difícil fue lograr un consenso para fijar las fórmulas matemáticas específicas que habrían de regir la asignación de escaños por adición. A modo de ejemplo, baste recordar que las delegaciones del Partido Socialista y el Partido Republicano presentaron medidas para proveer un número fijo de composición para la Asamblea Legislativa y un límite al número de candidatos propuestos o electos por cada partido de mayoría. Véase, *P.P.D. v. Peña Clos I*, 140 DPR 779, 801 (Naveira de Rodrón, Op. Concurrente). No obstante, estas propuestas fueron descartadas porque representaban soluciones demasiado mecánicas e inflexibles. Ello, pues "simplemente les garantizaba

a las minorías, no importa las circunstancias, el control de por lo menos una tercera parte del parlamento; y, en segundo término, no les garantizaba trato justo a los distintos partidos minoritarios, pues permitían que el partido más fuerte de la minoría se adueñase del cuerpo disponible para ésta". *Id*. en la pág. 799. Véase, además, José Trías Monge, *op. cit.*, Vol. III, en las págs. 145-146.

Finalmente, la propuesta de la Comisión de la Rama Legislativa fue aprobada, con enmiendas, y se convirtió en lo que hoy conocemos como la Sección 7 del Artículo III de la Constitución.[68] Esta sección establece dos formas

---

[68] Cuando en una elección general resultaren electos más de dos terceras partes de los miembros de cualquiera de las cámaras por un solo partido o bajo una sola candidatura, según ambos términos se definan por ley, se aumentará el número de sus miembros en los siguientes casos:

(a) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hubiese obtenido menos de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, se aumentará el número de miembros del Senado o de la Cámara de Representantes o de ambos cuerpos, según fuere el caso, declarándose electos candidatos del partido o partidos de minoría en número suficiente hasta que la totalidad de los miembros del partido o partidos de minoría alcance el número de nueve en el Senado y de diecisiete en la Cámara de Representantes.

Cuando hubiere más de un partido de minoría, la elección adicional de candidatos se hará en la proporción que guarde el número de votos emitidos para el cargo de Gobernador por cada uno de dichos partidos con el voto que para el cargo de Gobernador depositaron en total esos partidos de minoría. Cuando uno o más partidos de minoría hubiese obtenido una representación en proporción igual o mayor a la proporción de votos alcanzada por su candidato a Gobernador, no participará en la elección adicional de candidatos hasta tanto se hubiese completado la representación que le correspondiese bajo estas disposiciones, a cada uno de los otros partidos de minoría.

constitucionales para garantizar la adecuada representación de las minorías. Véase, Néstor Rigual, *El Poder Legislativo de Puerto Rico,* 22-26 (1961). La base de la primera forma ocurre cuando en una elección general un partido elige más de dos terceras partes (2/3) de cualquiera de los cuerpos legislativos, mas no obtiene dos terceras partes (2/3) de los votos para su candidato al cargo de gobernador. En esa instancia se añaden escaños por adición hasta que la totalidad de los representantes de los partidos políticos minoritarios sumen a la cantidad nueve

---

(b) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hubiese obtenido más de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, y uno o más partidos de minoría no eligieron el número de miembros que les correspondía en el Senado o en la Cámara de Representantes o en ambos cuerpos, según fuere el caso, en proporción a los votos depositados por cada uno de ellos para el cargo de Gobernador, se declararán electos adicionalmente sus candidatos hasta completar dicha proporción en lo que fuere posible, pero los Senadores de todos los partidos de minoría no serán nunca, bajo esta disposición, más de nueve ni los Representantes más de diecisiete.

Para seleccionar los candidatos adicionales de un partido de minoría, en cumplimiento de estas disposiciones, se considerarán, en primer término, sus candidatos por acumulación que no hubieren resultado electos, en el orden de los votos que hubieren obtenido y, en segundo término sus candidatos de distrito que, sin haber resultado electos, hubieren obtenido en sus distritos respectivos la más alta proporción en el número de votos depositados en relación con la proporción de los votos depositados a favor de otros candidatos no electos del mismo partido para un cargo igual en otros distritos.

Los Senadores y Representantes adicionales cuya elección se declare bajo esta sección serán considerados para todos los fines como Senadores o Representantes por Acumulación.

La Asamblea Legislativa adoptará las medidas necesarias para reglamentar estas garantías, y dispondrá la forma de adjudicar las fracciones que resultaren en la aplicación de las reglas contenidas en esta sección, así como el número mínimo de votos que deberá depositar un partido de minoría a favor de su candidato a Gobernador para tener derecho a la representación que en la presente se provee. Const. P.R. Art. III, Sec. 7.

(9) senadores o diecisiete (17) representantes.[69] La controversia en este caso gira en torno a la aplicación de esta forma de garantizar la representación minoritaria.

**IV**

**A**

Ahora bien, precisa destacar que el mecanismo de adición de escaños no es uno irrestricto. Así, de la Sección 7 del Artículo III de la Constitución surgen requisitos que tienen que ser satisfechos para que se pueda activar la referida garantía.

En primer lugar, destacamos lo evidente, la garantía constitucional está reservada para partidos políticos. Ello, pues, "surge con claridad que el sujeto a quien el Constituyente quiso tutelar directamente fue al partido político e indirectamente a los miembros que formarían parte de la Asamblea Legislativa, como Senadores o Representantes". *P.P.D. v. Peña Clos I*, 140 DPR en la pág. 790 (Naveira de Rodón, Op. Concurrente) (citas omitidas). A esos efectos, el Juez Asociado Fuster Berlingeri señaló que la referida disposición "no sólo se titula 'Representación de *partidos* de minoría', sino que toda su redacción literal gira esencialmente en torno a los '*partidos de minoría*'". *P.P.D. v. Peña Clos I*, 140 DPR en la pág. 820 (Fuster Berlingeri, Op. Concurrente) (énfasis en el original). Véase *Notes and Comments on the Constitution of the Commonwealth of Puerto Rico* 55-59 (1952).

Conviene señalar que existe una distinción conceptual tajante entre el término 'candidato independiente' y partido

---

[69]La segunda forma de determinar la representación minoritaria correspondiente se aplica cuando el partido que eligió más de dos terceras partes (2/3) de los candidatos a las cámaras legislativas obtuvo también, más de dos terceras partes (2/3) de los votos emitidos para el cargo de Gobernador.

político. Nótese que, desde la *Ley electoral* de 1974 se ha definido el término 'candidato independiente' como todo candidato que figure en una papeleta electoral sin ser candidato de un partido. 1974 Leyes de Puerto Rico 4. El término se definió de igual forma en la *Ley electoral* de 1977. 1977 Leyes de Puerto Rico 639, 641. Asimismo, el Artículo 1 (9) de la *Ley electoral* de 2011 lo define como "[t]oda persona que sin haber sido nominada formalmente por un partido político figure como candidato a un cargo público electivo en la papeleta electoral, conforme las disposiciones de este subtítulo". 16 LPRA sec. 4003 (9). Por tanto, es evidente que la característica inherente de la candidatura independiente es la falta de afiliación a un partido político.

Por otro lado, sería —como mínimo- irreflexivo soslayar o ignorar el último párrafo de la Sección 7 que pone de manifiesto que sólo los partidos políticos pueden percibir los beneficios de la garantía en cuestión. A saber,

> [l]a Asamblea Legislativa adoptará las medidas necesarias para reglamentar estas garantías, y dispondrá la forma de adjudicar las fracciones que resultaren en la aplicación de las reglas contenidas en esta sección, *así como el número mínimo de votos que deberá depositar un partido de minoría a favor de su candidato a Gobernador para tener derecho a la representación que en la presente se provee.* Const. P.R. Art. III, sec. 7 (énfasis suplido).

Con lo cual, es evidente que el acceso al mecanismo de escaños por adición está condicionado a que un partido político haya presentado un candidato para el cargo de gobernador y, a su vez, haya obtenido una cantidad particular de votos a ser fijada por la Asamblea Legislativa. Por ende, "[n]o cabe, pues, la menor duda de que el aludido mecanismo especial de representación de

minorías se hace efectivo a través de los *partidos* políticos que tengan esa condición". *P.P.D. v. Peña Clos I,* 140 DPR en la pág. 820 (Fuster Berlingeri, Op. Concurrente).

**B**

Por otro lado, la Sección 4 del Artículo VI de la Constitución establece que "[s]e dispondrá por ley todo lo concerniente al proceso electoral y de inscripción a electores, así como lo relativo a partidos políticos y candidaturas". Const. P.R. Art. VI, Sec. 4. Sin duda, ello es así pues "[s]ólo así puede cumplir el Estado con su obligación de proteger la pureza del proceso electoral". *P.A.C. v. E.L.A.,* 150 DPR en la pág. 373.

En consecuencia, "[b]ajo este poder, al reglamentar el acceso de los grupos, los candidatos o las fórmulas a las papeletas, el Estado se coloca en una posición que, por su naturaleza, tiene el efecto de restringir e imponer cargas sobre el derecho a participar en el proceso electoral". *P.A.C. v. E.L.A.,* 150 DPR en la pág. 373. Claro está, no pueden ser restricciones que atenten indebidamente contra los derechos fundamentales que se busca salvaguardar. Véase, en general, *P.A.C. v. C.E.E.,* 149 DPR 244 (1989). Por ello, hemos reconocido que aunque la facultad que ostenta la Asamblea Legislativa es amplia, ésta no es absoluta. Véase *P.S.P., P.P.D., P.I.P. v. Romero Barceló,* 110 DPR 248 (1980).

Ahora bien, en atención al mandato constitucional consagrado en el último párrafo de la Sección 7 del Artículo III de la Constitución, se aprobó la Ley Núm. 18 de 22 de agosto de 1952. 1952 Leyes de Puerto Rico 201-205. Así, se enmendó la

Sección 89(a) de la *Ley electoral* de 1919 con tal de especificar que

> [n]ingún partido de minoría tendrá derecho a candidatos adicionales ni a los beneficios que provee esta sección, a no ser que en la elección general obtenga a favor de su candidato a Gobernador un número de votos equivalentes a un cinco (5) por ciento o más del número total de votos depositados en dicha elección general a favor de todos los candidatos a Gobernador votados en la misma. *Id.*

En *Fuster v. Busó*, este Tribunal tuvo la oportunidad de examinar con detenimiento esta disposición. Sin ambages expresamos que "[d]icha disposición dispone que ningún partido de minoría tendrá derecho a candidatos adicionales *a no ser que en la elección general obtenga a favor de su candidato a Gobernador el cinco por ciento o más del número total de votos depositados a favor de todos los candidatos para ese cargo*". *Fuster*, 102 DPR en la pág. 336 (énfasis suplido). Tras señalar lo obvio, este Tribunal validó la constitucionalidad de este requisito que surgía como mandato expreso de la Constitución.

Posteriormente, se aprobó la Ley Núm. 1 de 13 de febrero de 1974, la cual derogó la *Ley electoral* de 1919. Respecto al asunto que nos atañe, el Artículo 7.085 mantuvo inalterado el requisito de votos mínimos en cuestión. Véase 1974 Leyes de Puerto Rico 88-90. Poco tiempo después, se aprobó la Ley Núm. 2 de 20 de diciembre de 1977, que consecuentemente derogó la *Ley electoral* de 1974. No obstante, de igual forma, en el Artículo 6.012 mantuvo el requisito de votos mínimos al cargo de gobernador como condición para la concesión de escaños por adición. Véase 1977 Leyes de Puerto Rico 726-728.

Luego de más de 30 años, en el 2011, la Asamblea Legislativa enmendó la ley electoral vigente. Es interesante notar que respecto a la representación de los partidos minoritarios, el Artículo 10.015 no introdujo enmiendas fundamentales. Ahora bien, si alteró el número mínimo de votos que un partido político debe acumular para el cargo de gobernador con tal de tener acceso al mecanismo de la garantía de representación de minorías. A saber, se estableció que "[n]ingún partido de minoría tendrá derecho a candidatos adicionales ni a los beneficios que provee la Sección 7 del Artículo III de la Constitución de Puerto Rico, a no ser que en la elección general obtenga a favor de su candidato a gobernador, una cantidad de votos equivalentes a un *tres (3) por ciento o más* del total de votos depositados en dicha elección general a favor de todos los candidatos a gobernador". 16 LPRA sec. 4205 (énfasis suplido).

Además de los requisitos discutidos bajo este acápite, la normativa constitucional estudiada impone otro requerimiento y es el que queda recogido en la figura de la mayoría cualificada, la que sirve de punta de lanza para activar la garantía de la Sección 7. Esta merece una discusión por separado. Veamos.

## V

Los Constituyentes plasmaron en la Constitución la figura de la mayoría cualificada de dos terceras (2/3) partes como parte esencial del funcionamiento de nuestra Rama Legislativa. Esto queda de manifiesto al examinar aquellas disposiciones que atienden los procesos de reforma constitucional y salvaguardan la separación de poderes. A esos efectos, una mayoría de no menos de dos terceras partes es necesaria para proponer

enmiendas a la Constitución. Const. PR, Art. VII sec. 1. Además, solamente una mayoría cualificada de dos terceras partes puede convocar una Asamblea Constituyente. Const. PR, Art. VII sec. 2. Incluso, el proceso de residenciamiento se puede iniciar con un voto de dos terceras partes de los miembros de la Cámara de Representantes. Const. PR, Art. III sec. 21. Aún más común en nuestra democracia, es la anulación de un veto ejecutivo mediante la aprobación de una ley por dos terceras partes de los miembros del Senado y la Cámara de Representantes. Const. PR, Art. III sec. 19.

Por ello, el mantener un adecuado balance entre preservar una mayoría cualificada de dos terceras partes para el partido que haya ganado más de esa proporción de los escaños legislativos y proveer representación apropiada para los partidos de minoría fue discutido en la Convención Constituyente. Durante la Convención, se suscitaron dos esquemas alternos de representación de minorías: el propuesto por la Comisión de la Rama Legislativa —el cual finalmente triunfó— y el propuesto por el delegado José Rosario Gelpí. Este último estipulaba para el Senado ocho (8) distritos electorales, con tres (3) escaños por distrito, para los cuales cada partido solamente podía nominar dos (2) candidatos. Donde ambas propuestas convergían y encontraban común acuerdo era en mantener viva la posibilidad de una mayoría cualificada de dos terceras partes de un único partido. El delegado Leopoldo Figueroa Carreras, en su alocución, lo resumió así:

> Tenemos que empezar por reconocer que en la pasada elección, o en las pasadas elecciones, como en las futuras elecciones a juzgar por el proyecto que está ante la consideración nuestra, fue el propósito, y parecer ser el propósito presente con

> vista al futuro, a la futura elección del Partido
> Popular, el conceder la oportunidad de una
> representación de la tercera parte a las minorías.
> . . Ahora bien, donde surge la diferencia, donde
> ha venido la discrepancia, es en el procedimiento
> por el cual se le da a las minorías esa tercera
> parte. **Tanto la mayoría como la minoría están
> contestes en que deben ustedes tener, los
> populares, las dos terceras [partes] y las
> minorías, la tercera parte.** *Diario de Sesiones*,
> Tomo 2, en la pág. 1292 (énfasis suplido).

Asimismo, el delegado Figueroa Carreras, en defensa del Plan Gelpí, declaró que dicho plan era favorable porque "da a la mayoría sus 2/3 partes como un margen de garantía y asegura a las minorías su tercera parte, sin tener que entrar en las disquisiciones estas a que nos llevan las fracciones". *Id.* en la pág. 1308.[70]

Así las cosas, el esquema que quedó instituido en nuestra Constitución, según las palabras de su propulsor el delegado Luis Negrón López, en determinados resultados electorales aumenta la representación de partidos minoritarios "dentro de la tercera parte del número original de miembros de una cámara". *Id*. en la pág. 1304. Como ha puntualizado este Tribunal en el pasado,

> [l]a razón de [esta cifra] es que la Ley
> quiere evitar el resultado anómalo de que mediante
> la donación de escaños adicionales a las minorías
> resulten tener más de una tercera parte de los
> miembros de una o más Cámaras Legislativas cuando
> el partido de la mayoría haya obtenido esas dos
> terceras partes o más. Esto es así porque hay
> asuntos que requieren las dos terceras partes o
> más de los votos y de lo contrario los escaños
> adicionales donados podrían frustrar el mandato

---

[70] El comentario de las fracciones se dirige a que el Plan Gelpí mantendría siempre un número estable de miembros en las cámaras legislativas, mientras que el plan de la Comisión y finalmente instituido en la Constitución variaría el número de miembros de periodo eleccionario a periodo eleccionario.

>     electoral. *Fuster v. Busó,*102 DPR en las págs.
>     336-37.

Consecuentemente, los escaños totales consagrados para la minoría, en casos donde un partido obtenga más de dos terceras partes de los escaños disponibles en determinada cámara, son nueve (9) para el Senado y diecisiete (17) para la Cámara de Representantes. Esto impide que la cláusula de garantía de representación de minorías derrote la mayoría cualificada de dos terceras partes que le otorgó el pueblo a un partido de mayoría mediante su mandato democrático. Es decir, la garantía opera tanto para la minoría que adquirirá más representación como para la mayoría que los electores favorecieron en las urnas. Ello debe ser así, pues no es del todo insólito que la campaña electoral de determinado partido gire en torno a la consecución de una enmienda a la Constitución o a la celebración de una Asamblea Constituyente que transforme nuestra naturaleza política. Rayaría en una corrupción de la voluntad democrática despojar a la ciudadanía de su prerrogativa de efectuar sendas reformas a su gobierno cuando su voluntad de así hacerlo ha sido más que patente.

**VI**

Según reseñamos, el 30 de noviembre de 2016, la Comisión emitió la *Resolución CEE-RS-16-090*. En ésta, determinó que correspondía incluir tanto al doctor Vargas Vidot como al licenciado Dalmau Ramírez en el conteo para el cálculo del número total de escaños por adición a ser añadidos al Senado. La Comisión arribó a tal conclusión apoyándose en diversos fundamentos. En primer lugar, realizó una interpretación expansiva del término 'partido político'. Ello, a pesar de reconocer el lenguaje prístino que se consignó en la Sección 7 del Artículo III de la Constitución. A esos efectos, expresó que "[p]odríamos haber optado por una interpretación literal y vacua de las disposiciones constitucionales y estatutarias. Hemos preferido, sin embargo, por la que consideramos más responsable dentro de la autoridad que nos ha sido conferida por ley". Véase *Resolución CEE-RS-16-090*, pág. 23.

De entrada, es menester clarificar que lo que está en juego en este caso no son los escaños de los senadores electos Vargas Vidot y Dalmau Ramírez. La inclusión o exclusión de éstos del referido cálculo no afecta de forma alguna su puesto, funciones o derechos. Más bien, la controversia que nos atañe requiere que este Tribunal armonice una disposición constitucional que no deja lugar a dudas sobre su intención, empero -ante los hechos de este caso-, devela un choque entre los valores que protege.

Este Tribunal ha expresado que al interpretar disposiciones constitucionales, "excepto que el lenguaje lo haga inevitable, no debe presumirse que una cláusula de la Constitución no tiene sentido alguno o que destruye el propósito de otra cláusula del mismo documentos". *Fuster v. Buzó*, 102 DPR en la pág. 339. Por

ello, "cuando el legislador se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa". *Alejandro Rivera v. E.L.A.*, 140 DPR 538, 545 (1996).

La Sección 7 del Artículo III de la Constitución provee un mecanismo que garantiza la representación de las voces minoritarias en nuestra Asamblea Legislativa. Ahora bien, dicha garantía no se manifiesta de forma irrestricta. Pues como señaláramos, de acuerdo al texto constitucional sólo los partidos políticos pueden acceder a ésta. Para sostener lo contrario, tanto la Comisión como las partes recurridas arguyen que los Constituyentes no consideraron la existencia de candidatos independientes antes de aprobar el lenguaje que hoy examinamos. Esta aseveración no es correcta como cuestión de Derecho pues la historia la desmiente.

Cabe destacar que desde el año 1928 existe legislación que reconoce la posibilidad de que candidatos independientes figuren como parte de los comicios electorales. Véase 1928 Leyes de Puerto Rico 497-498. Por otro lado, surge del debate en la Convención Constituyente que durante la discusión, en varias ocasiones, se consideró como posibilidad la inclusión de la figura del candidato independiente en diversas disposiciones constitucionales. Véase, por ejemplo, *Diario de Sesiones*, Tomo 4, en la pág. 2599 (Aunque como hemos dicho antes los partidos políticos son instrumentos indispensables en la democracia, nuestras leyes electorales han reconocido siempre las candidaturas independientes y, pensando en que los ciudadanos no deben ser privados de la oportunidad de elegir en determinado momento candidatos que no pertenezcan a ningún partido

político). Por tanto, no es aceptable concluir que los constituyentes no consideraron, por desconocerlo, la figura del candidato independiente al hablar de partidos políticos en la Sección 7 del Artículo III de la Constitución. El récord histórico demuestra lo contrario.

De otra parte, los recurridos sostienen que el término 'partido político' debe interpretarse de forma expansiva. Ciertamente, en *Guadalupe v. C.E.E.*, 165 DPR 106 (2005), este Tribunal validó una interpretación de la expresión 'partido político' que se alejaba de su acepción histórica. No obstante, cabe recordar que esa controversia se atendió al amparo de unas disposiciones muy particulares de la *Ley de municipios autónomos*. Así, la controversia ante nosotros es de un tipo muy distinto, a saber, de carácter constitucional.

Tras realizar una interpretación integral de la disposición constitucional, no cabe duda que resulta improcedente la lectura propuesta por los recurridos. Nuestra interpretación no puede alejarse del texto integral del documento fundacional de manera tal que el resultado sea enmendarlo mediante *fiat judicial*. La constitución tiene ya diseñado un mecanismo de enmienda.

Aunque nuestros pronunciamientos en *Guadalupe* se fundamentan en principios encomiables de democracia, disponer de este caso de la misma forma constituiría, precisamente, un atentado contra elementales principios democráticos que cimentan nuestro andamiaje constitucional.

De otra parte, el requisito dispuesto por la Constitución, y concretado por la ley electoral, respecto al número mínimo de votos requeridos al cargo de Gobernador para acceder a los escaños por adición, no puede ser ignorado. Ello, pues, es

imprescindible cumplir con éste para tener derecho a todo lo que la cláusula constitucional provee. En consideración a ello, los candidatos independientes no tienen acceso a un escaño por adición debido a que no están afiliados a un partido que tenga un candidato a Gobernador que, por consiguiente, pueda acumular el mínimo de votos requeridos.

En consideración a lo anterior, resultaría inconsistente bifurcar el mecanismo desarrollado para viabilizar la garantía en cuestión. A saber, considerar un candidato independiente para fines del conteo a realizarse, a pesar de que éste —según redactada la disposición constitucional- no tendría acceso a un escaño por adición debido a que no está afiliado a un partido que tenga un candidato a Gobernador que pueda acumular el mínimo de votos requeridos. Por tanto, consideramos que, en casos donde un candidato no está afiliado a un partido político que cumpla con el requisito de votos mínimos al cargo de Gobernador, éste no podrá ser contabilizado para efectos de calcular los escaños a ser añadidos.

Para recapitular, a base de la discusión que antecede es ineludible concluir que, según se redactó la Sección 7 del Artículo III de la Constitución, la garantía a la representación de minorías sólo aplica a partidos políticos. Ante este escenario, sin más, tendríamos que concluir que el doctor Vargas Vidot debe estar excluido del conteo de escaños por adición. Ello, pues, según reseñamos, el término de 'candidato independiente' supone necesariamente la falta de un partido político tras la candidatura.

Por otro lado, el Comisionado Electoral del P.P.D. y los señores Rodríguez Otero y Ruiz Nieves arguyen que el señor

Dalmau Ramírez tampoco debe ser contabilizado. Ello, pues el P.I.P. no quedó debidamente inscrito tras concluir la elección general. Esto, claro está, es un hecho.

Ciertamente, conforme lo dispone la *Ley electoral* de 2011, no es hasta el momento en que un partido político cumple con todos los requisitos exigidos para su inscripción que éste es acreedor de los derechos que ahí se consagran. Ahora bien, también es cierto que -en ciertas circunstancias- hemos reconocido la existencia de un partido político, incluso, luego de que éste no cumpliese con el requisito de votos mínimos para mantener vigente su inscripción.

A esos efectos, en *Democratic Party v. Tribunal Electoral*, expresamos que "[l]os movimientos políticos no mueren de repente al llegar la medianoche. La pérdida de la franquicia electoral . . . sobre la base de insuficiencia de votos, no marca necesariamente la extinción del partido o agrupación bajo el cual se aglutinan unos electores de minoría con un programa, planes de gobierno e ideas para enfrentar la problemática del país". *Democratic Party v. Tribunal* Electoral, 107 DPR 1, 14 (1978). Por ello,

> [l]a tradición política, los usos y costumbres, a lo largo de nuestro ejercicio democrático, reconoce la subsistencia del partido minoritario como grupo que aún habiendo perdido la condición de partido político inscrito por no llevar a las urnas en una época el 10%, y hoy el 5% del total de votos depositados para determinado cargo, sobrevive la pérdida de su franquicia manteniéndose por la intensidad de su cohesión ideológica, como grupo de minoría con una voz respetables en el consenso de opinión pública general. *Id. en la pág.* 14.

El licenciado Dalmau Ramírez fue electo como un candidato del P.I.P. Sería irrazonable desligarlo de esa identidad

política y del aval que recibió del electorado como candidato afiliado a este partido. Asimismo, sería un contrasentido razonar que, por el resultado de los comicios electorales, la candidatura del licenciado Dalmau Ramírez se transmuta en una independiente. Ello, a pesar de que ésta se apartó significativamente de todas las características que las precitadas leyes electorales utilizan para definir el término 'candidato independiente'.

Ahora bien, según el análisis precedente parecería que éste tampoco debe ser incluido en el cálculo para los escaños por adición pues la candidata al cargo de Gobernador por el P.I.P., Sra. María de Lourdes Santiago, obtuvo un cantidad menor al 3% que fija el Artículo 10.015 de la *Ley electoral* de 2011 como requisito para acceder a la garantía constitucional en cuestión. A saber, ésta obtuvo el 2.13% de los votos al cargo de Gobernador. Por tanto, procedería concluir que el licenciado Dalmau Ramírez debe ser excluido del conteo.

Si nuestro análisis concluyera aquí, el resultado sería que no se podrían considerar ni al doctor Vargas Vidot ni al licenciado Dalmau Ramírez para determinar los escaños por adición que hay que añadir para cumplir con el mandato de la sección 7 del Artículo III. Ello, pues no hay duda que el mecanismo para acceder a la representación por adición está fundamentado o tiene como base, los partidos políticos.[71] Ahora bien, la aplicación de la normativa según descrita entra en conflicto con el otro interés que salvaguarda la disposición constitucional en cuestión, a saber, la mayoría cualificada.

---

[71] Véase Claudia Delbrey Ortiz, *La elección de la Asamblea Legislativa y la crisis de representatividad: Las bases legales de la partidocracia*, 85 Rev. Jur. UPR, 1105 (2016).

Según reseñamos, la garantía en cuestión se efectúa mediante la concesión de cierto número de escaños por adición a los partidos minoritarios. La cuantía designada por los Constituyentes para ello no es una arbitraria. A esos efectos, surge con claridad que los números de escaños a ser adicionados, nueve (9) en el Senado y diecisiete (17) en la Cámara de Representantes, figuran perfectamente como una tercera (1/3) parte de la composición del cuerpo legislativo, entiéndase 33.33%. De otra parte, según descrito, el mecanismo consagrado en esta disposición se activa, en parte, cuando en una elección general un partido o candidatura obtiene más de dos terceras (2/3) partes de los escaños disponibles, a saber, más del 66.66%.

Nótese que la mayoría cualificada de dos terceras (2/3) partes que activa la garantía constitucional se configuró como resultado del voto directo depositado por los electores en las urnas el día de las elecciones generales. En consideración a ello, queda de manifiesto que la disposición en cuestión protege dos valores en conflicto. Por un lado, el balance de los poderes y funciones que se manifiestan en las cámaras legislativas; por otro, la voluntad de los electores en los comicios electorales. Así, pues, la controversia ante nuestra consideración, interesantemente, pone en cuestión la sabiduría tras el mecanismo matemático desarrollado en la Sección 7 del Artículo III de la Constitución.

Como resultado de los comicios electorales, el P.N.P. obtuvo veintiún (21) escaños en el Senado, para un total de 77.78% de los escaños. Ciertamente, al realizar los cálculos correspondientes para determinar los escaños por adición a ser

añadidos, la proporción de la mayoría que ostenta el P.N.P. se verá afectada. No obstante, el efecto sobre ésta no puede resultar en su menoscabo. Veamos.

De resolver que el doctor Vargas Vidot y el licenciado Dalmau Ramírez deben ser incluidos en el cálculo, al P.P.D. le corresponderían tres (3) escaños por adición. En consecuencia, el Senado se compondría de treinta (30) escaños y el P.N.P. ostentaría una mayoría representada por un 70% del total de los escaños.

Por otro lado, si éstos se excluyeran del conteo, le corresponderían al P.P.D. cinco (5) escaños por adición. [72] Así, la composición del Senado aumentaría a treinta y dos (32) escaños. En este caso, el P.N.P. ostentaría un 65.6% de todos los escaños en el cuerpo legislativo. De esta forma, evidentemente, se afectaría la mayoría cualificada de dos terceras (2/3) partes que garantiza la disposición constitucional.

Es un principio general de hermenéutica que este Tribunal debe realizar una interpretación integral de las disposiciones bajo análisis. En la ocasión en que se identifiquen dos disposiciones en aparente conflicto, el intérprete debe tratar de armonizarlas y solamente después de un claro convencimiento de que ello no es posible, le corresponde decidir cuál de los

_____

[72] El señor Pablo Hernández no presentó alegato ante este Tribunal. No obstante, hacemos constar que surge de su recurso de revisión judicial, presentado ante el Tribunal de Primera Instancia, que éste tiene una interpretación distinta. En esencia, debido a que éste no cuestiona la inclusión del señor Dalmau Ramírez dentro del conteo, arguyó que -mediante su inclusión como senador por adición- el total de escaños en el Senado aumentaría a treinta y uno (31). Bajo ese supuesto, planteó que la proporción de la mayoría que le corresponde al P.N.P. no se afectaría, pues, éstos ostentaría un 67.7% del total de escaños al Senado.

dos preceptos debe prevalecer.[73] *Garriga v. Tribunal Superior*, 88 DPR 245, 248 (1963). Es decir, que debe procurarse que haya armonía entre todas las partes del estatuto. *Correa Suárez v. Junta Retiro para Maestros*, 88 DPR 590, 598 (1963). Ello, pues, se debe evitar una interpretación que lleve a resultados absurdos. Véase *A.S.G. v. Municipio de San Juan*, 168 DPR 337 (2006); *Pueblo v. Dávila*, 143 DPR 687, 696 (1997); *Pacheco v. Vargas Alcaide*, 120 DPR 404, 409 (1988).

Somos conscientes de que "[l]a importancia reciente del voto del elector no afiliado o independiente, y los cambios en el grado de apoyo tradicional a los partidos políticos como consecuencia del crecimiento de las ciudades y el desarrollo económico, implican una revisión de la concepción tradicional de la función de los partidos". *P.I.P. v. C.E.E.*, 120 DPR en la pág. 618 (1988). Sin duda, pues este fenómeno particular se manifiesta en la médula de la legitimación de nuestro sistema político y de gobierno. A esos efectos, es preciso mencionar que

> [e]l poder público basado en el principio de democracia representativa obtiene su legitimidad del sufragio ciudadano para elegir gobernantes y legisladores mediado por los partidos políticos. La democracia representativa, en su modalidad más acabada, se resume en dos funciones: significa una delegación de poder de los ciudadanos a los gobernantes, pero manteniendo la facultad de control sobre éstos". A. Rendón Corona, *Los retos de la democracia participativa*, 54 Sociología 2004, 183, 194 (2004).

---

[73] Claro está, este Tribunal ha dispuesto que "excepto que el lenguaje lo haga inevitable, no debe presumirse que una cláusula de la Constitución no tiene sentido alguno o que destruye el propósito de otra cláusula del mismo documento". *Fuster v. Busó*, 102 DPR en la pág. 339. No obstante, según señalamos, ante estos hechos se manifiesta un conflicto en la propia disposición constitucional bajo examen.

Ante la facultad de control que posee la ciudadanía es que la participación de las minorías en la vida política cobra vital importancia y tiene un rol fundamental en la legitimación de nuestro gobierno. Es por ello que "[l]a concepción de un escaño por adición se origina en la voluntad del Constituyente de preservar una política de sana gestión de gobierno en un sistema de verdadera democracia que garantice la representación de aquellos sectores que promulgan ideas contrarias a las del partido que obtuvo la mayoría legislativa". Olga Elena Resumil de Sanfilippo y Rafael Faría González, *La garantía constitucional a la representación de las minorías en la asamblea legislativa: naturaleza, alcance y extensión*, 65 Rev. Jur. UPR 329, 338 (1996).

La disposición constitucional estudiada busca fortalecer nuestra democracia, robusteciendo los partidos minoritarios al garantizarle una representación mínima en la Asamblea Legislativa desde donde ejercer su labor fiscalizadora de la obra de gobierno. Es en todo punto admirable, que el Partido Popular Democrático en el *cénit* de su poder político, fuera lo suficientemente maduro para reconocer los peligros de un poder hegemónico carente de fiscalización. Cabría preguntarse si la clase política del presente sería capaz de esta altura de miras.

Este ejercicio democrático encomiable, sin embargo, no puede ser a costa de diluir el voto mayoritario emitido en las urnas a favor de una colectividad política. Es decir, cuando la aplicación de la fórmula contenida en la disposición constitucional analizada suponga descomponer las dos terceras (2/3) partes del partido mayoritario debemos sopesar qué valor tiene preeminencia: ¿la expresión libre del ciudadano en una

elección general emitida a través del voto, o garantizarle a los partidos/candidatos minoritarios alguna representación en la Asamblea Legislativa? Me decanto por la primera.

En consideración a lo anterior, concluimos que tanto el doctor Vargas Vidot como el licenciado Dalmau Ramírez, deben ser incluidos dentro del cálculo para determinar la asignación de escaños por adición en virtud de la Sección 7 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico. De lo contrario, se dilataría el ejercicio del voto directo del electorado que seleccionó a los representantes del P.N.P. para ocupar una mayoría de los escaños en el Senado. A esos efectos, le corresponden al P.P.D. tres (3) escaños por adición, tal y como certificó la Comisión Estatal de Elecciones.

Por último, valga reiterar que, según comentado, esta determinación no validaría que los candidatos independientes, aunque incluidos en el cálculo en cuestión, puedan percibir escaños por adición. Ello, pues, la garantía constitucional en cuestión se reserva a los partidos políticos. Tampoco validaría el que un partido minoritario, que no haya cumplido con el mínimo de votos necesarios para el cargo a Gobernador, sea considerado para recibir escaños por adición.


Anabelle Rodríguez Rodríguez
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ángel M. Rodríguez Otero

Recurrido

v.

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

Recurridos

Comisionado Electoral del Partido Popular Democrático

Recurrido

v.

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

Recurridos

Juan Pablo Hernández

Peticionario

v.

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

Recurridos

Ramón Ruiz Nieves

Recurrido

v.

Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros

Recurridos

CT-2016-19

CT-2016-20

Certificación

Intrajurisdiccional

Hon. Thomas Rivera Schatz,
Presidente entrante del
Senado de Puerto Rico y
Comisionada Electoral del
Partido Nuevo Progresista,
Norma Burgos Andújar

          Peticionarios en
           Certificación

                 v.

Comisión Estatal de
Elecciones por conducto de
su Presidenta, Lcda. Liza
García Vélez y otros

          Recurridos

Opinión Disidente en parte y Concurrente en parte emitida por
la Jueza Presidenta Oronoz Rodríguez.


En San Juan, Puerto Rico, a 4 de enero de 2017.

En el día de hoy, en lo que constituye un duro golpe a

la representatividad democrática que nuestro sistema

constitucional garantiza, una mayoría de este Tribunal ha

determinado negarle representación electoral a un partido

minoritario ante la Asamblea Legislativa. No puedo estar de

acuerdo con su proceder.

El examen del texto e historial de nuestra Constitución

no deja espacio para duda alguna con respecto a que en la

Convención Constituyente existía una voluntad unánime de

garantizar que las minorías tuviesen siempre una

representación adecuada en la Legislatura.[74] Los

_____

[74] Véase P.P.D. v. Peña Clos I, 140 DPR 779, 814-815 (1996) (Fuster
Berlingeri, J., Opinión concurrente en parte y disidente en parte).

Constituyentes conocían muy de cerca los peligros que representa para la democracia el total control legislativo por la mayoría, y la importancia de que el proceso político-democrático se enriquezca con la crítica y la fiscalización que los representantes de las minorías pueden hacer con respecto a la labor de una mayoría.[75]

Hoy una mayoría de este Tribunal le niega eficacia a ese mandato constitucional que procura garantizar representación sustancial a los partidos minoritarios en la Asamblea Legislativa.[76] Por ello, disiento de su dictamen.

I.

1.    **Los hechos del caso y su referente histórico**.

Los hechos del presente caso no están en controversia. En las elecciones de 2016 el Partido Nuevo Progresista ("PNP") obtuvo el 78% de los votos en la contienda al Senado de Puerto Rico, aunque únicamente alcanzó el 41.80% de los votos para la Gobernación. Ello ha levantado la interrogante de qué representación senatorial, si alguna, habrá de recibir el Partido Popular Democrático ("PPD"), como partido minoritario, en virtud de la Sección 7 del Artículo III de nuestra Constitución. Art. III, Sec. 7, Const. ELA, LPRA, Tomo 1.[77]

---

[75] Íd.

[76] Fuster v. Busó, 102 DPR 327, 330 (1974).

[77] Específicamente, a raíz de la referida contienda los veintisiete (27) escaños del Senado de Puerto Rico quedaron originalmente distribuidos de la siguiente forma:
   (a)   veintiún (21) escaños para la delegación del PNP;

Una situación electoral similar ocurrió en 1948, cuando un partido de mayoría (en aquel momento el PPD) también obtuvo escaños en la Legislatura que denotaban una desproporción sustancial a su fuerza electoral, según medida por los votos obtenidos en la contienda a la Gobernación. Véase Office of the Resident Commissioner of Puerto Rico, *Notes and Comments on the Constitution of the Commonwealth of Puerto Rico*, Washington D.C., 1952, págs. 57-58 ("Notes and Comments").

"La falla que se produjo en el año 1948", explica el delegado Luis Negrón López, Presidente de la *Comisión de la Rama Legislativa de la Convención Constituyente*, "fue que un partido obteniendo el 62 por ciento de los votos [para la gobernación], obtuviera la casi totalidad de la representación parlamentaria". 2 Diario de Sesiones de la Convención Constituyente de Puerto Rico ("Diario de Sesiones"), 1303 (1961). Véase además Notes and Comments, supra, pág. 57 ("In that election the candidates of the Popular Democratic Party won 94.8 per cent of the seats in the legislature [...] although its candidate for the governorship received only 61.2 percent of the vote cast for that office. To reverse these figures, the minority parties' gubernatorial candidates polled 38.8 per cent of the popular vote but managed to win only 5.2 per cent [...] of the seats in the legislature".) (énfasis suplido).

---

(b)    cuatro (4) escaños para la delegación del PPD;
(c)    un (1) escaño para el candidato que compareció a la elección general bajo la insignia del Partido Independentista Puertorriqueño ("PIP"), Lcdo. Juan Dalmau Ramírez y;
(d)    un (1) escaño para el candidato independiente, Dr. José Vargas Vidot.

El referente histórico del 1948 planteó, pues, la posibilidad real — repetida en otras instancias de nuestra historia electoral — "que una inadecuada distribución de los votos obtenidos por las minorías produzca el resultado indeseable de que su representación en las cámaras no guarde proporción con los votos que obtengan en las urnas". Diario de Sesiones, supra, t.4, pág. 2595 (Informe de la Comisión de la Rama Legislativa de la Convención Constituyente).

Para corregir esta "deficiencia" en el sistema electoral,[78] los Constituyentes elaboraron el mecanismo que ahora recoge la Sección 7 aquí en controversia, la cual "[e]stablec[e] la representación proporcional en forma excepcional y limitada, modificadamente, para asegurarle a las minorías una representación legislativa mínima irreducible". P.P.D. v. Peña Clos I, 140 DPR 779, 814 (1996) (Fuster Berlingeri, J., Opinión concurrente en parte y disidente en parte) (énfasis suplido). Es decir, se trata de un mecanismo que procura garantizar sustancialmente a cada partido minoritario una representación proporcional a la totalidad de su fuerza electoral, conforme a los factores delineados por los Constituyentes.[79] Veamos.

2.      **El texto y diseño constitucional**.

En lo pertinente, la Sección 7 del Artículo III de nuestra Constitución dispone que:

---

[78] 2 Diario de Sesiones de la Convención Constituyente de Puerto Rico 1303 (1961).
[79] Office of the Resident Commissioner of Puerto Rico, *Notes and Comments on the Constitution of the Commonwealth of Puerto Rico*, Washington D.C., 1952, págs. 57-58 ("Notes and Comments").

Cuando en una elección general resultaren electos más de dos terceras partes de los miembros de cualquiera de las cámaras por un solo partido o bajo una sola candidatura, según ambos términos se definan por ley, se aumentará el número de sus miembros en los siguientes casos:

(a) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hubiese obtenido menos de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, se aumentará el número de miembros del Senado o de la Cámara de Representantes o de ambos cuerpos, según fuere el caso, declarándose electos candidatos del partido o partidos de minoría en número suficiente hasta que la <u>totalidad de los **miembros del partido o partidos de minoría** alcance el número de nueve en el Senado</u> y de diecisiete en la Cámara de Representantes. Cuando hubiere <u>más de un partido de minoría</u>, la elección adicional de candidatos se hará <u>en la proporción que guarde el número de votos emitidos para el cargo de Gobernador por cada uno de dichos partidos</u> con el voto que para el cargo de Gobernador depositaron en total esos partidos de minoría. [...] Art. III, Sec. 7, Const. ELA, LPRA, Tomo 1 (énfasis suplido).

Como se puede apreciar, la citada Sección 7 establece "un mecanismo para que, cuando en las elecciones generales el partido de mayoría elija más de dos terceras (2/3) partes de los miembros de la Legislatura, <u>se garantice sustancialmente a cada **partido minoritario** una representación proporcional a la totalidad de su fuerza electoral</u>, pero nunca en exceso de una tercera parte del número original de legisladores en la cámara correspondiente". <u>P.P.D. v. Peña Clos I</u>, <u>supra</u>, pág.

843 esc. 2 (Negrón García, J., Opinión disidente) (énfasis suplido).[80]

La experiencia electoral de 1948 sirvió, pues, para que los Constituyentes diseñaran un procedimiento con la intención

'de asegurar que el partido de mayoría no obtuviera escaños en la legislatura que denotaran una desproporción sustancial a su fuerza electoral. Así cuando el partido de la mayoría elija más de dos terceras partes de los miembros de la legislatura, la sección [7 del Artículo III] provee un mecanismo por el cual se le garantice sustancialmente a cada partido minoritario una representación proporcional a la totalidad de su fuerza electoral.' Nótese que el concepto fuerza electoral se define, no por el número de representantes a la Asamblea Legislativa, sino por el número de votos obtenidos por un candidato a Gobernador. O. E. Resumil de Sanfilippo y R. Faría González, *La garantía constitucional a la representación de las minorías en la Asamblea Legislativa: naturaleza, alcance y extensión*, 65 Rev. Jur. UPR 329, 339-340 (1996) *citando* Notes and Comments, supra, pág. 57 (énfasis suplido).

Lo anterior queda claramente ilustrado con las siguientes expresiones contemporáneas a la aprobación de nuestra Constitución:

This section [7] is designed to assure representation of minority parties in the legislature approximating their voting strength on an island-wide basis. At the present time there are four political parties in Puerto Rico. Past experience has shown that the number of seats they win in the legislature may bear little relation to their total island-wide electoral strength. This has been true under both Organic Acts. As the situation is now, the party whose

---

[80] Véase además O. E. Resumil de Sanfilippo y R. Faría González, *La garantía constitucional a la representación de las minorías en la Asamblea Legislativa: naturaleza, alcance y extensión*, 65 Rev. Jur. UPR 329, 338 (1996).

candidate is elected Governor may win nearly all the seats in the legislature, even though the candidate himself has polled only a bare majority of the total vote. Conversely, the minority parties may poll a fairly large total vote for their respective candidates for Governor but succeed in capturing only two or three seats in both houses of the legislature.

All members of the Convention, majority and minority alike, wished to prevent this situation under the new Constitution. They therefore devise the system set forth in Section 7, which assures that a majority party will not receive seats in the legislature substantially disproportionate to its total voting strength. Notes and Comments, supra, pág. 57 (énfasis suplido).

Así pues, conscientes de los desfases que puede producir "una inadecuada distribución de los votos obtenidos por las minorías",[81] la Sección 7 introdujo "**la acción reparadora de completar la proporción a los partidos que no la obtuvieron**". Diario de Sesiones, supra, t.2, pág. 305 (énfasis suplido). Ello a través de "los delegados que se adicionan para completar la proporción de cada partido minoritario". Íd., pág. 1300 (énfasis suplido). Esto con el propósito de "garantiza[r] una representación igual a la que obtuvieron en las urnas, a los partidos que no la hayan obtenido, dentro de la tercera parte del número original de miembros de una cámara". Íd., pág. 1304.

3. **El reconocimiento jurisprudencial de los principios sobre los que se asienta el diseño constitucional**.

---

[81] Diario de Sesiones, supra, t.4, pág. 2595. Véase además Diario de Sesiones, supra, t.2, pág. 1304. ("[Con] este plan lo que se propone [...] es dar un poco de protección mayor a situaciones anómalas que pueden surgir, cuando haya una distribución matemáticamente inequitativa de los votos, porque resulte así en las urnas, cosa que es inevitable.").

Nuestros precedentes anteriores han reconocido los principios sobre los que se asienta el diseño constitucional de la Sección 7.

A tales efectos, en el pasado hemos destacado que "[e]s en la Sec. 7 [...] en donde se encuentran las disposiciones específicas que garantizan la representación de los partidos minoritarios en la Asamblea Legislativa". Fuster v. Busó, supra, pág. 332 (énfasis suplido). En otras palabras, "la Sec. 7 del Art. III es el vehículo que utilizaron los constituyentes para hacer realidad su deseo de garantizar representación en la Asamblea Legislativa a los partidos minoritarios." Íd., pág. 340. De esta forma, "dicha Sec. 7 [...] les concede determinados escaños legislativos a los partidos de minoría cuando éstos, todos juntos, no logran elegir más de una tercera parte de los senadores o de los representantes." Íd. (énfasis suplido).

Nuestra jurisprudencia ha sido, pues, enfática en establecer que "la Sec. 7 del Art. III de la Constitución [...] se refier[e] expresa y específicamente a partidos de minoría". Íd., pág. 342 (énfasis suplido). Véase además P.P.D. v. Peña Clos I, supra, pág. 791 (Naveira de Rodón, J., Opinión concurrente) ("Los partidos políticos de minoría y sus legisladores son acreedores del derecho cuyo ejercicio promueve la representación sustancial de dichos partidos en la Asamblea Legislativa".).

No debe, por tanto, causar sorpresa alguna que "la Constituyente [...] [haya] vincula[do] la representación de

minorías al concepto 'partido' en vez de 'candidato' al escribir el Art. III, Sec. 7". Fuster v. Busó, supra, pág. 354 (Díaz Cruz, J., Voto particular). Ello pues, el diseño constitucional de la Sección 7 se centra en "garanti[zar] sustancialmente a cada partido minoritario una representación proporcional a la totalidad de su fuerza electoral",[82] y no en otras figuras conocidas por los Constituyentes (como la del candidato independiente, que fue incorporada de forma expresa por éstos en la siguiente Sección 8, mas no en la Sección 7) pero ajenas al esquema delineado.

### 4. La representación senatorial minoritaria que exige la Sección 7.

Considero que el texto y diseño constitucional, así como nuestros pronunciamientos pasados, exigen que la representación minoritaria aquí en controversia alcance el número de nueve (9) en el Senado, mediante la adición de cuatro (4) escaños a la delegación del PPD.

### (a) La negativa mayoritaria a otorgar un cuarto escaño al PPD.

---

[82] P.P.D. v. Pena Clos I, supra, pág. 843 esc. 2 (1996) (Negrón García, J., Opinión disidente).

Me parece conveniente destacar que en este caso no existe controversia entre las partes sobre la procedencia de adicionarle al PPD tres (3) de esos cuatro (4) escaños.

Ahora bien, en cuanto al cuarto escaño una mayoría de este Tribunal opina que el mismo no debe ser añadido, por el simple hecho de considerar que la representación de los partidos minoritarios debe ser limitada por la elección de candidatos independientes. No le asiste la razón.

El diseño constitucional de la Sección 7 es claro en cuanto a su mandato de garantizar la representación de los partidos minoritarios ante la Asamblea Legislativa en proporción a su fuerza electoral. Véase Notes and Comments, supra, pág. 57 ("This section is designed to assure representation of minority parties in the legislature approximating their voting strength on an island-wide basis.") (énfasis suplido). Véase además P.P.D. v. Peña Clos I, supra, pág. 843 esc. 2 (Negrón García, J., Opinión disidente).

Estimo que la disminución en la representación de los partidos minoritarios que hoy decreta la mayoría de este Tribunal, configura un duro golpe para la representatividad democrática que fuera concebida por los Constituyentes.

Ello es particularmente cierto si se considera la situación de desproporcionalidad que los Constituyentes tuvieron presentes a raíz de la elección del 1948,[83] y cuyos

---

[83] Véase P.P.D. v. Peña Clos I, supra, pág. 802 esc. 18 (Naveira de Rodón, J., Opinión concurrente) ("reiteradamente se ha dicho que el propósito para adoptar una disposición constitucional que asegurara el derecho de

indicios se replican en el 2016 cuando (i) un partido mayoritario (PNP) obtiene el 78% de los votos en la contienda al Senado, aunque únicamente alcanza el 41.80% de los votos para la Gobernación y; (ii) como cuestión inversa, el partido minoritario (PPD) obtiene una representación de 15% en el Senado, a pesar de que su candidato a la Gobernación obtuvo el 38.87% de los votos. Nótese que

> los miembros de la Constituyente no rechazaron por completo el principio de representación proporcional. Es decir, [aunque] acogieron principalmente la [...] visión moderna de la representación legislativa, [...] también acogieron, de manera limitada y excepcional, la representación legislativa atada a los comitentes. Ello, porque les *preocupaba también, hondamente, el problema de la representación minoritaria.* [...] [Por tal razón,] *[e]stablecieron la representación proporcional en forma excepcional y limitada*, modificadamente, para asegurarle a las minorías una representación legislativa mínima irreducible. P.P.D. v. Peña Clos I, supra, pág. 814 (Fuster Berlingeri, J., Opinión concurrente en parte y disidente en parte)(énfasis en el original).

Es este sistema de proporcionalidad limitada el que hoy la mayoría coarta, utilizando el escaño de un candidato independiente ya electo para equivocadamente reducir los escaños que la Constitución pretende adicionar a los partidos minoritarios. Tal disminución tiene el efecto nocivo de (i) diluir la representación proporcional que nuestra Constitución estableció para tales partidos minoritarios, así

---

representación de las minorías era evitar, dentro de lo posible, la situación surgida en las elecciones de 1948. En esa ocasión el Partido Popular Democrático acaparó el 94.8% de los escaños legislativos, pero sólo obtuvo el 61.2% del total de los votos emitidos para el cargo de Gobernador. Los partidos de minoría, sin embargo, habiendo logrado el 38.8% de los votos para el cargo de Gobernador, obtuvieron sólo 5.2% del total de los escaños legislativos".)(énfasis suplido).

como (ii) anular el objetivo de los Constituyentes de asegurar que el partido de mayoría no obtenga escaños en la Legislatura que denoten una desproporción sustancial a su fuerza electoral, según medida por los votos obtenidos en la contienda a la Gobernación. Véase Notes and Comments, supra, págs. 57-58.

> (b) *La disposición del presente recurso por virtud de la adición de un cuarto escaño.*

En vista de lo anterior, resolvería que la Sección 7 requiere la adición del referido cuarto escaño al PPD. Asimismo, considero que la adición de ese cuarto escaño dispone de la controversia aquí planteada, por entender que en el cómputo de los nueve (9) Senadores que deben componer la minoría de los partidos en el Senado bajo la Sección 7 del Artículo III de nuestra Constitución, debe incluirse el escaño que ocupa el representante del PIP, el actual Senador Juan Dalmau Ramírez.[84] Ello, por razón de que el Senador Dalmau compareció a las elecciones bajo un partido político debidamente configurado según nuestro ordenamiento jurídico. El hecho de que el PIP haya perdido su franquicia electoral tras las elecciones del 8 de noviembre de 2016,[85] no debe tomarse en cuenta para restarle a la voluntad de los

---

[84] Esto hace innecesario abordar la controversia ulterior sobre si la composición *final* del Senado bajo la Sección 7 debe mantener, o no, las dos terceras (2/3) partes que originalmente recibió la mayoría parlamentaria. Ello pues, aún con la adición de cuatro (4) escaños al PPD, la delegación del PNP retendría dos terceras (2/3) partes de la mayoría parlamentaria, al contar con veintiún (21) de los treinta y un (31) escaños resultantes.

[85] Véase Democratic Party v. Tribunal Electoral, 107 DPR 1, 14 (1978): "Los movimientos políticos no mueren de repente al llegar la medianoche. La pérdida de la franquicia electoral […] sobre la base de insuficiencia de votos, no marca necesariamente la extinción del partido o agrupación bajo el cual se aglutinan unos electores de minoría con un programa, planes de gobierno e ideas para enfrentar la problemática del país."

electores que decidieron prestarle su voto a ese partido de minoría.

II.

En conclusión, no puedo avalar el curso de acción seguido por la mayoría, en tanto le niega eficacia al claro mandato constitucional que procura garantizar representación sustancial a los partidos minoritarios en la Asamblea Legislativa.

No existe apoyo en el texto o historial constitucional, ni en nuestra jurisprudencia, que justifique este proceder mayoritario.

En primer lugar, como cuestión de hermenéutica, resulta particularmente cuestionable que la mayoría le atribuya dos (2) significados distintos a un (1) mismo concepto (partido de minoría) en una (1) misma sección de la Constitución (Art. III, Sec. 7). Es decir, para tratar de justificar su dictamen la mayoría ha optado por crear un desfase interpretativo en cuanto al término partidos de minoría de la Sección 7, interpretando así que los candidatos independientes no serían un partido minoritario para fines de ser añadidos, pero sí lo serían para fines de reducir la acción reparadora que instauró la Sección 7 para completar la proporción de los partidos minoritarios conforme a su fuerza electoral (medida por el número de votos emitidos para el cargo de Gobernador).

De otra parte, las razones ofrecidas por algunos miembros de la mayoría para negarle eficacia a la Sección 7 lo único que reflejan es que — como preferencia personal —

hubieran deseado que la misma no fuera aprobada. Es decir, cuestionar que haya más legisladores de minoría no elegidos mediante voto directo de una mayoría simple (a los que haya que asignar recursos y funciones, como contrapeso al poder mayoritario) es una diferencia de visión democrática con los Constituyentes, que no le compete a este Foro tener.[86]

Asimismo, en cuanto a la interpretación que se le atribuye a la frase "núcleos de opinión" mencionada en los debates de la Asamblea Constituyente, si la intención de esta última hubiera sido que esos núcleos de opinión (que según la mayoría no son partidos políticos) estuvieran representados en las cámaras legislativas, y que sus voces se oyeran, hubiesen diseñado un mecanismo que les permitiera adicionarse bajo la sección 7.[87]

Lo cierto es que la Sección 7 en nada ayuda a esos núcleos de opinión (interpretado por la mayoría como candidatos independientes) a formar parte de la Asamblea Legislativa. Si forman parte de esta es porque fueron electos mediante el voto directo. Si no resultaron electos, la Sección 7 en nada abona a que sus voces se escuchen.

---

[86] El efecto directo en la distribución de recursos y tareas es uno que a conciencia crearon los Constituyentes al establecer el mecanismo para la adición de escaños. En 10 elecciones anteriores ese ha sido el efecto al activarse la "ley de minorías". Véase Resolución de la Comisión Estatal de Elecciones, CEE-RS-16-909, pág. 9 *citando a* F. Bayrón Toro, *Historia de las elecciones y los partidos políticos de Puerto Rico* (1809-2012), 8va ed. rev., Publicaciones Gaviota (2016). Este caso, y la elección directa de un candidato independiente, no varía esa realidad.

[87] Véase <u>Fuster v. Busó</u>, <u>supra</u>, pág. 354 (Díaz Cruz, J., Voto particular) ("Hay considerable argumento entre las partes en cuanto al propósito de la Asamblea Constituyente de dar representación en la Legislatura a los llamados grupos de opinión minoritaria. No existe mejor criterio conocible para percibir un grupo de opinión que su consolidación en partido político lo que indudablemente llevó la Constituyente a vincular la representación de minorías al concepto 'partido' en vez de 'candidato' al escribir el Art. III, Sec. 7 de nuestra Constitución").

De otra parte, y a diferencia de lo que estima la mayoría, la realidad es que este caso no presenta una encrucijada de partidos políticos versus candidaturas independientes. Ante nosotros no está en controversia la elección de candidato independiente alguno. Es decir, nadie cuestiona la elección del hoy Senador, Hon. José Vargas Vidot.[88] Lo único que está hoy planteado es si procede inhibir el diseño constitucional que procura garantizar representación sustancial a los partidos minoritarios en la Asamblea Legislativa. Soy de la opinión que ello no resulta procedente.

## III.

Expuesto lo anterior, me veo obligada a expresarme sobre un último asunto. En particular, me parece lamentable que una mayoría de este Tribunal resuelva una controversia de tanta envergadura mediante una sentencia. A pesar de que mi posición no es la postura mayoritaria, este Tribunal debió establecer una norma clara de cara al futuro. Además, si lo que se hace es acoger intacta la Resolución de la Comisión Estatal de Elecciones, este Tribunal derrotó con su actuación el propósito que nuestro ordenamiento jurídico le concede al auto de certificación intrajurisdiccional.

Nuestra Constitución delegó en nosotros, los jueces y juezas del Tribunal Supremo, una responsabilidad inmensa. A fin de cuentas, nosotros somos los intérpretes de la

---

[88] Y lo que hoy se resuelva no tiene efecto alguno en cuanto a su escaño.

Constitución. Esta Curia debió establecer un dictamen sostenido por una Opinión, en la cual se consideraran ampliamente las cuestiones envueltas, se fundamentaran los razonamientos con precedentes y se estableciera claramente la norma aplicable al asunto novel y trascendental que nos ha sido planteado. El respeto por nuestro sistema democrático de gobierno, así lo exigía.

En fin, en vista de lo anterior y de que una mayoría de este Tribunal hoy procede a coartar el diseño constitucional que procura garantizar representación sustancial a los partidos minoritarios en la Asamblea Legislativa, respetuosamente disiento en parte y concurro en parte.

Maite D. Oronoz Rodríguez
Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ángel M. Rodríguez Otero<br><br><br>Recurrido<br><br><br>v.<br><br><br>Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros<br><br><br>*Recurridos*<br>_____<br><br>Comisionado Electoral del Partido Popular Democrático<br><br><br>Recurrido<br><br><br>v.<br><br><br>Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros<br><br><br>*Recurridos* | CT-2016-0019<br><br>CT-2016-0020 |

_____

Juan Pablo Hernández


Peticionario


v.


Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros


*Recurridos*


Ramón Ruiz Nieves


*Recurrido*


*v.*


Comisión Estatal de Elecciones por conducto de su Presidenta, Lcda. Liza García Vélez y otros


*Recurridos*

_____

Comisionada Electoral del Partido Nuevo Progresista, Norma Burgos Andújar y Hon. Thomas Rivera Schatz, Presidente entrante del Senado de Puerto Rico

*Peticionarios en Certificación*

*v.*

Comisión Estatal de Elecciones por conducto de su Presidenta, Liza García Vélez y otros

*Recurridos*

---

Opinión concurrente emitida por el Juez Asociado señor MARTÍNEZ TORRES, a la cual se unió el Juez Asociado señor FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 4 de enero de 2017.

Coincido con el resultado al que llega una mayoría de este Tribunal de confirmar la Resolución Núm. CEE-RS-16-90 de la Presidenta de la Comisión Estatal de Elecciones (CEE). Sin embargo, no puedo estar conforme con el proceder de la mayoría de resolver esta controversia a través de una Sentencia sin tan siquiera tratar de llegar a un consenso, a pesar de que una

lectura de las distintas ponencias de los Jueces de este Tribunal contienen fundamentos legales comunes para arribar a un mismo resultado. Las diferencias —mayormente de metodología interpretativa- son salvables si se quiere producir una Opinión que refleje el consenso que existe en el Tribunal. Una cosa es que una ponencia no obtenga los votos para ser la Opinión del Tribunal; otra muy distinta es lo que pasó aquí: Nunca se propuso al Pleno una posible Opinión del Tribunal. Desde el inicio se trató de que solo se certificara una Sentencia.

Me parece lamentable que desperdiciemos la oportunidad de sentar un precedente claro sobre una controversia de semejante envergadura en nuestro ordenamiento jurídico y claudiquemos nuestro deber como máximos intérpretes de la Constitución. Cabe preguntarse: Si no íbamos a pautar nada, ¿para qué certificamos este caso? ¿Por qué no dejamos que siguiera su curso con premura en el sistema de tribunales? Con toda probabilidad, el caso estaría resuelto hoy comoquiera, sin que este Tribunal pautara nada. En otras palabras, estaríamos precisamente donde estamos hoy.

Peor aún, la negativa de este Tribunal a tratar de producir una Opinión puede dejar la impresión de que el Tribunal no quiere pautar para reservarse el derecho de cambiar su criterio en el futuro. Aunque no sea cierta, esa impresión de que este Tribunal está "velando güira" le hace mucho daño a la credibilidad de nuestros dictámenes presentes y futuros. Esa credibilidad es el único sostén para que todos los sectores acaten nuestras decisiones. Mi conciencia me impide dar mi voto de conformidad a la erosión de nuestra legitimidad ante el

Pueblo de Puerto Rico. Por mi parte, entiendo indispensable exponer los fundamentos legales que me llevan a coincidir con el dictamen del Tribunal.

Aunque este caso comprende cuatro recursos de revisión, los planteamientos legales de los candidatos Hernández, Rodríguez Otero y Ruiz Nieves son similares. En esencia, aducen que la determinación de la Presidenta de la CEE no está conforme con la metodología de interpretación y adjudicación originalista adoptada por este Tribunal. De esa manera, sostienen que el análisis correcto para disponer de la controversia ante nuestra consideración debe ser uno textualista y, por lo tanto, un candidato independiente al Senado y un candidato de un partido que no logró preservar su franquicia electoral en los comicios electorales de este año no pueden ser considerados como pertenecientes a un "partido de minoría" para ningún fin bajo la Sección 7 del Art. III de la Constitución de Puerto Rico. Art. III, Sec. 7, Const. PR, LPRA, Tomo 1. No obstante, según se expone a continuación, la interpretación propuesta por los candidatos Hernández, Rodríguez Otero y Ruiz Nieves no es cónsona con una lectura integral del texto constitucional y ampliaría la composición del Senado de Puerto Rico en números y proporciones no contemplados por los forjadores de la Constitución.

I

El pasado 8 de noviembre de 2016 se celebraron las elecciones generales en Puerto Rico. En estas, el Partido Nuevo Progresista (PNP) ganó veintiuno de los veintisiete escaños en

el Senado de Puerto Rico. Por su parte, el Partido Popular Democrático (PPD) obtuvo cuatro escaños, mientras que el Partido Independentista Puertorriqueño alcanzó solo uno. En esos comicios también resultó electo un candidato independiente, el Sr. José Vargas Vidot. En términos del cargo a la gobernación, el Dr. Ricardo Rosselló Nevares resultó electo gobernador bajo la insignia del PNP por un total de 660,510 votos, lo que representa un 41.80 por ciento del voto popular.

Este resultado activó el inciso (a) de la Sección 7 del Art. III de nuestra constitución, infra, denominada comúnmente como "Ley de Minorías". En vista de lo anterior, la Comisión Estatal de Elecciones (CEE) certificó la elección de tres candidatos del PPD por adición, sobre los cuales no hay controversia. Así, el Senado quedó compuesto por treinta senadores, de los cuales veintiuno son del PNP, siete del PPD, uno del PIP y, por último, el señor Vargas Vidot.

Así las cosas, tres candidatos del PPD solicitaron a la CEE que los declarara electos por adición en virtud de la "Ley de Minorías". Estos fueron el Sr. Juan Pablo Hernández, candidato del distrito senatorial de Guayama, el Sr. Ángel M. Rodríguez Otero, también candidato del distrito senatorial de Guayama, y el Sr. Ramón Ruiz Nieves, candidato por el distrito senatorial de Ponce.

En esencia, el señor Hernández arguyó que los mecanismos en la Sección 7, infra, operan únicamente a favor de "partidos de minoría". De este modo, sostuvo que con un lenguaje claro, no es posible considerar a un candidato independiente dentro de los

nueve escaños por adición. Bajo su lógica, solo cinco senadores de partidos de minoría resultaron electos, cuatro del PPD y uno del PIP. Por lo tanto, restarían cuatro candidatos adicionales por añadir de los senadores por acumulación.

Similarmente, el señor Rodríguez Otero adujo que procede excluir del cálculo de nueve senadores por adición al señor Vargas Vidot. Sin embargo, añadió que se debe excluir también al candidato electo por el PIP, ya que los escaños corresponden a "partidos de minoría" debidamente inscritos y este partido no obtuvo los votos necesarios.

Por último, el señor Ruiz Nieves argumentó lo mismo que el señor Rodríguez Otero con respecto al candidato independiente y al candidato por el PIP. La diferencia es que este, solicitó además que para efectos del cómputo de la proporción de votos obtenidos, se excluya las papeletas en blanco, las nulas y las de nominación directa de personajes ficticios. Por consiguiente, precisó que procedería añadir cinco senadores de los cuales tres corresponden a los candidatos por acumulación ya certificados y dos corresponderían a candidatos por distritos con la más alta proporción de votos que no fueron elegidos, luego de excluir las papeletas que sugirió.

Tras varios trámites procesales y con el beneficio de las posturas de los comisionados electorales, se realizó una vista. En ella, las partes tuvieron que argumentar sus posturas, pero los comisionados electorales no lograron alcanzar un criterio unánime. Así, la controversia quedó ante la consideración de la Presidenta de la CEE.

El 30 de noviembre de 2016, la Presidenta de la CEE emitió la Resolución Núm. CEE-RS-16-90 en la que denegó la solicitud de los candidatos Hernández, Rodríguez Otero y Ruiz Nieves. La Presidenta de la CEE entendió que un análisis del historial y los debates de la Convención Constituyente revelan que dentro de los nueve senadores requeridos por la "Ley de Minorías" deben ser incluidos los candidatos que representen un núcleo de opinión distinto aunque no esté afiliado a un partido político. Además, reconoció que la interpretación propuesta por los candidatos Hernández, Rodríguez Otero y Ruiz Nieves conllevaría alterar las dos terceras partes que el PNP obtuvo como resultado del voto directo del Pueblo. En esa línea, la Presidenta de la CEE resaltó que la referida cláusula no busca impedir que un partido que ganó el favor electoral pierda su mayoría, sino que se articuló para conceder que las minorías tuvieran representación legislativa para ejercer una función fiscalizadora.

Insatisfechos con el proceder de la Presidenta de la CEE, los candidatos Hernández, Rodríguez Otero y Ruiz Nieves recurrieron en revisión al Tribunal de Primera Instancia en casos separados. Posteriormente, el señor Hernández, el senador Thomas Rivera Schatz, candidato a senador electo por el PNP, y la Sra. Norma Burgos Andújar, en su función de comisionada electoral del PNP, acudieron ante esta Curia y solicitaron la certificación de los casos presentados ante el foro primario. Tras determinar que las controversias formuladas gozan de un alto interés público, resultan noveles en nuestro ordenamiento jurídico y redundan estrictamente en un asunto de Derecho,

certificamos los recursos presentados. Asimismo, paralizamos los procedimientos ante el Tribunal de Primera Instancia y ordenamos la certificación del diligenciamiento de los emplazamientos, así como la presentación de los alegatos de las partes.

Con el beneficio de la comparecencia de las partes, procedemos a resolver la controversia instada.

II

**A. Origen y texto de la Sección 7**

El esquema adoptado en la Sección 7, _supra_, surgió en respuesta a las preocupaciones que generaron los resultados electorales en la Isla durante la segunda mitad de la década del cuarenta. José Trías Monge, _Historia Constitucional de Puerto Rico_, San Juan, Ed. UPR, 1982, Vol. II, págs. 143-145. En particular, generó inquietudes el hecho de que durante los cuatrienios de 1944-1948 y de 1948-1952, el Partido Popular Democrático obtuvo victorias abrumadoras en las cámaras legislativas, al punto de que las minorías apenas lograron obtener una ínfima parte de los escaños legislativos. Ese panorama motivó a los dirigentes políticos de entonces a idear un mecanismo que le garantizara representación a las minorías en la Asamblea Legislativa, a pesar de que sus candidatos no resultaren electos por el Pueblo. _Fuster v. Busó_, 102 DPR 327, 334 (1974). No obstante, el esquema de representación proporcional existente en otros países, el cual subsanaría esa preocupación, fue rechazado. Así, el diseño constitucional finalmente adoptado fue producto de un balance entre la aspiración de fortalecer la representación minoritaria para

evitar que un solo partido acaparara las cámaras legislativas y la idea de contar con "partidos fuertes, capaces de dirigir por sí solos el país en la difícil tarea de reconstrucción, sin necesidad de coaliciones comprometedoras". José Trías Monge, op. cit., pág. 145. Como resultado de ese esfuerzo, la Constitución contó con el apoyo de las minorías y el proceso derivó en la adopción final del texto actual de la Sección 7, supra, el cual dispone:

> § 7. [Representación de partidos de minoría; miembros adicionales]

> Cuando en una elección general resultaren electos más de dos terceras partes de los miembros de cualquiera de las cámaras por un solo partido o bajo una sola candidatura, según ambos términos se definan por ley, se aumentará el número de sus miembros en los siguientes casos:

> (a) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hubiese obtenido menos de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, se aumentará el número de miembros del Senado o de la Cámara de Representantes o de ambos cuerpos, según fuere el caso, declarándose electos candidatos del partido o partidos de minoría en número suficiente hasta que la totalidad de los miembros del partido o partidos de minoría alcance el número de nueve en el Senado y de diecisiete en la Cámara de Representantes. Cuando hubiere más de un partido de minoría, la elección adicional de candidatos se hará en la proporción que guarde el número de votos emitidos para el cargo de Gobernador por cada uno de dichos partidos con el voto que para el cargo de Gobernador depositaron en total esos partidos de minoría.

> Cuando uno o más partidos de minoría hubiese obtenido una representación en proporción igual o mayor a la

proporción de votos alcanzada por su candidato a Gobernador, no participará en la elección adicional de candidatos hasta tanto se hubiese completado la representación que le correspondiese bajo estas disposiciones, a cada uno de los otros partidos de minoría.

(b) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hubiese obtenido más de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, y uno o más partidos de minoría no eligieron el número de miembros que les correspondía en el Senado o en la Cámara de Representantes o en ambos cuerpos, según fuere el caso, en proporción a los votos depositados por cada uno de ellos para el cargo de Gobernador, se declararán electos adicionalmente sus candidatos hasta completar dicha proporción en lo que fuere posible, pero los Senadores de todos los partidos de minoría no serán nunca, bajo esta disposición, más de nueve ni los Representantes más de diecisiete.

Para seleccionar los candidatos adicionales de un partido de minoría, en cumplimiento de estas disposiciones, se considerarán, en primer término, sus candidatos por acumulación que no hubieren resultado electos, en el orden de los votos que hubieren obtenido y, en segundo término sus candidatos de distrito que, sin haber resultado electos, hubieren obtenido en sus distritos respectivos la más alta proporción en el número de votos depositados en relación con la proporción de los votos depositados a favor de otros candidatos no electos del mismo partido para un cargo igual en otros distritos.

Los Senadores y Representantes adicionales cuya elección se declare bajo esta sección serán considerados para todos los fines como Senadores o Representantes por Acumulación.

La Asamblea Legislativa adoptará las medidas necesarias para reglamentar estas garantías, y dispondrá la forma de adjudicar las fracciones que

resultaren en la aplicación de las reglas contenidas en esta sección, así como el número mínimo de votos que deberá depositar un partido de minoría a favor de su candidato a Gobernador para tener derecho a la representación que en la presente se provee.

El hecho fundamental que activa la aplicación de esta cláusula es el que un partido de mayoría alcance más de dos terceras partes en una de las cámaras legislativas como resultado en una elección general. La preocupación se centra en cuál será la composición del poder legislativo. En el supuesto de que se dé ese escenario en alguna de las cámaras legislativas, el remedio dependerá de cuál es el resultado electoral a nivel de la gobernación. Aunque de primera impresión se puede pensar que ese esquema constitucional es complicado, en realidad no lo es. Se compone de dos mecanismos medulares organizados en sus incisos (a) y (b). El primero, recogido en el inciso (a), aplica cuando el partido que obtuvo más de dos terceras partes en una cámara, obtiene menos de dos terceras partes de los votos para la gobernación. El segundo, dispuesto en el inciso (b), aplica en casos en que esa mayoría en la gobernación sobrepasa dos terceras partes.

Asimismo, la Sección 7, _supra_, se encarga de disponer cómo se identifican los candidatos que entrarán por adición a la cámara correspondiente. La solución que brinda el texto constitucional es utilizar los candidatos por acumulación no elegidos y, agotada esa lista, los candidatos por distrito. El orden de prelación de los candidatos por acumulación es por número total de votos recibidos, mientras que los candidatos de distrito se colocan en orden conforme a la proporción de los

votos que recibieron en relación a los candidatos contrincantes dentro de sus distritos.

En este caso, los resultados electorales configuraron un escenario en el que procede aplicar el mecanismo del inciso (a) y bajo el cual procede añadir senadores hasta completar un total de nueve. De hecho, ya se añadieron tres. Por lo tanto, no existe duda alguna de que los resultados de los comicios electorales del pasado 8 de noviembre de 2016 requieren incorporar miembros por adición en el Senado de Puerto Rico. El asunto es cómo interpretar el mandato de declarar "electos candidatos del partido o partidos de minoría en número suficiente hasta que la totalidad de los miembros del partido o partidos de minoría alcance el número de nueve en el Senado". Const. PR, supra.

**B. Intención original de la Convención Constituyente**

Al examinar el Diario de Sesiones de la Convención Constituyente, encontramos tres eventos que aluden a la discusión en torno a la Sección 7, supra. Primeramente, resalta la presentación del Informe de la Comisión de la Rama Legislativa donde la propuesta inicial para la representación de minorías estaba contenida en la Sección 4. El 28 de diciembre de 1951 se presentó el texto inicial de lo que finalmente se convirtió en la actual "Ley de Minorías". 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2594-2595 (1961). Aunque existen ciertas diferencias respecto al texto finalmente aprobado, el diseño inicial en sus componentes más relevantes es el mismo. Ambas redacciones reconocen el supuesto de un partido que obtiene más de dos terceras partes en una de las cámaras

legislativas, las formulas a aplicar sujeto a si se obtuvo más o menos de dos tercios de los votos para la gobernación y topes para que los legisladores que se añadan no superen un tercio de los miembros que componen cada cámara. En su informe, la Comisión de la Rama Legislativa aseveró que "ha[bía] elaborado un plan de representación que garantiza una justa representación a los **grupos minoritarios**". (Énfasis Suplido). Íd., págs. 2595-2596. De igual modo, reconoció que "[e]sta fórmula de garantía a las minorías se [produjo] y recomend[ó] por la Comisión como un medio de dar justa interpretación a la voluntad del pueblo **y no como una concesión a partidos políticos**". (Énfasis Suplido). Íd., pág. 2596. Por último, tras explicar su propuesta, recalcó nuevamente que las disposiciones constitucionales que recomendó "fijan de una manera precisa y clara la garantía de representación mínima **a los grupos minoritarios**". (Énfasis Suplido). Íd., pág. 2597. Estas expresiones ilustran el foco primordial del texto constitucional objeto de examen.

En segundo lugar, el debate en la sesión de 28 de diciembre de 1951, cuando se presentó y se discutió el Informe de la Comisión de la Rama Legislativa, se concentró en una apreciación de que la propuesta elaborada por la Comisión era muy complicada y creaba incertidumbre en la ciudadanía sobre el número de legisladores que compondrían las cámaras legislativas. En ese contexto surgió una propuesta del delegado Gelpí, para eliminar los legisladores por acumulación y en el caso particular del Senado, estructurarlo a base de tres senadores por cada uno de los ocho distritos senatoriales. Su idea para garantizar las dos terceras partes de la mayoría era elegir tres legisladores por

cada distrito senatorial de manera que siempre hubiera un senador por distrito que perteneciera a un partido de minoría. 2 <u>Diario de Sesiones de la Convención Constituyente de Puerto Rico</u> 1283 (1961). Sin embargo, en respuesta a su proposición, el delegado Negrón López expresó:

> **Cuando nosotros redactamos este plan y cuando comparecemos ante la Convención Constituyente a defenderlo, no estamos pensando en que estamos afiliados a un partido político ni estamos pensando remotamente en la fuerza electoral que ese partido político puede tener.** Pero parece que una parte de los delegados no puede sustraerse a un gran impulso para hablar a nombre de las representaciones que ostentan y a veces cometen errores grandes en contra de sí mismos.
>
> […]
>
> **¿Dónde está la voz, no ya de esos partidos políticos que es lo único que preocupa a algunos delegados en esta Convención Constituyente, dónde está la voz de esos electores que votaron por esos partidos políticos, que no resultaron ser en ningún distrito, el segundo partido?** ¿Cuál es la expresión de su voluntad democrática que se va a oir en los cuerpos parlamentarios? Sin duda alguna que este plan está predicado en la aspiración o de ser mayoría o de ser primer partido de la minoría, pero yo no creo que ése es el *role* que debe jugar ningún delegado en la Convención Constituyente. **A mí me parece que es más elevada y me parece que es más respetable, la actitud de guardar el más alto reconocimiento al deseo de los electores cuando votan, cualquiera que sea el partido o la forma en que ellos expresen su deseo y su voluntad.** (Énfasis Suplido). <u>Íd.</u>, págs. 1301-1302.

Luego, al discutir el inciso (b) de la eventual Sección 7, <u>supra</u>, el delegado Negrón López expuso:

No hay ninguna situación en la historia con la cual nosotros podamos ilustrarnos cómo funciona esta regla. Y esperamos que una situación de esa índole no se produzca, porque me parece que es demasiado extrema y que no hace ni siquiera bien a la democracia. Pero si ocurriera, como dádiva tampoco, generosidad tampoco, **pero tampoco como acto de justicia a partido político, sino como reconocimiento a núcleos de opinión, aquí está la garantía de representación para que no haya grupos electorales, voluntad de masa y de pueblo, cuya voz no se oiga en las cámaras legislativas, para que se planteen y se discutan todos los problemas, y todos los puntos de vista, y para que las mayorías legislativas tengan el acicate y el estímulo de una minoría que vigila y colabora en el proceso democrático.** (Énfasis Suplido). Íd., pág. 1304.

El contenido de estas expresiones no debe ser minimizado. Si bien no exhiben una discusión donde se reconoció tajantemente que los candidatos independientes debían ser contados entre las adiciones producto de esta protección constitucional, arrojan luz sobre el propósito que se buscó proteger en la Sección 7, supra. Se reconoció expresamente que el designio responde a brindar un reconocimiento a los núcleos de opinión "cuya voz no se oiga en las cámaras legislativas" y no como un "acto de justicia a [un] partido político". Íd. Estas expresiones encarnan el principio de que la clasificación de ciertos candidatos como de "partido de minoría" se define en contraste con la mayoría que obtuvo una representación abrumadora en la cámara legislativa correspondiente. Los constituyentes cavilaron que el fin de la garantía constitucional fue enfrentar esa mayoría de más de dos terceras partes con un contrapeso de poder articulado a través de una minoría de núcleos de opinión que vigilara su actuación.

Estos debates de 28 de diciembre de 1951 produjeron algunas modificaciones al texto propuesto. El 21 de enero de 1952, la "Ley de Minorías", identificada ya para ese entonces como la Sección 7, supra, fue nuevamente objeto de discusión. Precisamente ese día, la disposición sufrió dos enmiendas que generaron un debate relevante para fines de este análisis. Una de las enmiendas incorporó lo que hoy día es el segundo párrafo del inciso (a) de la Sección 7, supra. La otra fue la última oración de la Sección 7, supra, que delega en la Asamblea Legislativa la facultad de establecer el número mínimo de votos que deberá depositar un partido de minoría a favor de su candidato a gobernador para tener derecho a la representación por adición. Durante una discusión sobre esa última enmienda, el delegado Negrón López indicó lo siguiente:

> [E]so es lo que **siempre se tuvo en mente cuando se discutió sobre estas fórmulas que proporcionaban una garantía de representación adicional a los grupos minoritarios**, pudiera haber una representación, una distribución inadecuada de los votos, que produjera una situación, que no respondiera a los criterios de opinión pública, **y para eso convenía proveer algo en la constitución, de manera que importantes núcleos de opinión pública tuvieran voces que expresaran sus puntos de vista en la Asamblea Legislativa de Puerto Rico.**

> Pero yo quiero decir, señor Presidente, que **cuando se escribieron las palabras de esta proposición originalmente, no se tuvo una idea tan preeminente, tan importante, tan absoluta, tan esclarecida sobre los partidos políticos.** Lo que se tenía era un gran respeto a los grupos de opinión, a los núcleos de opinión importantes, no pensando en pequeños grupos que pudieran equivocarse y dividirse por cosas accidentales y adjetivas, votando en contra de lo que debía ser la norma de su pensamiento y de su criterio, de lo que es el ejercicio útil de la democracia, que

manda a los hombres no dividirse por trivialidades y que les ordena ceder en las cosas que puedan ser pequeñas, a cambio de lo que sea definitivo y fundamental; y pensando en esos grupos importantes de opinión… digo, si no importaba tampoco que fueran pequeños… pero que fueran respetables y sobre todo lo que tuvieran, que pudieran expresarse y que tuvieran corporeidad expresada en estas disposiciones constitucionales... y para esos grupos se proveía representación.

[…]

Yo no creo que la Asamblea Legislativa, ni ahora ni nunca, porque estamos en la afirmación de principios puros de democracia en Puerto Rico, yo no creo que nadie se atreva a negar la virtualidad de esos principios haciendo algo que pueda ser contrario a los mismos. Yo no creo que la Asamblea Legislativa pueda ser injusta cuando determine cuál es el mínimum que ha de tener en votos determinado partido político, para que pueda participar en este número de candidatos adicionales. **Pero yo creo, señor Presidente, que lo justo es que cuando en las proporciones un grupo, [o grupos] de electores —no importa si tienen una insignia, no importa si tienen un partido— tienen un número suficiente para que su identidad se refleje en la proporción total, que esos grupos puedan participar sin limitaciones**, aunque la Asamblea Legislativa, caprichosamente, pueda imponérselas en el futuro. (Énfasis Suplido). 3 <u>Diario de Sesiones de la Convención Constituyente de Puerto Rico</u> 2027 (1961).

En ese sentido, podemos concluir que la idea en torno a la importancia de los núcleos de opinión y su identificación dentro del propósito principal de respetar la voluntad de los electores, es un componente inherente en el diseño de la Sección 7, <u>supra</u>. Según surge de los debates de la Convención Constituyente, aunque hubo diferencias de criterios sobre los

detalles de la propuesta, el sentido general del esquema adoptado fue el propuesto desde un inicio.

## III

Los candidatos Hernández, Rodríguez Otero y Ruiz Nieves sostienen que como la Sección 7, supra, menciona "partido de minoría" esa es la figura exclusiva que la disposición busca proteger y en torno a la cual gira todo el mecanismo de la "Ley de Minorías". Arguyen que no es posible que la mención de "partido de minoría" pueda incluir candidatos independientes. Su contención supone que un candidato independiente nunca puede ser considerado para el cómputo de la totalidad de nueve senadores que dispone la "Ley de Minorías". Según su lógica, estos caen en una tercera categoría no contemplada por la Sección 7, supra, que los excluye de su aplicación, pues la suma de la totalidad de los nueve senadores por adición debe considerar únicamente legisladores electos bajo la insignia de un partido político. Es decir, los legisladores independientes no son del partido de minoría y no son del partido de mayoría y, por consiguiente, quedan fuera del alcance de la cláusula constitucional.

Aunque en ciertas instancias el texto de nuestra Constitución es claro y no requiere mayor elucubración, siempre surgen ocasiones -como esta- en las que es necesario auscultar qué fue lo que los constituyentes concibieron, de manera que su interpretación sea cónsona con sus propósitos. En cuanto al debate que existe sobre cómo descifrar la intención original de los constituyentes, he advertido que "**[n]o debe confundirse el originalismo con el literalismo**". (Énfasis Suplido). R.L.

Martínez Torres, El Originalismo como método de interpretación constitucional y el principio de separación de poderes, 49 Rev. Jur. UIPR 249, 265 (2015). Según hemos reconocido, los jueces de este foro no brindaremos una interpretación al texto de nuestra carta magna que vaya más allá de su significado original y **que pretenda ignorar la historia detrás de la cláusula constitucional en cuestión**. Ex parte AAR, 187 DPR 835, 872 (2013). Es decir, no "avalar[emos] interpretaciones de cláusulas constitucionales que claramente van en contra del propósito de quienes las formularon". Íd., pág. 874. "Las disposiciones de un texto se deben interpretar de un modo que las haga compatibles en lugar de contradictorias (Traducción nuestra)". A. Scalia y B.A. Gardner, Reading Law: The Interpretation of Legal Texts, St. Paul, MN, Thomson/West, 2012, pág. 180.[89] A fin de cuentas, la labor de hermenéutica en este tipo de controversia constitucional nos requiere contestar la interrogante: ¿Cuál es el significado de la cláusula constitucional bajo análisis en el momento en que la Constitución se aprobó?

La contención de los candidatos Hernández, Rodríguez Otero y Ruiz Nieves es completamente contraria al significado original que se desprende del historial constitucional de la Sección 7, supra. Resulta sumamente difícil reconocer un rechazo a los candidatos independientes cuando, precisamente, los debates sobre el texto constitucional ilustran la intención de proteger los núcleos de opinión carentes de representación en las cámaras legislativas. No se pueden pasar por alto las expresiones incisivas que reconocen que este mecanismo no buscó proteger a

---

[89] "The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."

los partidos políticos y que, por el contrario, se diseñó para garantizar una representación justa de los **grupos minoritarios**. Las discusiones durante la Convención Constituyente desentrañan la importancia de los núcleos de opinión y la voluntad de los electores en el esquema de la disposición constitucional en controversia como bases del texto adoptado. En ese sentido, la idea cardinal de los constituyentes de que la propuesta constitucional buscó ampliar el espectro de representación política resalta del debate e historial constitucional. De esta manera, para fines de la Sección 7, supra, el concepto "partido de minoría" significa un grupo de opinión que promulga ideas contrarias a las del partido que obtuvo la mayoría legislativa, sin importar si tiene una insignia o un partido debidamente inscrito. No depende del número de candidatos que postule ese grupo de opinión, ni de si tiene o no una insignia.

Del texto constitucional surgen dos categorías de representación: (1) los candidatos de la mayoría que obtuvo más de dos terceras partes de los escaños y (2) la minoría que la vigilará y colaborará en el proceso democrático desde la Rama Legislativa. Los candidatos independientes, claramente, no son parte de esa mayoría, por lo que, como consecuencia inescapable, quedan enmarcados dentro de la minoría que servirá de contrapeso. No procede reconocer una tercera categoría no contemplada en el texto de la Sección 7, supra, para enmarcar a los candidatos independientes y dejarlos desprovistos de la protección que precisamente los constituyentes quisieron reconocer en la "Ley de Minorías". Igual apreciación se ha tenido en la academia. Véase O. E. Resumil de Sanfilippo & R.

Faría González, <u>La garantía constitucional a la representación de las minorías en la Asamblea Legislativa: naturaleza, alcance y extensión</u>, 65 Rev. Jur. UPR 329, 338 (1996)("La realidad es que la tutela que [el constituyente] quiso garantizar para evitar la concentración de poder en una ideología política se fundamentó en ofrecer participación a los diferentes sectores de opinión en la gestión gubernamental cuando un solo partido lleva a la cámara correspondiente más de dos terceras partes de sus miembros").

Además, resulta pertinente destacar que el PPD también compartió esta interpretación cuando en 1995 solicitó ante este Tribunal la concesión de un escaño adicional tras la afiliación del senador Sergio Peña Clos bajo el PNP. Véase <u>PPD v. Peña Clos I</u>, 140 DPR 779 (1996). En ese sentido, aunque el senador Peña Clos abandonó el PPD en 1993 y se identificó como senador independiente, el PPD lo consideró dentro del cálculo que requiere la "Ley de Minorías" y no se cuestionó la necesidad de un candidato adicional para completar la representación minoritaria hasta que el senador cambió de afiliación al PNP. En ese entonces permitimos que el senador Peña Clos permaneciera en el Senado y concedimos la certificación de un candidato adicional. <u>PPD v. Peña Clos I</u>, <u>supra</u>, pág. 781.

Esta interpretación se sustenta a su vez con precedentes de este Tribunal. En <u>Guadalupe v. Comisión Estatal de Elecciones</u>, 165 DPR 106 (2005), atendimos una controversia sobre el mecanismo de representación de minorías bajo la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991, 21 LPRA sec. 4001 <u>et seq</u>. La Asamblea Legislativa creó un

esquema de representación de minorías estatutario como parte de la elección de los componentes de las legislaturas municipales. Específicamente, la Ley de Municipios Autónomos estableció que el poder legislativo en Vieques se ejerce por una Legislatura Municipal, compuesta por doce legisladores municipales, nueve de ellos elegidos por el voto directo de los electores, y tres mediante el mecanismo de representación de minorías. El método que debe seguirse en la repartición de estos últimos tres escaños es el siguiente:

> (a) La Comisión Estatal de Elecciones declarará electo entre los candidatos que no hayan sido electos por el voto directo, aquéllos dos (2) que hayan obtenido más votos en el partido que llegó segundo en la votación para legisladores municipales, y uno del partido que llegó tercero. En el caso de Culebra, el legislador municipal adicional que se declarará electo será del partido segundo en la votación para legisladores municipales. (Énfasis suplido.) 21 LPRA sec. 4153(a).

La controversia se generó cuando resultó electo un candidato independiente a alcalde y, además, su grupo de candidatos a legisladores municipales alcanzó más votos que el Partido Independentista Puertorriqueño (PIP). Se cuestionó si el tercer escaño correspondería al PIP, tercer partido en votos, o al grupo del candidato independiente. En aquella ocasión, la CEE optó por reconocer que el requisito de "partido" no impedía reconocer que el tercer escaño pertenecía por decisión popular al grupo de legisladores municipales del candidato independiente. Esa posición fue avalada por todos los Jueces que componían este Tribunal. Al llegar a esa conclusión, este Tribunal expresó unánimemente que

[c]ualquier interpretación de la Ley Electoral de Puerto Rico debe estar en consonancia con el referido articulado que, como hemos visto, promulga, entre otras cosas, la prevalencia de los derechos electorales del ciudadano sobre los derechos y las prerrogativas de todos los partidos y las agrupaciones políticas. **La democracia existe para hacer valer la voluntad de los ciudadanos, no la de los partidos políticos.**

En consecuencia, concluimos que el mecanismo electoral para garantizar la representatividad de las minorías no está limitado a los partidos políticos. Se debe entender que la expresión "partido político" contenida en el inciso (a) del Art. 4.003 de la Ley de Municipios Autónomos, <u>supra</u>, incluye a cualquier agrupación de individuos o a candidatos independientes que hayan comparecido válidamente a una elección y hayan obtenido la segunda o tercera posición de entre las alternativas electorales de una elección. En este sentido, haber obtenido el suficiente número de votos directos como para llegar segundo o tercero en un evento electoral cualifica a un candidato independiente para obtener un escaño mediante el mecanismo de representación de minorías. (Énfasis Suplido). <u>Guadalupe v. Comisión Estatal de Elecciones</u>, <u>supra</u>, págs. 118-119.

Incluso, la entonces Jueza Asociada, Hon. Liana Fiol Matta, manifestó al dar su conformidad a la Opinión del Tribunal "que el Tribunal utiliz[ó] una metodología interpretativa correcta, a partir de los principios básicos de nuestro esquema electoral, para llenar una laguna en la Ley de Municipios Autónomos y evitar una interpretación contraria a nuestra Constitución". <u>Íd.</u>

IV

No cabe duda de que esta lectura del texto constitucional es la más razonable y la que mejor se ajusta a su verdadera intención. Además, la interpretación que avala una mayoría en el

día de hoy trasciende la situación de hechos particular en este caso y considera las consecuencias que supondría ajustarnos al literalismo que proponen los candidatos Hernández, Rodríguez Otero y Ruiz Nieves. El problema con su planteamiento no es solo que resulta contrario a la intención de los constituyentes, sino que, además, tampoco presta atención al efecto que tiene sobre la mayoría de dos terceras partes no incluir a los candidatos independientes entre los nueve de minoría.

El diseño constitucional, según vimos, busca lograr que el hecho de que un partido obtenga una mayoría superior de dos terceras partes no implique la supresión de voces disidentes en el proceso legislativo. Es decir, se pretendió proteger que esa diferencia representativa tan amplia, producto de la voluntad popular, no limitara el debate entre una mayoría electa con una misma ideología y una minoría alterna. Ahora bien, ese diseño también preserva las dos terceras partes de la mayoría.

Debe tenerse presente que la mayoría de dos terceras partes juega un papel fundamental en nuestra Rama Legislativa. En particular, esa mayoría cualificada tiene el poder de enmendar la Constitución, convocar una Asamblea Constituyente, iniciar procesos de residenciamiento y sobrepasar un veto ejecutivo. Véase Art. VII, Sec. 1, Const. PR, LPRA, Tomo 1, Art. VII, Sec. 2, Const. PR, LPRA, Tomo 1, Art. III, Sec. 21, Const. PR, LPRA, Tomo 1, Art. III, Sec. 19, Const. PR, LPRA, Tomo 1. La facultad para ejercer esos poderes quedaría afectada severamente de no protegerse el delicado balance que la Sección 7, _supra_, estructura entre la mayoría de dos terceras partes, electa por el Pueblo, y la representación minoritaria. No obstante, esas

facultades de la mayoría legislativa se anularían si adoptáramos la postura de los candidatos Hernández, Rodríguez Otero y Ruiz Nieves. Sobre este punto es correcto el siguiente análisis incluido en la Resolución recurrida:

> [T]omemos como supuesto que hubieran resultado electos 20 senadores por el PNP, 3 por el PPD y 4 candidatos independientes. El PNP tendría una mayoría de 74% que activa la disposición constitucional. Bajo la posición esbozada por los peticionarios solo deberíamos contar 3 senadores de minoría para efectos del cómputo y correspondería añadir 6 legisladores por fórmula constitucional. El resultado final sería un total de 33 senadores, donde la mayoría del PNP se reduce ahora a un 60.60%, menos de las dos terceras partes. Resolución Núm. CEE-RS-16-90, págs. 21-22.

Solo uno de los candidatos peticionarios se aventura a afirmar que no existe una exigencia de preservar las dos terceras partes de la mayoría. Sin embargo, lo cierto es que se trata de un principio claro reconocido en los debates de la Convención Constituyente. Con respecto a ese principio, el delegado Reyes Delgado reconoció enfáticamente que los constituyentes "no queremos que un partido que ha obtenido las dos terceras partes del voto total, venga a formar la Asamblea Legislativa con menos votos de los que en realidad el voto electoral le produjo para venir al hemiciclo de la Cámara y del Senado en su día". 2 <u>Diario de Sesiones</u>, <u>supra</u>, pág. 1282. Además, el delegado Reyes Delgado indicó que "**la mayoría no se está desprendiendo de nada, no está haciendo ningún sacrificio, ni pone en peligro el funcionamiento de sus dos cámaras aun hasta las dos terceras partes para que su gobierno se desarrolle sin dificultades de ninguna índole**". (Énfasis Suplido). <u>Íd.,</u>

págs. 1299-1300. De hecho, existe una discusión entre este delegado y el delegado Negrón López, en la cual este último rechazó una enmienda ante la posibilidad de que el resultado fuera que la representación de la minoría excediera la tercera parte. Mientras tanto, el delegado Reyes Delgado aseguró que ese número no puede excederse. Íd., pág. 1305. Asimismo, el delegado Figueroa Carreras reconoció la intención de preservar las dos terceras partes de la mayoría cuando se propuso como enmienda disponer una fracción fija de un tercio para la minoría. Por consideraciones prácticas, la redacción final fijó un número determinado de nueve espacios para el caso del Senado y no un cálculo fraccional. Se escogió el número de nueve senadores porque nunca excedía del tercio reservado a la minoría. A esos fines, el delegado Figueroa Carreras expresó que

> [ésta] es la proposición que cubre precisamente la aspiración de la mayoría, porque **la aspiración** de la mayoría es garantir una tercera parte a la minoría, pero al mismo tiempo, **ella tener garantidas sus dos terceras partes**.

> Tan es así, que cuando se hizo una proporción exacta, yo recuerdo que se argumentaba, "en el caso de la defección de una persona", y yo reconocí que eso podría ser un argumento fuerte. De ahí que surgiera una proposición como ésta, **que da a la mayoría sus 2/3 partes con un margen de garantía y asegura a las minorías su tercera parte, sin tener que entrar en las disquisiciones estas a que nos llevan las fracciones**, sin las grandes complicaciones que tiene el trabajo, trabajo laborioso, trabajo justiciero, pero complicado; y del mismo modo, vuelvo a decir, que la representación proporcional ha sido rechazada por ustedes—y al decir ustedes me refiero a don Luis Muñoz Marín—sobre la base de que es muy complicada. (Énfasis Suplido). Íd., págs. 1307-1308.

Precisamente, así lo reconocimos en Fuster v. Busó, supra, págs. 336-337, cuando puntualizamos que

la Ley [de Minorías] **quiere evitar el resultado anómalo de que mediante la donación de escaños adicionales las minorías resulten tener más de una tercera parte de los miembros de una o ambas Cámaras Legislativas cuando el partido de la mayoría haya obtenido esas dos terceras partes o más.** Esto es así porque hay asuntos que requieren las dos terceras partes o más de los votos y de lo contrario los escaños adicionales donados podrían frustrar el mandato electoral. (Énfasis Suplido).

V

Debo aclarar que dentro del diseño de la Sección 7, supra, se distinguen dos escenarios en los que se hace referencia al término "partidos de minoría". El primero, previamente discutido, gira en torno a quiénes cuentan dentro de los nueve candidatos que la disposición constitucional procura preservarle a la minoría en la Asamblea Legislativa. Ahora bien, el segundo escenario es uno distinto y versa sobre quiénes son elegibles para ser añadidos bajo la "Ley de Minorías".

Precisamente, en Fuster v. Busó, supra, este Tribunal tuvo que resolver si un candidato que no pertenece a un "partido de minoría" podía aspirar a ser añadido por adición conforme a la Sección 7, supra. En ese entonces, se reclamó que el ex gobernador Roberto Sánchez Vilella, candidato por acumulación por el Partido del Pueblo que no resultó electo en las elecciones de 1972, debía ser incluido como representante por adición, por haber obtenido el mayor número de votos entre los candidatos por acumulación no electos. En aquella elección el

Partido Popular Democrático (PPD) obtuvo una mayoría en exceso de dos terceras partes en la Cámara de Representantes, mientras que para la gobernación alcanzó menos de dos terceras partes. Ante esa realidad, quedaron configurados los elementos para la activación del inciso (a) de la Sección 7, supra. El problema de quienes solicitaron el escaño para Sánchez Vilella era que su partido obtuvo solo un 0.24% de los votos para gobernador. Es decir, logró menos del cinco por ciento requerido por la ley electoral para quedar inscrito.

Al excluir a Sánchez Vilella de la lista de candidatos no electos a ser considerados por adición, señalamos claramente que en la Ley Electoral se adoptó el requisito de un mínimo de cinco por ciento en la candidatura a la gobernación en obediencia al mandato constitucional expresado en el último párrafo de la Sección 7, supra. Fuster v. Busó, supra, pág. 341. En otras palabras, el legislador dispuso el número mínimo de votos que debería depositar un partido de minoría a favor de su candidato a gobernador para tener derecho a la representación que provee la "Ley de Minorías".

Ese escenario es completamente distinto al que se enfrenta hoy este Tribunal. La posibilidad de reconocer la representación de otros núcleos de opinión que no sean de partidos políticos resulta excluida para efectos de identificar qué candidatos pueden entrar por la "Ley de Minorías". Esto no se debe al mero hecho de que la Sección 7, supra, hace referencia a "partido de minoría", sino al diseño que se desprende luego de un análisis integral de la disposición constitucional, según concluido correctamente en Fuster v. Busó, supra. Entre los votos

obtenidos para la gobernación y a nivel de candidaturas legislativas existe una correlación que los amarra a la necesidad de un partido político. Se trata de un límite en el propio esquema de la disposición constitucional. Es decir, en este supuesto no se da la adición, no porque estos no sean candidatos de un "partido de minoría" sino porque incumplen el requisito adicional de correr junto con un candidato a gobernador que hubiere obtenido un porcentaje predeterminado de los votos.

Por el otro lado, al esclarecer quiénes deben ser considerados dentro de la totalidad de los nueve senadores que la Sección 7, _supra_, le concede a la minoría, es nuestro deber vindicar la noción original de los constituyentes de procurar ampliar el espectro de representación política diversa en nuestras cámaras legislativas, sin diluir la representación mayoritaria a menos de dos terceras partes del número total de miembros del cuerpo. Queda armonizado así el texto de la disposición constitucional en su contexto real.

VI

El sentido de responsabilidad que supone nuestra labor como máximos intérpretes de la Constitución nos requiere reconocer las complejidades de esta controversia para poder brindar una solución que esté acorde con la intención de los constituyentes. Por primera vez en nuestra historia resultó electo un senador independiente por acumulación por una cantidad abrumadora del voto electoral al mismo tiempo que un partido obtuvo más de dos terceras partes de los veintisiete escaños que componen ese

cuerpo legislativo. Una interpretación del texto constitucional que peque de literalista, según nos solicitan los candidatos Hernández, Rodríguez Otero y Ruiz Nieves, resultaría en excluir a ese senador electo del análisis que requiere la Sección 7 del Art. III de la Constitución, supra. Según expuesto, no podemos abrir la puerta a ampliar la composición del Senado de Puerto Rico en número y proporciones que chocan claramente con la voluntad de los forjadores de la Constitución. Su pretensión fue, precisamente, "dotar a nuestro pueblo de instituciones de gobierno genuinamente representativas y democráticas" y es nuestra labor preservar y defender esa intención. En definitiva, los porcentajes de la Sección 7, supra, se basan en la totalidad de los senadores electos. Por eso el cálculo no puede excluir a ninguno.

Por último, la situación particular con respecto a la elección del Lcdo. Juan Dalmau Ramírez como senador por acumulación del PIP, tampoco altera este análisis. El que el partido del licenciado Dalmau Ramírez no quedara inscrito no incapacita que sus candidatos al Senado sean contados dentro de los nueve escaños que garantiza este mecanismo constitucional a la minoría. Tanto el electo senador Dalmau Ramírez como el electo senador Vargas Vidot —así como todo otro senador electo— cuentan para determinar cuántos legisladores hay en total. En ese cálculo estos dos senadores deben ser clasificados como legisladores de "partido de minoría" porque —como vimos— esa frase en la Sección 7, supra, no se limita a partidos inscritos sino a grupos de opinión que no tienen representación mayoritaria en la Asamblea Legislativa. Es claro que ambos

senadores electos no pertenecen al partido de mayoría, por lo que se clasifican más apropiadamente dentro del grupo de la minoría a la que se refiere la Sección 7, supra.

VII

Por los fundamentos expuestos procede confirmar la Resolución Núm. CEE-RS-16-90 emitida por la Presidenta de la CEE, porque su conclusión es correcta y conforme a derecho.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ángel M. Rodríguez Otero

    Recurrido

        v.

Comisión Estatal de
Elecciones por conducto de
su Presidenta, Lcda. Liza
García Vélez y otros

    Recurridos

_____

Comisionado Electoral del
Partido Popular
Democrático

    Recurrido

        v.

Comisión Estatal de
Elecciones por conducto de
su Presidenta, Lcda. Liza
García Vélez y otros

    Recurridos

_____

Juan Pablo Hernández

    Peticionario

        v.

Comisión Estatal de
Elecciones por conducto de
su Presidenta, Lcda. Liza
García Vélez y otros

    Recurridos

_____

CT-2016-19   Certificación
CT-2016-20

Ramón Ruiz Nieves

Recurrido

v.

Comisión Estatal de
Elecciones por conducto de
su Presidenta, Lcda. Liza
García Vélez y otros

Recurridos

_____

Comisionada Electoral del
Partido Nuevo Progresista,
Norma Burgos Andújar y
Hon. Thomas Rivera Shatz,
Presidente entrante del
Senado de Puerto Rico

Peticionarios en
Certificación

v.

Comisión Estatal de
Elecciones por conducto de
su Presidenta, Lcda. Liza
García Vélez y otros

Recurridos

Opinión Disidente en parte y Concurrente en parte emitida
por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 4 de enero de 2017.

Hoy, por primera vez en la historia constitucional de
Puerto Rico, nos corresponde interpretar el término
*"partido político"* en el contexto de la disposición
constitucional que garantiza la representación de partidos
de minoría en la Asamblea Legislativa. *Véase* Art. III,

Sec. 7, Const. ELA, 1 LPRA. Ello, para determinar si en virtud del aludido precepto constitucional, y a la luz de los resultados obtenidos en los comicios electorales del pasado 8 de noviembre de 2016, el Partido Popular Democrático (en adelante, "P.P.D.") tiene derecho a que la Comisión Estatal de Elecciones (en adelante, "C.E.E.") certifique a dicha colectividad cinco (5) Senadores, en vez de los tres (3) que hasta este momento ha certificado.

En fin, en palabras del entonces Juez Asociado de este Tribunal señor Fuster Berlingeri, hace exactamente dos (2) décadas, en su Opinión Concurrente en parte y Disidente en parte, en *P.P.D. v. Peña Clos*, 140 DPR 779, 812 (1996):

> [n]os toca decidir si una de las disposiciones verdaderamente autóctonas de nuestra propia Constitución, relativa al orden político del país, tiene eficacia duradera o si, en cambio, sólo es una medida anodina que está sujeta a la merced del trapicheo partidista. En efecto, nos toca resolver si las minorías políticas en Puerto Rico tienen un sólido derecho propio a la representación legislativa o si en 1952 lo que quiméricamente se les otorgó fue un derecho tenue, que depende en realidad de las conveniencias y los vaivenes de los designados a ostentar esa representación.

Así las cosas, y por entender que el objetivo reparador de la cláusula constitucional en controversia solo se cumple reservando los escaños adicionales por minoría exclusivamente a los candidatos o candidatas pertenecientes a un partido o partidos políticos, disentimos en parte y concurrimos en parte con lo resuelto por una mayoría de este Tribunal en el día de hoy. Veamos.

I.

Como resultado de las elecciones generales celebradas en el país el 8 de noviembre de 2016, y por mandato de nuestro pueblo expresado en las urnas, para el cuatrienio 2017-2020, el Senado de Puerto Rico estará compuesto por veintiún (21) senadores del Partido Nuevo Progresista (en adelante, "P.N.P."), cuatro (4) senadores del P.P.D., un (1) senador del Partido Independentista Puertorriqueño (en adelante, "P.I.P."), y un (1) senador independiente, el Dr. José Vargas Vidot (en adelante, "Dr. Vargas Vidot"). Al obtener veintiún (21) de los veintisiete (27) escaños senatoriales, el P.N.P. logró el control de más de dos terceras (2/3) partes de los escaños en el referido cuerpo legislativo.

Ahora bien, a pesar de que el P.N.P. obtuvo sobre dos terceras partes (2/3) de los escaños en el Senado de Puerto Rico, su candidato a gobernador, el Dr. Ricardo Rosselló Nevares, obtuvo menos de dos terceras (2/3) partes de todos los votos emitidos para dicho cargo. Como consecuencia de ello, se activó el Art. III, Sec. 7, de la Constitución del Estado Libre Asociado, *supra*, que garantiza la representación de los partidos de minoría en la Asamblea Legislativa. Así las cosas, luego de los cómputos de rigor, la C.E.E. procedió a declarar electos y certificó como Senadores al licenciado José Nadal Power, al licenciado Miguel Pereira Castillo y al señor Cirilo Tirado Rivera.

Inconforme con dicho proceder, y en virtud de lo dispuesto en el Art. III, Sec. 7, de la Constitución del Estado Libre Asociado, *supra*, los señores Juan Pablo Hernández Santiago (en adelante, "señor Hernández Santiago"), Ángel M. Rodríguez Otero (en adelante, "señor Rodríguez Otero") y Ramón Ruiz Nieves (en adelante, "señor Ruiz Nieves"), solicitaron a la C.E.E. su certificación como Senadores por Acumulación. En esencia, éstos señalaron que, para fines de la aplicación de la referida cláusula constitucional, no se puede incluir en su cómputo al candidato independiente, Dr. Vargas Vidot, ni al candidato del P.I.P., el Lcdo. Juan Dalmau Ramírez (en adelante "licenciado Dalmau Ramírez"), como incorrectamente, en parte, lo hizo la C.E.E. Ello, puesto que estos no representan a un partido político, tal y como lo requiere nuestra Carta Magna. A dicha solicitud, se unió el Comisionado Electoral del P.P.D., mientras que el Comisionado Electoral del P.N.P. se opuso. Por su parte, el Comisionado Electoral del P.I.P. argumentó que el licenciado Dalmau Ramírez no puede ser considerado como un Senador independiente dado que ello es ajeno a la forma en que este aspiró -- y fue electo -- a su escaño.

Celebradas las vistas de rigor, y evaluados los planteamientos de todas las partes, la C.E.E. emitió su Resolución. Al así hacerlo, determinó que los escaños obtenidos por el candidato independiente, Dr. Vargas Vidot, y por el candidato del P.I.P., licenciado Dalmau

Ramírez, debían ser incluidos en el cálculo de los escaños de los partidos de minoría. En consecuencia, rechazó certificar senadores adicionales por el P.P.D. a los señores Hernández Santiago, Rodríguez Otero y Ruiz Nieves.

Inconformes con tal determinación, y con planteamientos similares a los expuestos ante la C.E.E., éstos últimos -- de forma individual -- recurrieron en revisión ante el Tribunal de Primera Instancia. Atendidas sus solicitudes, el foro primario consolidó los aludidos recursos y señaló vista para el 16 de diciembre de 2016.

En el ínterin, el pasado 15 de diciembre de 2016, tanto el Comisionado Electoral de P.P.D., los señores Ruiz Nieves y Rodríguez Otero, como la Comisionada Electoral del P.N.P. y el honorable Thomas Rivera Schatz, Presidente Electo del Senado, solicitaron -- en recursos distintos -- que este Tribunal certificase el aludido caso. A raíz de ello, el 15 de diciembre de 2016, este Tribunal emitió una Resolución mediante la cual consolidó ambos recursos, emitió una certificación intrajurisdiccional, paralizó los procedimientos ante el foro de instancia y le concedió un término a todas las partes para que se expresaran.

En cumplimiento con lo ordenado, las partes comparecieron ante nos y expusieron sus planteamientos de Derecho. Con el beneficio de sus comparecencias, una mayoría de este Tribunal -- en un atropellado ejercicio de interpretación constitucional -- confirmó la determinación de la C.E.E. y, en consecuencia, determinó que para fines

del cómputo requerido por el Art. III, Sec. 7, de la Constitución del Estado Libre Asociado, *supra*, no se incluyen al candidato independiente, Dr. Vargas Vidot, ni el Senador por el P.I.P., el licenciado Dalmau Ramírez.

De ese proceder, disentimos en parte y concurrimos en parte. Nos explicamos.

## II.

Como es sabido, el derecho al voto es "*una de las garantías fundamentales de nuestro ordenamiento constitucional*", *Ramírez de Ferrer v. Mari Bras*, 144 DPR 141, 173 (1997); *P.I.P. v. C.E.E.*, 120 DPR 580, 615 (1988), y "*la más preciada de las prerrogativas del pueblo, porque es a través del voto que el pueblo ejerce su poder soberano y expresa su voluntad*". *P.P.D. v. Adm. Gen. de Elecciones*, 111 DPR 199, 207 (1981). Así también ha sido reconocido por el Tribunal Supremo de los Estados Unidos. *Véase Reynolds v. Sims*, 377 US 533, 561-562 (1964) ("*[u]ndoubtedly, the right of suffrage is a fundamental matter in a free and democratic society […] the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights […]*"). *Véanse* además, *Bullock v. Carter*, 405 US 134 (1972); *Harper v. Virginia State Bd. of Elections*, 383 US 663 (1996).

En Puerto Rico, el derecho al voto tiene su génesis en el derecho natural de todos los seres humanos a elegir sus gobiernos; en la Constitución de Estados Unidos de

América; en la Constitución del Estado Libre Asociado de Puerto Rico; y en aquellos estatutos que imparten utilidad a las disposiciones constitucionales. *Véase* Art. 2.002 de la *Ley Electoral de Puerto Rico*, 16 LPRA sec. 4002.

Una de esas disposiciones constitucionales que persigue darle eficacia y efectividad al voto que cada cuatro (4) años emiten los puertorriqueños y las puertorriqueñas, lo es el Art. III, Sec. 7, de la Constitución del Estado Libre Asociado, *supra*, el cual procura evitar que una inadecuada distribución de los votos obtenidos por las minorías produzca el resultado indeseable de que su representación en las Cámaras no resulte proporcional a los votos que se obtuvieron en las urnas. En lo aquí pertinente, dicha disposición constitucional reza de la siguiente manera:

> **Representación de partidos de la minoría; miembros adicionales.**
>
> Cuando en una elección general resultaren electos más de dos terceras partes de los miembros de cualquiera de las cámaras por un solo partido o bajo una sola candidatura, según ambos términos se definan por ley, se aumentará el número de sus miembros en los siguientes casos:
>
> a) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hubiese obtenido menos de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, **se aumentará el número de miembros del Senado o de la Cámara de Representantes o de ambos cuerpos, según fuere el caso, <u>declarándose electos candidatos del partido o partidos de minoría</u> en número suficiente hasta que la totalidad de los miembros del <u>partido o partidos de minoría</u> alcance el número de nueve en el Senado** y de

diecisiete en la Cámara de Representantes. Cuando hubiere más de un partido de minoría, la elección adicional de candidatos se hará en la proporción que guarde el número de votos emitidos para el cargo de Gobernador por cada uno de dichos partidos con el voto que para el cargo de Gobernador depositaron en total esos partidos de minoría.

Cuando uno o más partidos de minoría hubiese obtenido una representación en proporción igual o mayor a la proporción de votos alcanzada por su candidato a Gobernador, no participará en la elección adicional de candidatos hasta tanto se hubiese completado la representación que le correspondiese bajo estas disposiciones, a cada uno de los otros partidos de minoría.

**Para seleccionar los candidatos adicionales de un partido de minoría, en cumplimiento de estas disposiciones, se considerarán, en primer término, sus candidatos por acumulación que no hubieren resultado electos, en el orden de los votos que hubieren obtenido y, en segundo término sus candidatos de distrito que, sin haber resultado electos, hubieren obtenido en sus distritos respectivos la más alta proporción en el número de votos depositados en relación con la proporción de los votos depositados a favor de otros candidatos no electos del mismo partido para un cargo igual en otros distritos.**

Los Senadores y Representantes adicionales cuya elección se declare bajo esta sección serán considerados para todos los fines como Senadores o Representantes por Acumulación.

**La Asamblea Legislativa adoptará las medidas necesarias para reglamentar estas garantías, y dispondrá la forma de adjudicar las fracciones que resultaren en la aplicación de las reglas contenidas en esta sección, <u>así como el número mínimo de votos que deberá depositar un partido de minoría a favor de su candidato a Gobernador para tener derecho a la representación que en la presente se provee</u>.** (Énfasis nuestro). Art. III, Sec. 7, Const. ELA, *supra*.

En cumplimiento con lo dispuesto en el aludido texto constitucional -- particularmente, en aquella parte que requiere que el poder legislativo adopte las medidas

reglamentarias dirigidas a garantizar lo expuesto en el
Art. III, Sec. 7 de nuestra Constitución, y lo relativo a
la forma de adjudicar las fracciones que resultaron en la
aplicación de las reglas contenidas en el mismo -- la
Asamblea Legislativa promulgó el Art. 10.015 de la *Ley
Electoral*, *supra*, el cual, en lo aquí pertinente,
establece que:

(1) A los fines de implantar el inciso (a) de la
Sección 7 del Artículo III de la Constitución de
Puerto Rico, cuando un partido que no obtuvo dos
terceras partes de los votos para el cargo de
Gobernador haya elegido sobre dos terceras
partes de los miembros de una o ambas cámaras,
**se hará la determinación de los senadores o
representantes adicionales que corresponda a
cada uno de dichos <u>partidos de minoría</u> en la
siguiente forma:**

(a) Se divide la cantidad de votos
emitidos para el cargo de Gobernador
de cada partido de minoría entre la
cantidad total de votos depositados
para el cargo de Gobernador de todos
los partidos de minoría;

(b) se multiplica el resultado de la
anterior división por nueve (9) en el
caso de los senadores y por
diecisiete (17) en el caso de los
representantes, y

(c) se resta del resultado de la
multiplicación que antecede, la
cantidad total de senadores o
representantes que hubiera elegido
cada partido de minoría por voto
directo.

**El resultado de esta última operación
matemática será la cantidad de senadores o
representantes adicionales que se adjudicará a
cada <u>partido de minoría</u> hasta completarse la
cantidad que le corresponda, de manera que <u>el
total de miembros de partidos de minoría</u> en los
casos que aplica el inciso (a) de la Sección 7
del Artículo III de la Constitución de Puerto**

**Rico sea nueve (9) en el Senado o diecisiete (17) en la Cámara de Representantes de Puerto Rico.**

(2) A los fines de las disposiciones establecidas en el inciso (b) de la Sección 7 del Artículo III de la Constitución de Puerto Rico, cuando un partido que en efecto obtuvo más de dos terceras partes de los votos para el cargo de Gobernador haya elegido más de dos terceras partes de los miembros de una o ambas cámaras, si hubiere dos o más partidos de minoría, la determinación de los senadores o representantes que correspondan a cada uno de dichos partidos de minoría se hará dividiendo la cantidad de votos emitidos para el cargo de Gobernador por cada partido político de minoría, por la cantidad total de votos depositados para el cargo de Gobernador para todos los partidos políticos y multiplicando el resultado por veintisiete (27) en el caso del Senado de Puerto Rico y por cincuenta y uno (51) en el de la Cámara de Representantes de Puerto Rico. En este caso se descartará y no se considerará ninguna fracción resultante de la operación aquí establecida que sea menos de la mitad de uno. El resultado de la operación consignada en este inciso constituirá la cantidad de senadores o representantes que le corresponderá a cada partido de minoría, y hasta esta cantidad se deberá completar, en lo que fuere posible, el total de senadores o de representantes de dicho partido de minoría.

Los senadores de todos los partidos de minoría nunca serán más de nueve (9) ni los representantes más de diecisiete (17). De resultar fracciones en la operación antes referida, se considerará como uno la fracción mayor para completar dicha cantidad de nueve (9) senadores y de diecisiete (17) representantes a todos los partidos de minoría y si haciendo ello no se completare tal cantidad de nueve (9) o de diecisiete (17) se considerará entonces la fracción mayor de las restantes, y así sucesivamente, hasta completar para todos los partidos de minoría la cantidad de nueve (9) en el caso del Senado de Puerto Rico y de diecisiete (17) en el caso de la Cámara de Representantes de Puerto Rico.

Al aplicar el párrafo antepenúltimo de la Sección 7 del Artículo III de la Constitución

de Puerto Rico se descartará y no se considerará fracción alguna que sea menos de la mitad de uno. En el caso que resulten dos fracciones iguales, se procederá con la celebración de una elección especial de conformidad con lo establecido en este subtítulo. **Ningún <u>partido de minoría</u> tendrá derecho a candidatos adicionales ni a los beneficios que provee la Sección 7 del Artículo III de la Constitución de Puerto Rico, a no ser que en la elección general obtenga a favor de su candidato a gobernador, una cantidad de votos equivalentes a un tres (3) por ciento o más del total de votos depositados en dicha elección general a favor de todos los candidatos a gobernador.** (Énfasis nuestro). 16 LPRA, sec. 4205.

De entrada, como se puede apreciar de una lectura detenida y desapasionada de las disposiciones constitucionales y legales antes transcritas -- pero, particularmente, de lo dispuesto en el Art. III, Sec. 7, de la Constitución del Estado Libre Asociado, *supra* -- podemos colegir que, en casos como el de autos, donde un partido político obtiene sobre dos terceras (2/3) partes de los escaños senatoriales y su candidato a gobernador obtiene menos de dos terceras (2/3) partes de todos los votos emitidos para dicho cargo, la mencionada disposición constitucional expresamente reserva los escaños adicionales por minoría a los candidatos o candidatas pertenecientes a un partido o partidos políticos. Contrario a lo señalado por una mayoría de este Tribunal, no cabe hablar aquí de candidatos o candidatas independientes[90]. Ello claramente no encuentra apoyo en el

---

[90] Como cuestión de hecho, los candidatos independientes a lo largo de nuestra historia constitucional y legal han tenido vida

texto del referido artículo de nuestra Constitución, que desde su título -- ***<u>Representación de partidos de la minoría</u>; miembros adicionales*** (énfasis nuestro) -- postula en contra del curso de acción seguido por la mayoría. Ello tampoco encuentra sustento en el historial y desarrollo de la normativa constitucional objeto de estudio en el presente caso.

Y es que del debate que tuvo lugar en la Convención Constituyente, relacionado a la aludida disposición constitucional, no queda duda alguna que tanto los proponentes de la medida, como el resto de los delegados que pertenecían a otros partidos políticos, coincidieron en que el propósito de la disposición bajo estudio era que

---

propia y distinta del concepto "partido político". Bastaría con señalar que, al momento de debatir y aprobar nuestra Carta Magna, la *Ley Electoral de Puerto Rico*, *supra*, contaba con una enmienda de 5 de mayo de 1928, mediante la cual se concibieron las candidaturas independientes en la política puertorriqueña. Es decir, dicha figura no era ajena a los delegados en la Asamblea Constituyente. Cónsono con ello, el Art. III, Sec. 8 de la Constitución del Estado Libre Asociado, contempla la figura del candidato independiente en el contexto de las cámaras legislativas. *Véase* Art. III, Sec. 8, Const. ELA, 1 LPRA. En este sentido, también resulta pertinente el Informe Complementario de la Comisión de la Rama Legislativa, en el cual se señaló que:

> [a]unque como hemos dicho antes los partidos políticos son instrumentos indispensables en la democracia, nuestras leyes electorales han reconocido siempre las candidaturas independientes y, pensando en que los ciudadanos no deben ser privados de la oportunidad de elegir en determinado momento candidatos que no pertenezcan a ningún partido político, se ha recomendado que las vacantes que puedan ocurrir en el cargo de un legislador así electo se cubran por elección general. 4 *Diario de Sesiones de la Convención Constituyente*, a la pág. 3215 (1961).

Asimismo, el Art. VI, Sec. 4 de la Constitución del Estado Libre Asociado, Art. VI, Sec. 4, Const. ELA, 1 LPRA, también contempla las candidaturas en el proceso electoral. A todas luces, resulta imperativo concluir que la denominada *Ley de Minorías, supra,* sólo aplica a partidos políticos, pues los constituyentes excluyeron de la misma a los candidatos independientes.

los partidos minoritarios tuviesen en el seno de la Asamblea Legislativa una cantidad de escaños que justificasen los votos obtenidos en los comicios electorales. Es decir, que el mecanismo propuesto -- y posteriormente aprobado -- de representación legislativa, tuviera el efecto de proteger el derecho de los partidos políticos a que cierto número de sus candidatos no electos, fungieran como representantes en los cuerpos legislativos, en proporción a la voluntad del pueblo expresada en las urnas. *Véase* 4 *Diario de Sesiones de la Convención Constituyente*, a las págs. 1553-1591 (1961). En palabras del delegado a la Convención Constituyente señor Padrón Rivera,

> *[…] este proceso electoral que va a escribirse en la constitución nuestra, merece la consideración y la aceptación del pueblo de Puerto Rico porque ello implica un camino libre y expedito para que **los partidos** pequeños tengan representación proporcional en razón a los votos que [se] emitan en las urnas electorales.* (Énfasis suplido). *Íd.*, a la pág. 1577.

En ese sentido, debemos recordar que, según se desprende del *Diario de Sesiones*, así como del *Informe Complementario de la Comisión de la Rama Legislativa* presentado a la Convención Constituyente el 28 de diciembre de 1951, con la incorporación en nuestra Constitución de la disposición en controversia -- entiéndase, el Art. III, Sec. 7, *supra* -- se persiguió subsanar lo que era un defecto del sistema de representación geográfica que, al momento en que se

redactaba nuestra Carta Magna y en lo relacionado a la composición de nuestros cuerpos legislativos, se prefería sobre el de representación proporcional.

En los sistemas mayoritarios o de representación geográfica, los escaños obedecen a distritos geográficos que se ganan con una mayoría simple de votos y el ganador representa la totalidad del electorado en esa jurisdicción. Los sistemas proporcionales, por otra parte, propenden al multipartidismo, no requieren dispersión geográfica y tienden a crear gobiernos inestables al depender de coaliciones partidarias. *Véase* H.L. Acevedo, *La democracia puertorriqueña y su sistema electoral*, Puerto Rico y su Gobierno Estructura, Retos y Dinámicas, P.R., Ed. SM, pág.292 (2016). Aunque la mayoría de los delegados en la Convención Constituyente rechazaban la representación proporcional, reconocían que el sistema de representación geográfica podía resultar en una representación minoritaria precaria y, por ende, poco saludable para la democracia. En palabras del propulsor de la fórmula contenida en el Art. III, Sec. 7 de la Constitución del Estado Libre Asociado, *supra*, el delegado Luis Negrón López, la misma se veía como: ***"la acción reparadora de completar la proporción a <u>los partidos</u> que no la obtuvieron"***. (Énfasis nuestro). *Diario de Sesiones*, *supra*, a la pág. 1581.

Sobre este particular, el prestigioso constitucionalista y pasado Juez Presidente de este

Tribunal, Don José Trías Monge, en su obra J. Trías Monge,

*Historia Constitucional de Puerto Rico*, Río Piedras, Ed.

U.P.R., 1982, Vol. III, sostiene que al  momento de

debatirse si se incluía o no el precitado artículo en

nuestra Carta Magna,

> *[e]ra la convicción general que la representación minoritaria debía fortalecerse, que no era deseable repetir la experiencia de 1948[91], que el sistema vigente permitía la acaparación [sic.] de la casi totalidad de los escaños por un partido, en exceso de su fuerza proporcional, a la par que les negaba a otros una representación comparable a su pujanza. De la otra parte, se estaba igualmente convencido de las fallas de la representación estrictamente proporcional. Se temía el fraccionamiento y la proliferación de los partidos usualmente resultantes de este tipo de sistema. **Se estimaba que Puerto Rico necesitaba <u>partidos fuertes</u>, capaces de dirigir por sí solos el país en la difícil tarea de su reconstrucción, sin necesidad de coaliciones comprometedoras.*** (Énfasis suplido). *Íd.*, a la pág. 145.

Con relación a dicha discusión, pero particularmente

a la primacía y protección que le brindaba a los partidos

políticos de minoría la incorporación del Art. III, Sec.

7, en la Constitución del Estado Libre Asociado, *supra*, el

delegado a la Convención Constituyente, el señor Negrón

López, propulsor de la fórmula en cuestión, sostuvo:

> […] en su segunda parte, este plan lo que se propone meramente es dar un poco de protección mayor a situaciones anómalas que pueden surgir,

---

[91] En las elecciones generales que tuvieron lugar en el año 1948, el Partido Popular Democrático obtuvo el 94.8 por ciento de los escaños legislativos (55 de los 58 existentes); sin embargo, dicho partido sólo obtuvo el 61.2 por ciento de los votos emitidos para el cargo de Gobernador. Por su parte, los partidos minoritarios, con 38.8 por ciento de dicho total de votos a su favor, solo obtuvieron tres escaños, equivalentes al 5.2 por ciento del total. *Véase*, J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, págs. 143-144.

cuando haya una distribución matemáticamente inequitativa de los votos, porque resulte así en las urnas, cosa que es inevitable. Bajo el segundo plan, bajo la segunda parte, lo que este plan se propone es que todavía, cuando la situación no sea la de 1948, sino cuando la situación sea más difícil todavía, cuando sea una situación verdaderamente precaria para las minorías electorales, [cuando] su fuerza electoral no llegue al treinta y tres por ciento de los votos, este plan le garantiza una representación igual a la que obtuvieron en las urnas, **a los partidos** que no la hayan obtenido, dentro de la tercera parte del número original de miembros de una cámara.

Significa esto que si los partidos de minoría, en conjunto, obtienen menos del treinta y tres y un tercio [por ciento] de los votos que se depositan en una elección, y obtienen menos del treinta y tres y un tercio [por ciento] de los miembros de una cámara, y ocurre la situación anómala de que alguno de esos partidos, habiendo obtenido determinada proporción en el electorado, no haya obtenido una proporción igual en los votos, hasta donde queda dentro de la tercera parte del numero original de miembros, **se aumenta la representación de esos partidos minoritarios**. (Énfasis nuestro). *Íd.*, a la pág. 1580.

Por su parte, el delegado a la aludida Convención Constituyente, en el debate de la referida norma constitucional, el señor Solá Morales, señaló lo siguiente:

La realidad es que, consecuente con la historia, consecuente con los precedentes legislativos y con la actitud de este partido y con la forma en que se condujeron las últimas elecciones y con la forma en que está constituida esta Convención Constituyente, **el partido de la mayoría, que tiene más de dos terceras partes de la [Asamblea] Legislativa actualmente, está tomando aquí una medida en virtud de la cual se proteja a las minorías en el sentido de que tengan en la Asamblea Legislativa de Puerto Rico la cantidad de representantes que merecen en proporción a los votos que saquen en la elección.** No es que la mayoría se quiera asegurar dos terceras

partes de los miembros que compongan la Asamblea Legislativa de Puerto Rico. **La mayoría lo que tiene preparado aquí es un proyecto, y creo que votará por ese proyecto, para que cada <u>partido político</u> tenga en la Asamblea Legislativa de Puerto Rico la representación que en justicia le corresponda de acuerdo con los votos que tiene.** Y lo que aquí se presenta es un proyecto de enmienda en el sentido de que de cualquier manera, tenga o no tenga votos, cualquiera que inscriba una candidatura, tenga representantes en la [Asamblea] Legislativa. Nosotros creemos que eso está bien hasta el punto en que esa representación sea proporcionada a sus fuerzas en la opinión pública, y así se ha preparado un proyecto, y así lo estamos discutiendo aquí, señor Presidente y compañeros delegados. (Énfasis nuestro). *Íd.*, a la pág. 1565.

De igual forma, es menester señalar que incluso la minoría política en la Convención Constituyente, que presentó reparos con la fórmula propuesta por preferir una representación estrictamente proporcional de los partidos minoritarios, reconoció que el sujeto de lo que hoy se encuentra codificado en el Artículo III, Sección 7, de la Constitución del Estado Libre Asociado, *supra*, son los partidos políticos. En este sentido, se expresó el delegado a la Convención Constituyente señor Reyes Delgado:

[d]ecía el compañero Negrón que el error es que nosotros estamos pensando en partidos políticos. Yo confieso que yo estoy pensando en partidos políticos. Aquí estamos escribiendo una constitución para Puerto Rico, ¿y es qué en Puerto Rico los partidos políticos no significan nada? ¿No tienen ellos derechos que deban defenderse? ¿No son ellos los vehículos a través de los cuales se hace la labor democrática? ¿No nos hemos preocupado por las escuelas; no nos hemos preocupado por las iglesias de modo que no haya preferencia para ninguna? ¿Por qué no nos hemos de preocupar también por los partidos políticos? Y yo le pregunto ahora y no tiene que

contestarme en voz alta, al compañero Negrón, que me conteste desde el fondo de su conciencia, ¿por qué fue que se cambió el texto que originalmente se pensó en la proposición, no oficial, pero impresa, sustituta? Porque de acuerdo con lo que se entendía por el lenguaje en que estaba escrito el párrafo (b), podría resultar que el partido de la mayoría no tuviera las dos terceras partes de las cámaras. **Se pensó en término de partidos y creo que fue muy bien hecho que se presentara [el asunto] en términos de partido**. *Íd.*, a la pág. 1586.

Cabe mencionar que el delegado a la Convención Constituyente señor Padrón Rivera opinó sobre la propuesta de representación de partidos de minoría que, al considerar los estados de la Unión Norteamericana y las veinticuatro repúblicas de Hispanoamérica, no existía procedimiento más democrático en cuanto a representación proporcional de minorías. En este sentido, reconoció la importancia del sistema de representación que se debatía: "*la importancia de que sienta un principio tan claro de democracia y de oportunidades de_ **partidos minoritarios** *para compartir la responsabilidad en la rama legislativa […]*". *Íd.,* a la pág. 1576.

Por último, también resulta altamente ilustrativo lo recogido en el *Informe Complementario de la Comisión de la Rama Legislativa*, cuando -- en referencia a lo dispuesto en la precitada disposición constitucional -- los miembros de ese Comité, al hacer constar los motivos que les movieron a proponer la innovadora fórmula que posteriormente fue adoptada en el Art. III, Sec. 7 de nuestra Carta Magna, *supra*, consignaron lo siguiente:

[...] es posible que una inadecuada distribución de los votos obtenidos por las minorías produzca el resultado indeseable de que su representación en las cámaras no guarde proporción con los votos que obtengan en las urnas. Previendo esta situación la Comisión ha elaborado un plan de representación que garantiza una justa representación a los grupos minoritarios que no la obtengan en razón a los factores señalados. No se ha elaborado este plan a base del principio de representación proporcional, porque entendemos que no es recomendable ni debe adoptarse. El sistema de representación proporcional equivaldría a reproducir en el instrumento legislativo la misma división de criterios que exista en el cuerpo electoral, y con su adopción el proceso democrático no produciría el resultado de fijar la responsabilidad del gobierno en los grupos favorecidos por la opinión pública. Sin embargo, entendemos que la misión fiscalizadora de las minorías no puede cumplirse eficazmente si no hay la garantía de cierto mínimo de representación en proporción a los votos que las minorías obtengan, consideradas en conjunto. La Comisión entiende que siendo justa y adecuada la división en distritos representativos y senatoriales que se hace en la constitución, y proveyéndose para la elección de un número razonablemente alto de legisladores por acumulación, hay suficiente garantía para que los distintos criterios de opinión pública estén representados en la Asamblea Legislativa. **No obstante, para el caso de que esto no resulte así, la Comisión ha recomendado que si un partido o una sola candidatura elige más de dos terceras partes de los miembros de una cámara, se aumente de manera automática la composición de esa cámara para fortalecer la representación minoritaria bajo dos circunstancias distintas la primera, cuando los partidos de minoría han obtenido más de la tercera parte del voto total emitido para el cargo de Gobernador, en el cual caso el número de miembros de la cámara se aumentará de manera que la representación total de las minorías sea igual a la tercera parte del número original de miembros de dicha cámara; y la segunda, cuando los partidos de minoría han obtenido menos de la tercera parte de dichos votos, en el cual caso se aumentará la composición de dicha cámara declarándose electos adicionalmente candidatos minoritarios para que la representación de cada partido de minoría guarde proporción con los votos que haya obtenido para el cargo de**

**Gobernador**, en la medida en que esto sea posible sin que la representación total minoritaria exceda de la tercera parte del número original de miembros de la cámara. Para el aumento de miembros de una cámara en la forma antes dispuesta, el número original de miembros del Senado será siempre veintisiete (27) y el de la Cámara de Representantes cincuenta y uno (51). […] (Énfasis nuestro). *Diario de Sesiones*, *supra*, a las págs. 2595–2596.

En fin, del texto de las disposiciones constitucionales y legales antes transcritas; de la jurisprudencia aplicable; de los debates en el seno de la Convención Constituyente, según recogidos en su Diario de Sesiones; así como del *Informe Complementario de la Comisión de la Rama Legislativa;* y de los acercamientos que hacen prestigiosos tratadistas de derecho constitucional a este tema, surge con extrema claridad que el sujeto a quien el constituyente quiso tutelar directamente al aprobar el Art. III, Sec. 7, de la Constitución del Estado Libre Asociado, *supra*, fue al partido político e, indirectamente, a los miembros que formarían parte de la Asamblea Legislativa (en este caso, sus Senadores).

Como acertadamente indicó uno de los peticionarios -- el señor Hernández Santiago -- en su comparecencia ante la C.E.E., la mencionada disposición constitucional contiene dos referencias. La primera nos indica de donde saldrán los candidatos electos que se añaden -- de los partidos políticos -- y la segunda referencia nos indica cuántos han de ser -- nueve (9). La primera referencia a *"partido*

*o partidos de minoría"* no puede incluir a los candidatos o candidatas independientes, pues estos no tienen candidatos o candidatas adicionales que puedan declararse electos. Si la primera referencia a partidos de minoría no incluye los candidatos independientes, tampoco lo puede la segunda referencia, que es dependiente de la primera. Así pues, los *"miembros del partido o partidos de minoría"* que tienen que alcanzar el número de nueve, son los del *"partido o partidos de minoría"* de donde surgen los candidatos adicionales

Acorde con dicha interpretación resultan ser las expresiones de la entonces Jueza Asociada del Tribunal Supremo, señora Naveira Merly, quien, en su Opinión Concurrente en *P.P.D. v. Peña Clos I*, *supra*, a las págs. 806-807, en el contexto de una controversia relacionada al análisis de la disposición constitucional bajo estudio, sostuvo que el propósito de misma era ofrecer a los partidos minoritarios la capacidad de ejercer su función fiscalizadora en relación con la gestión legislativa. En este sentido, sentenció: **"*[a]l disponer de esta forma, el Constituyente proveyó una garantía para que la voz de los distintos núcleos de opinión tuviera una efectiva repercusión en la Asamblea Legislativa, a través de los partidos políticos*"**. (Énfasis suplido). Dicho de otro modo, *"[…]la representación de minorías aludida [en el Art. III, sec. 7 de nuestra Constitución] está atada y se conduce a través de los partidos políticos minoritarios"*.

*Íd.*, a las págs. 819-820, citando con aprobación a *P.I.P. v. Comisión Electoral*, 120 DPR 580 (1988). *Véanse* además *García Passalacqua v. Tribunal Electoral*, 105 DPR 49, 55 (1976); *Fuster v. Busó*, 102 DPR 327 (1974).

Como bien señaló el entonces Juez Asociado Señor Fuster Berlingeri, en su Opinión Concurrente en parte y Disidente en parte en *P.P.D. v. Peña Clos I*, *supra*, a la pág. 821, dicha interpretación no resulta contraria a aquella parte del *Informe Complementario de la Comisión de la Rama Legislativa de la Convención Constituyente*, que establece que el Art. III, Sec. 7, de la Constitución del Estado Libre Asociado, *supra*, se crea *"como medida de dar justa interpretación a la voluntad del pueblo y no como una concesión a partidos políticos"*. En el precitado caso, el entonces Juez Asociado Fuster Berlingieri reconoce -- y quien suscribe, coincide -- que la referida cláusula constitucional es *"una garantía para los votantes que se agrupan en tales partidos, no para la estructura que los organiza. Pero al momento de implantar la garantía, el medio que se utiliza para alcanzar su propósito gira en torno al partido que agrupa a los electores de minoría"*. *Íd.*

Por otro lado, la interpretación que del texto constitucional objeto del presente litigio realizamos tampoco es contrario a lo resuelto en *Guadalupe v. C.E.E.*, 165 D.P.R. 106 (2005). Adviértase que allí, este Tribunal se enfrentó a una controversia similar a la presente,

donde un candidato a Legislador Municipal que acudió a las elecciones de 2004 como candidato independiente alegaba tener derecho a ocupar el último escaño de Legislador Municipal que la *Ley de Municipios Autónomos* le reservaba. No obstante, el caso ante nuestra consideración versa sobre la vigencia de la cláusula constitucional de minorías. Aquí, a diferencia de en *Guadalupe*, no estamos ante una patente violación a la intención del pueblo, manifestada a través de su voto. Por el contrario, en caso ante nos, es precisamente dicha intención la que se intenta salvaguardar.

Siendo ello así, tal como mencionamos anteriormente, y contrario a lo erróneamente resuelto por una mayoría de este Tribunal, no albergamos duda alguna que el objetivo reparador de la cláusula constitucional en controversia solo se cumple reservando los escaños adicionales por minoría exclusivamente a los candidatos o candidatas pertenecientes a un partido o partidos políticos, sin incluir en su cálculo a los candidatos independientes.

Lo anterior, claro está, sin burlar las dos terceras (2/3) partes que el Art. III, Sec. 7, de la Constitución del Estado Libre Asociado, *supra*, le reserva al partido político de mayoría; en este caso, el P.N.P. Ello, pues según resuelto en *Fuster v. Busó, supra*,

> [se] quiere evitar el resultado anómalo de que mediante la donación de escaños adicionales las minorías resulten tener más de una tercera parte de los miembros de una o ambas Cámaras Legislativas cuando el partido de la mayoría

haya obtenido esas dos terceras partes o más. Esto es así porque hay asuntos que requieren las dos terceras partes o más de los votos y de lo contrario los escaños adicionales donados podrían frustrar el mandato electoral. *Íd.*, a las págs. 336-337.

III.

De otra parte, resulta medular para la correcta disposición de las controversia ante nos, recordar que un partido político, contrario a un candidato o candidata independiente -- quien por definición, aspira a un cargo público electivo sin haber sido nominado por un partido político, -- se estructura a través de un andamiaje jurídico particular. Así claramente se desprende del Artículo 2.003 de la *Ley Electoral*, *supra*, el cual define **_Partido_** como el "*[p]artido político que participó en la elección general precedente y que obtuvo la cantidad de votos en la candidatura a Gobernador no menor de tres por ciento (3%) ni mayor de veinticinco por ciento (25%) de los votos válidos emitidos para todos los candidatos a Gobernador*". 16 LPRA sec. 4003. Por otra parte, el término **_Candidato Independiente_** se define como "*toda persona que sin haber sido nominada formalmente por un partido político figure como candidato a un cargo público electivo en la papeleta electoral, conforme las disposiciones de esta Ley*". *Íd*. Como se puede apreciar, la diferencia entre uno y otro es clara.

Primero, para la inscripción de un partido político, la *Ley Electoral*, *supra*, requiere la presentación ante la

C.E.E. de peticiones de inscripción juradas de un mínimo de electores no menor del tres por ciento (3%) del total de votos válidos emitidos para todos los candidatos al cargo de gobernador en la elección general precedente. Además, se requiere la presentación de un programa de gobierno, así como la identificación de los candidatos que se postularán a cargos electivos y de los individuos que compondrán su organismo directivo central, entre otras. *Véase* 16 LPRA sec. 4091. De igual forma, se le asigna un fondo electoral. *Íd.* Ello no es así en el caso de los candidatos independientes.

Según ha sido reconocido por esta Curia en *PAC v. ELA*, 150 DPR 359 (2000), *"los partidos políticos han asumido un rol cada vez más extenso e importante en el funcionamiento cotidiano de los estados modernos, y que existe una correlación entre el sistema de partidos y el ordenamiento constitucional"*. A la luz de dicho rol, también hemos señalado que *"[e]n nuestra democracia los partidos políticos son indispensables para su funcionamiento. Están investidos de poderes cuasi gubernamentales.* ***Constituyen el vehículo de expresión colectiva ciudadana para canalizar pacíficamente las distintas tendencias políticas e intereses de los varios sectores de opinión del país"***. (Énfasis suplido) (Citas internas omitidas). *P.R.P. v. ELA*, 115 DPR 631, 638 (1984).

A ese partido político, el cual tiene un andamiaje jurídico particular y muy distinto al de las candidaturas independientes, es el que se refiere el Art. III, Sec. 7 de la Constitución del Estado Libre Asociado, *supra*, cuando, en aquellos casos en que es de aplicación el mismo, postula que "se *aumentará la cantidad de miembros del Senado o de la Cámara de Representantes o ambos, según fuere el caso, declarándose así electos candidatos del partido o partidos de minoría hasta que la totalidad de los miembros del partido o partidos de minoría logre el número de nueve en el Senado"*. En ese sentido, y como mencionamos anteriormente, esto es un elemento adicional para concluir que aquí no cabe hablar de candidatos independientes al momento de realizar el cómputo de los nueves miembros de minoría que, por mandato constitucional, debe tener el Senado de Puerto Rico.

Es, precisamente, a la luz del marco jurídico antes expuesto que debemos disponer de las controversias ante nuestra consideración.

IV.

En el presente caso, es un hecho incontrovertido que el P.N.P. obtuvo sobre dos terceras (2/3) partes de los escaños senatoriales, mientras que su candidato a gobernador, el Dr. Ricardo Rosselló Nevares, obtuvo menos de dos terceras (2/3) partes de todos los votos emitidos para dicho cargo. Lo anterior es una de esas instancias en la que es de aplicación el inciso (a) del Art. III, Sec.

7, de la Constitución del Estado Libre Asociado, *supra*. Contrario a lo resuelto por la C.E.E., y erróneamente validado por una mayoría de este Tribunal, a la luz de la normativa antes expuesta, procedía que el referido organismo electoral declarase electos a los candidatos del partido o partidos de minoría en número suficiente hasta que la totalidad de los miembros del partido o partidos de minoría alcanzara el número de nueve (9); ello claro está, sin incluir al candidato independiente, el Dr. Vargas Vidot.

Cónsono con lo anterior, en virtud de la cláusula constitucional -- y toda vez que en representación de los partidos políticos solo resultaron electos cuatro (4) senadores del P.P.D. y uno (1) del P.I.P., para un total de cinco (5) -- le correspondía a la minoría del P.P.D. cuatro (4) escaños adicionales, en vez de los tres (3) otorgados por la C.E.E. El total de nueve (9) miembros de la minoría pertenecientes a los partidos políticos, se cumple al certificarse los cuatro (4) senadores por el P.P.D. **Es así, y solo así, que se estaría cumpliendo con la voluntad de los fundadores de nuestra Constitución**. Una interpretación en sentido contrario equivaldría a minar la trascendental función fiscalizadora que nuestros constituyentes delegaron en los partidos políticos de minoría. A tales efectos, *véase Silva v. Hernández Agosto*, 118 DPR 45, 70, citando el *Informe de la Comisión de la*

*Rama Legislativa de la Convención Constituyente, supra*, a la pág. 2590, a saber:

> […] Es básico para la salud democrática que las minorías tengan una representación que, aun bajo las circunstancias más desfavorables, les permita cumplir adecuadamente su función de fiscalizar y estimular a la mayoría en su obra de gobierno sin crear entorpecimientos que puedan resultar en detrimento de la democracia. En todo caso, el pueblo debe tener los medios para asegurarse de que sus representantes respondan siempre a la verdadera voluntad de los representados.

Así las cosas, ordenaríamos a la C.E.E. certificar electo a un senador adicional del P.P.D. para ocupar un escaño por minoría en el Senado de Puerto Rico, según dispuesto en la aludida *cláusula de minorías*.

En ese sentido, y conforme lo exige la Constitución del Estado Libre Asociado, a los efectos de seleccionar los candidatos adicionales de un partido de minoría, se considerarán, primeramente, sus candidatos por acumulación que no hubieren resultado electos, en el orden de los votos que hubieren obtenido y, en segundo lugar sus candidatos de distrito no electos, que hubieren obtenido en sus respectivos distritos "la más alta proporción en el número de votos depositados en relación con la proporción de los votos depositados a favor de otros candidatos no electos del mismo partido para un cargo igual en otros distritos". Art. III, Sec. 7, Const. ELA, 1 LPRA.

Al añadir estos cuatro escaños adicionales para el P.P.D., la composición final del Senado sería: 21 escaños por el P.N.P.; 8 escaños por el P.P.D.; 1 escaño por el

P.I.P., y 1 escaño para candidato independiente, para un total de 31 escaños. Con este resultado, el P.N.P. controlaría 21 de los 31 escaños equivalente al 67.74%. De este modo, mantendría la mayoría de dos terceras (2/3) partes, conforme al resultado electoral. De esta forma, garantizaríamos la expresión libre del ciudadano, emitida a través de su voto, así como la representación en la asamblea legislativa a los partidos políticos que, por minoría, les otorga el Art. III, Sec. 7, de la Constitución del Estado Libre Asociado, *supra*.

Así pues, por los fundamentos antes expuestos, disentimos de lo resuelto por una mayoría de este Tribunal en cuanto a esta parte de la controversia ante nos.

V.

Ahora bien, lo dispuesto anteriormente no es óbice para reconocer -- tal como lo hemos hecho en el cómputo que antecede -- que, en el cálculo de los nueve (9) senadores que deben componer la minoría en el Senado de Puerto Rico, debe incluirse el escaño que ocupa el representante del P.I.P., el licenciado Dalmau Ramírez. El P.I.P. compareció a la elección general del pasado 8 de noviembre de 2016 como un partido político debidamente inscrito y en cumplimiento con todas las exigencias legales y reglamentarias establecidas en el ordenamiento electoral puertorriqueño. Así lo entendieron los miles de ciudadanos y ciudadanas que, al momento de emitir su voto, depositaron su confianza en el referido partido político.

Esa realidad, si bien quedó alterada luego del resultado de las elecciones al no quedar inscrito el P.I.P., no debe ser impedimento para que este Tribunal vindique la voluntad de los electores, quienes, como bien reconoce la C.E.E., votaron a favor de un partido político que, en tal momento, estaba debidamente inscrito. Desvirtuar dicha realidad, utilizando para ello el resultado post elecciones -- es decir, que el P.I.P. no quedo inscrito -- sería ir en contra de la voluntad de los electores y electoras al momento de ejercer su derecho al voto.

No podemos avalar la interpretación de que ante la pérdida de la contienda electoral, se obvien los escaños legislativos obtenidos a nombre de una colectividad que cumplió con los requisitos y compareció ante el electorado como un partido político de minoría. En este sentido, conviene repasar las expresiones de este Tribunal en *Democratic Party v. Tribunal Electoral*, 107 DPR 1, a la pág. 14 (1978), a saber:

> Los movimientos políticos no mueren de repente al llegar la medianoche. La pérdida de la franquicia electoral […] no marca necesariamente la extinción del partido o agrupación bajo el cual se aglutinan unos electores de minoría con un programa, planes de gobierno e ideas para enfrentar la problemática del país. La tradición política, los usos y costumbres, a lo largo de nuestro ejercicio democrático, reconoce la subsistencia del partido minoritario como grupo que aún habiendo perdido la condición de partido político inscrito por no llevar a las urnas en una época el 10%, y hoy el 5% del total de votos depositados para determinado cargo, **sobrevive la pérdida de su franquicia manteniéndose por la intensidad de su cohesión ideológica, como grupo**

**de minoría con una voz respetable en el consenso de opinión pública general.** (Énfasis nuestro).

Siendo ello así, resulta forzoso concluir que el licenciado Dalmau Ramírez, al ocupar su escaño legislativo, representará la voluntad del electorado identificado por el P.I.P., partido bajo cuya insignia aspiró. Es precisamente por ello que nos vemos impedidos de considerarlo como un "candidato independiente" para efectos de añadir un escaño adicional al P.P.D. Concurrimos, pues, con esta parte de la determinación que hoy toma el Tribunal.

V.

En atención a los fundamentos antes discutidos, disentimos en parte y concurrimos en parte, del curso de acción seguido por una mayoría de este Tribunal en el día de hoy.

Ángel Colón Pérez
Juez Asociado